UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SAMUEL TAYLOR GOINES,** *individually and on behalf of all others similarly situated,*<br><br>      **Plaintiff,**<br><br>      v.<br><br>**CELSIUS NETWORK, LLC, CELSIUS LENDING, LLC, CELSIUS KEYFI LLC, ALEXANDER MASHINSKY, SHLOMI "DANIEL" LEON, DAVID BARSE, and ALAN JEFFREY CARR,**<br><br>      **Defendants.** | Civ. No. 22-cv-04560 (KM) (ESK)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

Before the Court in this putative federal securities class action are the motions for appointment as lead plaintiff and appointment of counsel as lead counsel by:

(i) a group of individual plaintiffs consisting of Jonathan Holt and Matthew Coffey (collectively, the "Holt Group") (DE 12);[1]

(ii) plaintiff Chrishan de Almeida (DE 13);

(iii) a group of individual plaintiffs consisting of Patrick Gayle, Ari Ovadia, Daniel Rooney, Samuel Trego, and Alfons Eggink (collectively, the "Gayle Group") (DE 14);

(iv) a group of individual plaintiffs consisting of Noël Dernesch and Benjamin Robertson (together, "Dernesch & Robertson") (DE 15); and

---

[1] Certain citations to the record are abbreviated as follows:

   DE = docket entry

   Compl. = Complaint (DE 1)

    (v)    a group of individual plaintiffs consisting of s Zack Kaplan, Eli Kaplan, Benjamin Kaplan, Michael Kaplan, and Michael Mazzotta (collectively, the "Kaplan/Mazzotta Group") (DE 16).

After filing their motions, the Gayle Group and Dernesch & Robertson entered notices of non-opposition. (DE 26; DE 27.) The Holt Group opposes the motion of de Almeida but does not oppose the motion of the Kaplan/Mazzotta Group. (DE 30; DE 34.)

For the reasons set forth herein, the Kaplan/Mazzotta Group is appointed lead plaintiff, Scott+Scott Attorneys at Law LLP is designated as lead counsel, and the Radice Law Firm is designated as liaison counsel.

## I. BACKGROUND
### A. Factual Summary

The underlying federal securities action is brought on behalf of purchasers of various products offered by Celsius Network LLC ("Celsius") from February 9, 2018, to the present. Plaintiff Samuel Taylor Goines, individually and on behalf of all others similarly situated, alleges violations of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), and state law.

Celsius is a company that allegedly "generates revenue through cryptocurrency trading, lending, and borrowing, the sale of its unregistered securities, as well as engaging in proprietary trading." (Compl. ¶ 2.) Celsius, through its affiliates Celsius Lending LLC and Celsius KeyFi LLC, is alleged to have sold unregistered securities in the form of "Earn Rewards Accounts" and "CEL Tokens," and to have provided loans to investors who deposited CEL Tokens or other digital assets in exchange for a loan ("Celsius Loan"). (*Id.* ¶ 5.) Collectively, I will refer to the Earn Rewards Accounts, CEL Tokens, and Celsius Loans as the "Celsius Products."

### 1. Celsius Products

This action concerns three products offered by Celsius:

First, an Earn Rewards Account is a product through which an investor may "lend crypto assets to Celsius in exchange for Celsius' promise to provide a variable monthly interest payment." (*Id.* ¶ 6.) According to the complaint, the Earn Rewards Accounts are not protected by the Securities Investor Protection Corporation, are not insured by the Federal Deposit Insurance Corporation, and are not registered with any securities regulatory authority. (*Id.* ¶ 4.)

Second, a CEL Token is a "platform utility token" that is "rewarded to crypto holders in the Celsius Wallet as interest on their coins." (*Id.* ¶ 48.) Celsius promoted CEL Tokens as an investment that paid dividends and as a credit that could be used to purchase a Celsius Loan. (*Id.* ¶ 60.) However, the complaint alleges that the "real purpose" of the CEL Token was to "create an Initial Coin Offering [] that netted [Celsius] $50 million without strings to start financing their operations." (*Id.* ¶ 80.) The complaint asserts that CEL Tokens can be "minted out of thin air" and "serve[] no purpose for investors." (*Id.* ¶ 81.)

Third, the Celsius Loan is a promissory note offered and sold by Celsius to investors who deposited their digital assets as collateral with Celsius. (*Id.* ¶¶ 53, 55.) Celsius collected monthly interest payments on the loans. (*Id.* ¶ 55.)

### 2. Misleading Statements

Plaintiff alleges that Celsius made numerous misleading and false statements when promoting its products. (*Id.* ¶ 57.)

Many of the alleged misrepresentations come from weekly YouTube podcasts hosted by Celsius using the "Ask Me Anything" or "AMA" format, whereby investors could ask questions directly to Alexander Mashinsky who is the CEO and founder of Celsius, as well as other Celsius representatives. (*Id.* ¶¶ 15, 63.)

The complaint alleges that, during the AMAs, Mashinsky and other Celsius representatives made various statements regarding Celsius's "borrower-friendly stance on liquidation." (*See id.* ¶¶ 65, 68–69, 73.) For example, on February 5, 2021, a Celsius representative stated that Celsius will "liquidate only when someone is not answering our margin calls and he/she

keeps being in default. We give a lot of time. A lot more than others. Trust me. Sometimes weeks to answer our margin calls!" (*Id.* ¶ 65.) On April 23, 2021, Mashinsky stated that a "margin call doesn't mean we sold your assets or stole your coins. That's what the other guys do. We always give you ample time to post more collateral, return some of the assets, or instruct us to sell your coins." (*Id.* ¶ 69.)

Additionally, Mashinsky is alleged to have promoted the "stability and wherewithal" of the CEL Token on numerous occasions. (*See id.* ¶¶ 67, 70, 66, 71–73.) For example, on May 28, 2021, Mashinsky stated: "Looking at coins, the CEL Token was one of the most stable out there. It did better than Bitcoin or Ethereum. It did not drawdown as much." (*Id.* ¶ 70.)

Furthermore, the complaint alleges, Mashinsky made Twitter posts promoting CEL Tokens and encouraging CEL Token holders not to sell. For example, on December 9, 2021, Mashinsky tweeted: "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token." (*Id.* ¶ 94.) Despite that statement, the complaint states that Mashinsky was "secretly selling millions of dollars' worth of CEL Tokens." (*Id.* ¶ 89.) Since June 2021, plaintiff estimates that Mashinsky sold approximately 2.8 million CEL Tokens worth over $16 million. (*Id.* ¶ 95.)

### 3. Cease and Desist Notices

On September 17, 2021, the New Jersey Bureau of Securities (the "Bureau") issued a summary cease and desist order against Celsius. (*Id.* ¶ 31.) The Bureau found that the Earn Rewards Accounts were securities under New Jersey law and were neither registered with the Bureau nor exempt from such registration. (*Id.*) Therefore, the Bureau found that Celsius was offering and selling unregistered securities in violation of New Jersey law. (*Id.*)

Around the same time, the Texas Bureau of Securities issued a similar cease and desist notice of hearing against Celsius. (*Id.* ¶ 33.)

### 4. June 2022 Announcement

On June 13, 2022, Celsius paused all user withdrawals, swaps, and transfers. (*Id.* ¶¶ 104, 110.) According to Celsius's official announcement, this was done "due to extreme market conditions in order to stabilize liquidity and operations while we take steps to preserve and protect assets." (*Id.* ¶ 110.) About one year prior to the announcement, the CEL Token price was $7.73. Following the announcement, the CEL Token price was $0.28. (*Id.* ¶ 214.)

### B. Procedural History

Plaintiff filed the complaint on July 13, 2022. (DE 1.) On September 13, 2022, five competing motions were filed, all seeking appointment as lead plaintiff and approval of selection of lead counsel: (1) the motion of the Holt Group (DE 12); the motion of Chrishan de Almeida (DE 13); the motion of the Gayle Group (DE 14); the motion of Dernesch & Robertson (DE 15); and the motion of the Kaplan/Mazzotta Group (DE 16). The Gayle Group and Dernesch & Robertson soon filed notices of non-opposition to the competing motions. (DE 26; DE 27.) The remaining movants—the Holt Group, de Almeida, and the Kaplan/Mazzotta Group—filed opposition briefs on October 3, 2022 (DE 30; DE 31; DE 32) and reply briefs thereafter (DE 33; DE 34; DE 35). Notably, the Holt Group opposes the motion of de Almeida but does not oppose the motion of the Kaplan/Mazzotta Group.[2] (DE 30; DE 34.)

### C. Causes of Action

Plaintiff alleges that the Celsius Products are securities under the Securities Act, that they are not registered with the SEC, and that no

---

[2] The Holt Group concedes that the Kaplan/Mazzotta Group appears to have the largest financial interest in the relief sought by the class and appears to satisfy the Rule 23 requirements at this stage. However, the Holt Group does oppose de Almeida's motion. Thus the Holt Group submits that, if the Court determines that the Kaplan/Mazzotta Group is not the presumptive lead plaintiff, the Holt Group has the next greatest financial interest and should be appointed as lead plaintiff over the other potential plaintiffs, including de Almeida. Because I find that the Kaplan/Mazzotta Group is the presumptive lead plaintiff, *see infra,* I need not consider the Holt Group's opposition to de Almeida's appointment as lead plaintiff.

5

exemption to registration applies. (Compl. ¶ 186.) Plaintiff alleges that the class has suffered damages as a result of their purchase of the unregistered Celsius Products. (*Id.* ¶ 190). Additionally, plaintiff alleges that defendants "carried out a plan, scheme and course of conduct that Celsius intended to and did deceive" plaintiff and the class members by making false or misleading statements. (*Id.* ¶¶ 194–97.) Plaintiff alleges that defendants' statements were material and that the defendants acted with scienter. (*Id.* ¶¶ 200, 203.) Furthermore, plaintiff alleges that he and the class members relied on those statements and were thereby damaged. (*Id.* ¶ 212.) Plaintiff also alleges that that defendants artificially inflated the price of the CEL Tokens and were unjustly enriched when they sold the Celsius Products at the inflated prices. (*Id.* ¶ 239–40.)

Count I alleges a violation of Section 5 and 12(a)(1) of the Securities Act. Count II alleges a violation of Section 10b of the Securities Act and Rule 10b-5 promulgated thereunder. Count III alleges a violation of Section 20(a) of the Securities Act. Count IV alleges a violation of Section 20A of the Exchange Act. Count V alleges a violation of Section 15 of the Securities Act. Count VI alleges unjust enrichment under New Jersey law. Count VII seeks a declaratory judgment from the Court declaring that any current or open Celsius Loans are void and unenforceable.

## II. LEGAL STANDARD

The Private Securities Litigation Reform Act of 1995 (the "PSLRA") governs the appointment of the lead plaintiff in "each private action arising under the [Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1). The PSLRA directs courts to adopt a rebuttable presumption that "the most adequate plaintiff is the person or group of persons that has (1) either filed the complaint or made a motion in response to the notice to the class; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Federal Rule of Civil Procedure 23." *Lewis v. Lipocine Inc.*, No. 16-cv-4009, 2016 WL 7042075, at *4 (D.N.J. Dec. 2, 2016) (citing *Fields v.*

*Biomatrix, Inc.*, 198 F.R.D. 451, 456 (D.N.J. 2000) and 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)).

At this stage, in the context of the PSLRA, Rule 23 requires that the party or parties seeking to represent a class (1) have claims or defenses that are typical of the claims or defenses of the class, (the "typicality requirement") and (2) be able to fairly and adequately protect the interests of the class, (the "adequacy requirement"). *See* Fed. R. Civ. P. 23(a); *In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001); *Lewis*, 2016 WL 7042075, at *4. A more thorough analysis, of course, will occur at the class certification stage.

"Once a presumptive lead plaintiff is located, the court should then turn to the question [of] whether the presumption has been rebutted." *In re Cendant*, 264 F.3d at 268. The presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also In re Cendant*, 264 F.3d at 268 ("[T]he question *is not* whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a 'fair[] and adequate[]' job." (citation omitted) (alterations in original)).

### III.    MOTION TO APPOINT LEAD PLAINTIFF

#### A. Timely Motion in Response to Notice of the Class

The Kaplan/Mazzotta Group and de Almeida submitted timely motions to be appointed as lead plaintiff. The PSLRA provides that, once a complaint is filed, the pendency of the action must be publicized in a widely circulated national business-oriented publication or wire service within 20 days. 15 U.S.C. § 78u-4(a)(3)(A)(i). The notice shall advise members of: (1) the pendency of the action; (2) the claims asserted therein; (3) the purported class period; and (4) the right to move the court to be appointed as lead plaintiff within 60

7

days of notice. *Id.* In this case, adequate notice was published through Business Wire on July 15, 2022. (DE 16-4.) The Kaplan/Mazzotta Group and de Almeida filed their motions on September 13, 2022. These motions were timely filed within the 60-day deadline after publication and therefore meet this first requirement.

### B. Largest Financial Interest

The Kaplan/Mazzotta Group asserts that it has the largest financial interest in the relief sought by the class. Together, the members of the Kaplan/Mazzotta Group claim a financial loss of $3,621,545.80. (DE 16-1 p. 6; DE 33-3; DE 39.) Specifically, Zack Kaplan claims a financial interest of $1,121,017.63; Michael Mazzotta claims a financial interest of $1,105,521.35; Eli Kaplan claims a financial interest of $573,243.04; Benjamin Kaplan claims a financial interest of $421,257.73; and Michael Kaplan claims a financial interest of $400,506.05. (DE 16-5; DE 33-3; DE 39.) De Almeida asserts that he has the largest financial interest with his claimed total expenses of $883,060.05 and loss of $370,654.61. (DE 13-2 p. 6; DE 13-6.)

I rank the amounts, aggregate and individual, by size in table format:

| Movant(s) | Claimed Loss |
|---|---|
| Kaplan/Mazzotta Group | $3,621,545.80 |
| Zack Kaplan | $1,121,017.63 |
| Michael Mazzotta | $1,105,521.35 |
| Chrishan de Almeida (total) | $883,060.05 |
| Eli Kaplan | $573,243.04 |
| Benjamin Kaplan | $421,257.73 |
| Michael Kaplan | $400,506.05 |
| Chrishan de Almeida (loss) | $370,654.61 |

If the Kaplan/Mazzotta Group's claimed amounts are aggregated—and indeed, even if not—its members clearly have the largest financial interest.

### C. Rule 23 Requirements

There are four requirements for class certification under Rule 23(a): the class must be "so numerous that joinder of all members is impracticable," "there are questions of law or fact common to the class," "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These four requirements are frequently referred to as numerosity, commonality, typicality, and representation.

"[O]f the four requirements for class certification under Rule 23(a), only two—typicality and adequacy of representation—directly address whether a lead plaintiff movant is the 'most adequate plaintiff.'" *Chao Sun v. Han*, No. 15-cv-703, 2015 WL 2364937, at *3 (D.N.J. May 14, 2015) (citation omitted). At this stage of the litigation, the parties need make only a *prima facie* showing of typicality and adequacy, as determined by the Court in its independent judgment. *In re Cendant*, 264 F.3d at 264 (explaining that "both the statutory structure and the legislative history [of the PSLRA] suggest that the court's initial inquiry as to whether the movant with the largest losses satisfies the typicality and adequacy requirements need not be extensive").

#### 1. Typicality

"The typicality requirement is satisfied if the plaintiff, as a result of the same course of conduct, suffered the same injuries as the other class members, and their claims are based on the same legal issues." *Lifestyle Invs., LLC v. Amicus Therapeutics, Inc.*, No. 15-cv-7448, 2016 WL 3032684, at *7 (D.N.J. May 26, 2016); *see also In re Cendant*, 264 F.3d at 264–65 ("[I]n inquiring whether the movant has preliminarily satisfied the typicality requirement, [courts] should consider whether the circumstances of the movant with the largest losses 'are markedly different or the legal theory upon

9

which the claims [of that movant] are based differ[] from that upon which the claims of other class members will perforce be based.'") (quoting *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988)). The Rule 23(a)(3) typicality requirement "is to ensure that maintenance of a class action is economical and that the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Chao Sun*, 2015 WL 2364937, at *5 (citation and internal quotation omitted).

      Here, the Kaplan/Mazzotta Group members' claims arise from the same event or course of conduct that gives rise to the other class members' claims and are based on the same legal theory. The Kaplan/Mazzotta Group alleges that they stand in the same shoes as all members of the class, in that "the sale of unregistered Celsius [] Products and the fraudulent misstatements concerning them violated the federal securities laws" and "they purchased the unregistered Celsius [] Products during the Class Period in reliance upon defendants' false and misleading statements and suffered damages thereby." (DE 16-1 pp. 7–8.) Therefore, I find that the Kaplan/Mazzotta Group has made a *prima facie* showing of typicality.

### 2. Adequacy of Representation

      When assessing the adequacy of the representation, "courts should consider whether [the movant] 'has the ability and incentive to represent the claims of the class vigorously, [whether the movant] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class.'" *In re Cendant*, 264 F.3d at 265 (quoting *Hassine*, 846 F.2d at 179)). In doing so, the court should be mindful of two additional caveats. First, the court should consider whether the movant "lack[s] legal experience or sophistication, intend[s] to select as lead counsel a firm that [is] plainly incapable of undertaking the representation, or ha[s] negotiated a clearly unreasonable fee agreement with its chosen counsel." *In re Cendant*, 264 F.3d at 265. Importantly, however,

> the question at this stage is not whether the court would "approve" [the] movant's choice of counsel or the terms of its retainer agreement or whether another movant may have chosen better lawyers or negotiated a better fee agreement; rather, the question is whether the choices made by the movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all.

*Id.* at 266.

Second, where "the movant with the largest interest in the relief sought by the class is a group rather than an individual person or entity," a court should consider whether "the way in which a group seeking to become lead plaintiff was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff." *Id.* The text of the PSLRA permits the appointment of a "person or group of persons" to be the lead plaintiff. 15 U.S.C. § 74u-4(a)(3)(B)(iii)(I). The group of persons does not need to be "related" in some manner; but any such group must be able to "fairly and adequately protect the interests of the class." *In re Cendant*, 264 F.3d at 266–67. While unrelated groups may be considered together as plaintiffs under the PSLRA, there are circumstances where such groups may not be appropriate:

> If, for example, a court were to determine that the movant "group" with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the members of that "group" could not be counted on to monitor counsel in a sufficient manner.

*Id.* at 267. In determining whether the group will "fairly and adequately" represent the interests of the class, the following factors are instructive: "(i) whether the [members of the group] had a pre-existing relationship, (ii) the extent of that relationship, (iii) whether the group was created by the efforts of lawyers for the purpose of obtaining lead plaintiff status, and (iv) whether the group is too large to adequately represent the Class." *Chao Sun*, 2015 WL 2364937, at *4 (citing *In re Cendant*, 264 F.3d at 266–67.)

11

The Kaplan/Mazzotta Group is represented by counsel with deep experience in securities litigation, and their choice of counsel does not tend to indicate that they cannot fairly and adequately represent the interests of the class. (*See* DE 16-7; DE 16-8.) There are no known conflicts between the Kaplan/Mazzotta Group and the members of the class, and, based on their significant financial losses, the Kaplan/Mazzotta Group appears to have a sufficient interest in the outcome of the case to ensure vigorous advocacy.

As to the group's size, the Third Circuit has stated that, generally, "groups with more than five members are too large to work effectively." *In re Cendant*, 264 F.3d at 267. The Kaplan/Mazzotta Group comprises just five members, and I find no concern regarding the size of the group.

The group members' relationship is a natural and preexisting one. Michael Kaplan is the father of Zack Kaplan, Benjamin Kaplan, and Eli Kaplan. (*See* DE 33-2 ¶¶ 3–6.) (I will collectively refer to these four as the "Kaplan Family.") The Kaplan Family and Mazzotta submitted a joint declaration explaining that, prior to seeking appointment as lead plaintiff, they had multiple calls with their proposed lead counsel, Scott+Scott Attorneys at Law LLP, and a group call to discuss the case. (*Id.* ¶ 12.) However, the Kaplan Family explains that they, as a family, decided to seek appointment as co-lead plaintiff with Mazzotta "based on [their] respective financial loses, and in order to gain the advantages of joint decision-making, collective resources, full coverage for all of the Celsius [] Products alleged, and to provide the Class stable representation." (DE 33-2 ¶ 9; *see* DE 16-6.) Additionally, the Kaplan Family has a total financial interest of $2,516,024.45, which is far greater than Almeida's interest of $883,060.05 (with $370,654.61 in losses). This circumstance eases any concerns about the Kaplan Family and Mazzotta coming together solely to aggregate losses. *See Aguilar v. Vitamin Shoppe, Inc.*, No. 17-cv-6454, 2018 WL 1960444, at *11 (D.N.J. Apr. 25, 2018).

Therefore, I find that the Kaplan/Mazzotta Group has made a *prima facie* showing of adequacy of representation.

\* \* \*

The Kaplan/Mazzotta Group is entitled to the presumption that they are the most adequate plaintiffs. They made a timely motion, have the largest financial interest in the relief sought by the class, and satisfy the typicality and adequacy prongs of Rule 23.

### D. Rebuttable Presumption

Once a movant is presumptively the most adequate plaintiff, this presumption

> may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—
>
> > (aa) will not fairly and adequately protect the interests of the class; or
> >
> > (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 74u-4a(3)(B)(iii)(II). In accordance with the statute, the burden falls on de Almeida to support these two rebuttal factors with proof.

In his opposition, de Almeida makes a number of arguments, but fails to provide any evidence demonstrating that the Kaplan/Mazzotta Group "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render [it] incapable of adequately representing the class." *See id.* I address each of de Almeida's arguments below.

First, de Almeida argues that there is a "recent trend" to "reject unrelated groups." (DE 31 p. 6.) I am unpersuaded that de Almeida's position has legal weight or that it is particularly applicable to the situation here. First, under Third Circuit precedent, there is no rigid requirement that the group of persons be "related." *In re Cendant*, 264 F.3d at 266–67. For support, de Almeida cites to only one "recent" case in this Circuit, *Takata v Riot Blockchain, Inc.*, No. 18-cv-2293, 2018 WL 5801379 (D.N.J. Nov. 6, 2018), which I find is distinguishable from the present action. In *Takata*, the court was concerned with the appointment of "three seemingly unconnected strangers from across the count[r]y" with no "information regarding how these . . . apparent strangers

13

from different states found each other." 2018 WL 5801379, at *5. Here, the Kaplan/Mazzotta Group does not consist of unconnected strangers; four of the five individuals are immediate family, dispelling any concern that this is a "loose, attorney-driven group of investors." *See id.* at *5.

Second, de Almeida argues that the Kaplan/Mazzotta Group provided "no client- or class-driven reason for [its] grouping[]." (DE 31 pp. 7–8.) De Almeida is incorrect. The Kaplan/Mazzotta Group submitted a joint declaration stating that they decided to seek appointment as co-lead plaintiff "based on [their] respective financial loses, and in order to gain the advantages of joint decision-making, collective resources, full coverage for all of the Celsius [] Products alleged, and to provide the Class stable representation." (DE 33-2 ¶ 9; *see* DE 16-6.) Additionally, the case on which de Almeida relies, *Stires v. Eco Sci. Sols., Inc.*, No. 17-cv-3707, 2018 WL 5784817 (D.N.J. Feb. 14, 2018), is distinguishable from the present action. In *Stires*, the court was concerned with the appointment of "five apparent strangers from different states." 2018 WL 5784817, at *5. Here, again, de Almeida treats the Kaplan/Mazzotta Group as unrelated individuals and ignores the fact that four of the five individuals are immediate family members whose interests in their parallel investments would naturally align.

Third, de Almeida argues that the Kaplan/Mazzotta Group's joint declaration is insufficient because it is "boilerplate" and is signed by only Zack Kaplan and Mazzotta. De Almeida provides no explanation for his conclusory position that the joint declaration is "boilerplate." (DE 31 p. 9.) In any event, the Court has already concluded that the joint declaration provides a *prima facie* showing of typicality and adequacy; de Almeida fails to provide any proof, as required, to rebut that presumption. Additionally, although only Zack Kaplan and Mazzotta signed the joint declaration, the joint declaration explains that Zack is speaking on the Kaplan Family's behalf and his signature is made "on behalf of the Kaplan Family." (DE 16-6.) To rectify any concern, however,

the Kaplan/Mazzotta Group submitted an updated joint declaration signed by all group members. (DE 33-2.)

Fourth, de Almeida challenges the Kaplan/Mazzotta Group's "joint decision-making process" by making a conclusory, single-sentence argument: "There is no reason to think this purported dispute resolution mechanism exists, could work, or would comply with the PSLRA." (DE 31 p. 11.) Absent from de Almeida's conclusory, speculative argument is any proof sufficient to rebut the presumption.

Fifth, de Almeida argues that the court cannot consider the members of the group individually. (DE 31 pp. 12–13.) For support, de Almeida cites to cases addressing whether the court could break apart a group and appoint an individual member of the group as lead plaintiff. *See, e.g., Takata*, 2018 WL 5801379, at *5 (rejecting request to break apart a group and appoint one member as lead plaintiff). I find that this argument has no application to this action because the Kaplan/Mazzotta Group members have not asked the Court to break apart the group and appoint an individual member as lead plaintiff. Any consideration I give to the financial loss of an individual member of the Kaplan/Mazzotta Group relates to whether that individual member can fairly and adequately represent the class and does not concern whether the individual member should be appointed as the sole lead plaintiff. *See Aguilar*, 2018 WL 1960444, at *11 (considering that each member of the group had a higher financial loss than the competing movant when determining whether the group could fairly and adequately represent the interests of the class).

Sixth, de Almeida argues that the Kaplan/Mazzotta Group's loss charts are insufficient because they do not state the total financial interest, and Zack Kaplan's loss chart includes blank rows. (DE 31 p. 13.) De Almeida provides no explanation as to why those technicalities render the loss charts so faulty as to rebut the presumption. The Kaplan/Mazzotta Group submitted a loss chart for each group member; the loss charts are formatted as tables and list each

15

transaction with its corresponding approximate value in a way that allows the reader to calculate the financial interest. (*See* DE 16-5.)[3]

\*   \*   \*

For the reasons stated above, none of de Almeida's arguments provide the requisite proof to rebut the presumption that the Kaplan/Mazzotta Group is the most adequate plaintiff. Therefore, the Kaplan/Mazzotta Group's motion to be appointed lead plaintiff is granted.

### IV. MOTION TO APPOINT LEAD COUNSEL

The PSLRA vests authority in the lead plaintiff to select and retain counsel, subject to the approval of the court. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). Under Federal Rule of Civil Procedure 23(g)(1), "a court that certifies a class must appoint class counsel." In appointing class counsel the court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The court will not disturb the plaintiff's choice of counsel unless it is "necessary to protect the interests of the plaintiff class." *See In re Cendant*, 264 F.3d at 274.

The Kaplan/Mazzotta Group has selected Scott+Scott Attorneys at Law LLP as lead counsel and the Radice Law Firm as liaison counsel. (DE 16-1 pp. 10–13.) I have reviewed the firms' submissions (DE 16-7; DE 16-8), and I find that both firms meet the criteria of Rule 23(g). Both firms have experience litigating similar class actions, and have demonstrated their knowledge of the

---

[3] At the Court's request, the Kaplan/Mazzotta Group resubmitted their loss charts with the total amounts included. (*See* DE 33-3; DE 39.) *See In re Cendant*, 264 F.3d at 262 (stating that "a district court would be well within its discretion . . . in seeking further information if it deems the original submissions to be an inadequate basis for an informed decision."). This request was made for convenience and in an abundance of caution; the evidence was sufficient in its original form.

16

applicable law and the resources they are willing to commit to representing the class.

As a result, Scott+Scott Attorneys at Law LLP is appointed as lead counsel and the Radice Law Firm is appointed as liaison counsel.

## V. CONCLUSION

For the foregoing reasons, the motion of Zack Kaplan, Eli Kaplan, Benjamin Kaplan, Michael Kaplan, and Michael Mazzotta to be appointed as lead plaintiffs (DE 16) is **GRANTED**. Their choice of Scott+Scott Attorneys at Law LLP as lead counsel and the Radice Law Firm as liaison counsel for the class is approved.

The motions of Jonathan Holt and Matthew Coffey (DE 12); Chrishan de Almeida (DE 13); Patrick Gayle, Ari Ovadia, Daniel Rooney, Samuel Trego, and Alfons Eggink (DE 14); and Noël Dernesch and Benjamin Robertson (DE 15) are **DENIED**.

An appropriate order accompanies this opinion.

Dated: April 14, 2023

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**