**RADICE LAW FIRM**
John Radice (Bar No. 023612004)
475 Wall Street
Princeton, NJ 08540
Telephone: 646-245-8502
Facsimile: 609-385-0745
jradice@radicelawfirm.com

**SCOTT+SCOTT ATTORNEYS
AT LAW LLP**
Jonathan M. Zimmerman (Bar No.
204322016)
Sean T. Masson (admitted *pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jzimmerman@scott-scott.com
smasson@scott-scott.com

*Attorney for Plaintiffs*

[Additional Counsel Appear on Signature Page.]

**SCOTT+SCOTT ATTORNEYS
AT LAW LLP**
John T. Jasnoch (admitted *pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
jjasnoch@scott-scott.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ZACK KAPLAN, BEN KAPLAN, MICHAEL KAPLAN, ELI KAPLAN, and MICHAEL MAZZOTTA, Individually and on Behalf of Themselves and All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>ALEXANDER MASHINSKY, SHLOMI "DANIEL" LEON, HANOCH GOLDSTEIN, HARUMI URATA-THOMPSON, JEREMIE BEAUDRY, KRISTINE MASHINSKY, AM VENTURES HOLDING, INC., KOALA1 LLC, and WINTERMUTE TRADING LTD.,<br><br>        Defendants. | Case No. 2:22-cv-04560-KM-ESK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Lead Plaintiffs Zack Kaplan, Ben Kaplan, Michael Kaplan, Eli Kaplan, and Michael Mazzotta ("Plaintiffs"), along with named Plaintiffs Taylor Goines, Matthew Coffey and Jonathan Holt, bring this action on behalf of themselves and all others similarly situated against Defendants Alexander Mashinsky, Shlomi "Daniel" Leon, Hanoch Goldstein, Harumi Urata-Thompson, Jeremie Beaudry, Kristine Mashinsky, AM Ventures Holding, Inc., Koala1 LLC, and Wintermute Trading Ltd.  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit on behalf of all people who purchased Celsius Financial Products by way of a Celsius Earn Rewards Account, the so-called native "CEL Tokens," and/or the Celsius Loans (collectively referred to as the "Celsius Financial Products"), and suffered damages as a result.

2.      Celsius was a financial services company that generated revenue through cryptocurrency trading, lending, and borrowing the sale of its unregistered securities, as well as engaging in proprietary trading.

3.      Celsius offered and sold Celsius Earn Rewards Accounts to investors, through which investors lent crypto assets to Celsius in exchange for Celsius' promise to provide a variable monthly interest payment.  Celsius generated the interest paid out to Earn Rewards Accounts by deploying its assets in various ways, including loans of crypto assets made to institutional and corporate borrowers, lending U.S. dollars and stablecoins to retail investors, and by investing in other highly speculative cryptocurrency ventures.  Celsius then pooled these cryptocurrencies together to fund its lending operations and proprietary trading.

4.      Celsius investors were promised a better-than-market interest rate that was paid monthly in cryptocurrency in exchange for investing in the Earn Rewards Accounts.  The Earn Rewards Accounts were not protected by the Securities Investor Protection Corporation (the "SIPC") nor were they insured by the Federal Deposit Insurance Corporation (the "FDIC"). Furthermore, the Earn Rewards Accounts were not registered with the United States Securities and Exchange Commission ("SEC"), the New Jersey Commissioner of Corporations ("New Jersey Commissioner"), the California Commissioner of Corporations ("California Commissioner"), or any other securities regulatory authority, or exempt from registration.  Despite the additional risk, and lack of safeguards and regulatory oversight, as of March 2021, Celsius held the equivalent of $10 billion from the sale of these unregistered securities in violation of federal and state securities laws, which peaked at over $25 billion later that year.

5.      From February 9, 2018, Celsius, through its affiliates Celsius Lending LLC and Celsius KeyFi LLC, was, at least in part, funding its lending operations and proprietary trading through the sale of unregistered securities in the form of Earn Rewards Accounts and CEL tokens, and through providing loans to investors that deposited CEL Tokens or other digital assets in exchange for a fiat cash loan (a "Celsius Loan").

6.      The Earn Rewards Accounts and Celsius Loans were securities under the securities test set forth in *Reves v. Ernst & Young*, 494 U.S. 56, 64-66 (1990) and its progeny.  Additionally, all of the Celsius Financial Products were investment contracts under the four-prong test set forth in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases

discussed by the SEC in its Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO.[1]

7.      Worse still, throughout the Relevant Period, Defendants made a series of misleading statements that induced unsuspecting investors to purchase the Celsius Financial Products at inflated rates.  Further, Defendants engaged in, and financially benefitted from, a multifaceted scheme to commit acts of malfeasance such that they should be held personally liable.

8.      In June 2022, the cryptocurrency market in general faced a downtrend, with the prices of digital assets decreasing across the board.  This broader market downturn exposed the fragility of the Celsius ecosystem and, more importantly, that Celsius did not have enough assets on hand to meet its withdrawal obligations.  Much like a literal Ponzi scheme, Defendants could only maintain their yield rate promises by continually bringing in new investors whose new influx of money would be used to pay off the yield for old investors.

9.      Because of Defendants' unregistered offers and sales of securities, the New Jersey Bureau of Securities issued a cease-and-desist order to Celsius dated September 17, 2021, requiring the Company to cease and desist from "offering for sale any security, including any Earn Rewards product," "accepting any additional assets into an existing Earn Rewards account," and, most importantly, "violating any other provisions of the Securities Law."[2]

---

[1]      Securities and Exchange Commission, Release No. 81207, *Report of Investigation Pursuant to Section(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017).

[2]      State of New Jersey Bureau of Securities, *Summary Cease and Desist Order, In the Matter of Celsius Network, LLC* (Sep. 17, 2021).

## PARTIES

*Plaintiffs*

10.     Lead Plaintiff Zack Kaplan ("Z. Kaplan") is a citizen of the State of New York and resides in Brooklyn, New York.  As set forth in his previously filed sworn certification (ECF No. 16-5), Lead Plaintiff Z. Kaplan purchased Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

11.     Lead Plaintiff Ben Kaplan ("B. Kaplan") is a citizen of the State of New York and resides in Brooklyn, New York.  As set forth in his previously filed sworn certification (ECF No. 16-5), Lead Plaintiff B. Kaplan purchased Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

12.     Lead Plaintiff Michael Kaplan ("M. Kaplan") is a citizen of the State of New York and resides in Brooklyn, New York.  As set forth in his previously filed sworn certification (ECF No. 16-5), Lead Plaintiff M. Kaplan purchased Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

13.     Lead Plaintiff Eli Kaplan ("E. Kaplan") is a citizen of the State of New York and resides in Brooklyn, New York.  As set forth in his previously filed sworn certification (ECF No. 16-5), Lead Plaintiff E. Kaplan purchased Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

14.     Lead Plaintiff Michael Mazzotta ("Mazzotta") is a citizen of the State of California and resides in San Diego, California.  As set forth in his previously filed sworn certification (ECF No. 16-5), Lead Plaintiff Mazzotta purchased Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

15.     Plaintiff Taylor Goines ("Goines") is a citizen of the State of Arkansas and resides in Rogers, Arkansas.  As set forth in his previously filed sworn certification (ECF No. 1-2), Plaintiff Goines purchased Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

16.     Plaintiff Matthew Holt ("Holt") is a citizen of the State of Minnesota and resides in Mankato.  As set forth in his previously filed sworn certification (ECF No. 12-2), Plaintiff Holt purchased Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

17.     Plaintiff Matthew Coffey ("Coffey") is a citizen of the United Kingdom and resides in Southampton.  As set forth in his previously filed sworn certification (ECF No. 12-2), Plaintiff Coffey purchased Celsius Financial Products during the Relevant Period and suffered investment losses as a result of Defendants' conduct.

*Defendants*

18.     Defendant Alexander Mashinsky ("Mashinsky") is a resident and citizen of New York, living in New York, New York.  Mashinsky was the founder and Chief Executive Officer of Celsius, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

19.     Defendant Shlomi Daniel Leon ("Leon") is a resident and citizen of New York, living in New York, New York.  Leon was the co-founder of Celsius and served as an executive director and the Chief Operating Officer, and he exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

5

20.     Defendant Hanoch "Nuke" Goldstein ("Goldstein") is a resident and citizen of New York, living in New York, New York.  Goldstein was a co-founder of Celsius Network, LLC, Celsius Lending LLC, and Celsius Network Limited from each companies' respective inception until March 21, 2022.  Goldstein also served on the ExCO from its inception until the end of his tenure at Celsius, and the Risk Committee from on or around September 2021 until March 2022.  Upon information and belief, Mr. Goldstein regularly attended, participated in, and received materials from the ExCO and Risk Committee meetings during his time at Celsius, even if he was not a member of that committee at the time.  Throughout the Relevant Period, Goldstein exercised control over the various Celsius entities and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

21.     Defendant Harumi Urata-Thompson ("Urata-Thompson") is a resident and citizen of New York, living in New York, New York.  Urata-Thompson served as the Chief Investment Officer of Celsius Network Limited and Celsius Network, Inc. from April 2020 through November 2021.  Upon information and belief, Urata-Thompson served on: (1) the ALCO from its inception in July 2021 until the end of her tenure at Celsius; (2) the New Business Committee from the beginning of her employment with Celsius until it was disbanded in July 2021; (3) the Risk Committee from its inception on December 20, 2020 until the end of her tenure at Celsius; (4) the Deployment Committee as its chair from its inception on April 7, 2020 until it was disbanded; (5) the A&O Committee from its inception on April 7, 2020 until it was disbanded; (6) the Investment Committee in or around 2020; and (7) the ExCO from the beginning of her employment with Celsius until her departure.  Upon information and belief, Urata-Thompson regularly attended, participated in, and received materials from the ExCO, ALCO, New Business Committee, Investment Committee, Deployment Committee, A&O Committee, and Risk

Committee meetings during her time at Celsius, even if she was not a member of the applicable committee at the time.  During her tenure with the various Celsius entities, Urata-Thompson exercised control over those entities and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

22.     Defendant Jeremie Beaudry ("Beaudry") is a resident and citizen of Georgia that conducts business New York (or did so during the Relevant Period).  Beaudry served as the General Counsel, Chief Compliance Officer, and Secretary to the Board of Celsius Network Limited from April 7, 2020 to September 2021.  Beaudry served as the CCO of Celsius Lending LLC and Celsius Networks Lending LLC from its inception until September 2021.   Upon information and belief, Beaudry also served on the: (1) Risk Committee from April 2021 to July 2021; (2) the A&O Committee as its chair from its inception on April 7, 2020 until it was disbanded; (3) the Regulatory Committee from its inception on April 7, 2020 until the end of his tenure at Celsius; and (4) the ExCO from the beginning of his employment with Celsius until the end of his tenure at Celsius.  Upon information and belief, Beaudry regularly attended, participated in, and received materials from the A&O Committee, ExCO, Regulatory Committee, and Risk Committee meetings during his time at Celsius, even if he was not a member of that committee at the time.  During his tenure with the various Celsius entities, Beaudry exercised control over Celsius and directed and/or authorized, directly or indirectly, the sale and/or solicitation of Celsius Financial Products to the public.

23.     Kristine Meehan Mashinsky ("K. Mashinsky") is a resident and citizen of New York, living in New York, New York.  K. Mashinsky is the spouse of Celsius' former CEO, Alex Mashinsky.

24.     Defendants Mashinsky, Leon, Goldstein, Urata-Thompson, and Beaudry are collectively referred to as the "Executive Defendants."  The Executive Defendants and K. Mashinsky are collectively referred to as the "Individual Defendants."

25.     Defendant AM Ventures Holding, Inc. ("AMV") is a Delaware corporation with its principal place of business located in New York.  Upon information and belief, AMV is wholly-owned by Defendant Mashinsky.

26.     Defendant Koala1 LLC ("Koala1") is a Delaware corporation with its principal place of business located in New York.  Upon information and belief, Koala1 is wholly-owned by Defendant Mashinsky.

27.     Defendant Wintermute Trading LTD ("Wintermute") is the operator of an algorithmic trading platform intended to provide liquidity for digital assets, with its headquarters located at 1 Ashley Road, Cheshire, United Kingdom WA14 2DT.

**JURISDICTION AND VENUE**

28.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1331, and pursuant to 28 U.S.C. §1331 and §27 for the Exchange Act claims.  The Court has supplemental jurisdiction over the entire action under 28 U.S.C. §1367.

29.     Venue is proper under 28 U.S.C. §1391 because Defendants have their principal place of business in this District and therefore reside in this District.  Venue is further proper pursuant to 15 U.S.C. §78aa.

30.     This Court has personal jurisdiction over Defendants because they are subject to general jurisdiction in this District because Defendants' principal place of business is in this District.

## FACTUAL ALLEGATIONS

**A.     Celsius Background**

*There is no rules in this business.* – Alexander Mashinsky, CEO and Founder of Celsius

31.     Celsius began as Celsius Network Limited – a privately held company that was incorporated on February 9, 2018, with its registered office located at 77-79 New Cavendish Street, London, England, and its headquarters at 35 Great St. Helen's, London, England, EC3A 6AP.

32.     On June 23, 2021, Celsius Network Limited announced that it was "migrating our main business activity and headquarters from the United Kingdom to the United States" and was withdrawing its "application from the UK Financial Conduct Authority's temporary registration regime for crypto assets."[3]  The Company stated that its "efforts will be focused on securing licenses and registrations in the US and other jurisdictions that will ensure the long-term viability of Celsius and its community."[4]

33.     In anticipation of this migration to the United States, Celsius formed a new corporate entity, Celsius Networks, LLC and opened its headquarters in Hoboken, New Jersey.

34.     For its entire existence, Celsius was a financial services company, generating revenue through cryptocurrency trading, lending, and borrowing, as well as by engaging in propriety trading.  From June 2018, Celsius was, at least in part, funding its lending operations and proprietary trading through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts.  Celsius referred to these unregistered securities as its "Earn Rewards" accounts.

---

[3]     Celsius Network, *Celsius Community Update – June 23, 2021*, (Jun. 23, 2021), https://blog.celsius.network/celsius-community-update-june-23-2021-a28fca899091.

[4]     *Id.*

35.     Defendants solicited investors to invest in the Earn Rewards accounts by depositing certain eligible cryptocurrencies into the investors' accounts at Celsius.  Celsius then pooled these cryptocurrencies together to fund its various income generating activities, including lending operations and proprietary trading.  In exchange for investing in the Earn Rewards product, investors were promised an attractive interest rate that is paid weekly in the same type of cryptocurrency as originally invested, or, subject to certain conditions, in Celsius' native digital token CEL.

36.     The Celsius Earn Rewards Accounts, CEL Tokens, and the Celsius Loans were not registered with any state or federal securities regulatory authority, nor were they otherwise exempt from registration.  Celsius' Earn Rewards accounts were not protected by the SIPC, insured by the FDIC, nor are they insured by the National Credit Union Administration ("NCUA").

37.     This lack of a protective scheme or regulatory oversight subjected Celsius investors to additional risks not borne by investors who maintained assets with most SIPC member broker-dealers, banks and savings associations, or credit unions.

38.     Despite the lack of safeguards that SIPC, FDIC, and the NCUA would offer or the regulatory oversight of registration, Celsius held the equivalent of more than $14 billion from the sale of these unregistered securities in violation of the securities laws as of August 18, 2021.

39.     On September 17, 2021, the New Jersey Bureau of Securities (the "Bureau") issued a Summary Cease and Desist Order against Celsius.  In this order, the Bureau made the following findings: (1) the Earns Reward product was a security as defined in N.J. Stat. Ann. §49:3-49(m) (West); (2) the "Earns Reward product had not been registered with the Bureau, is not exempt

from registration, and is not federally covered";[5] and (3) that Celsius had offered and sold unregistered securities in violation of N.J. Stat. Ann. §49:3-60 (West) and continued to do so.

40.     The Bureau, pursuant to Uniform Securities Law (1997), N.J. Stat. Ann. §49:3-47 to -89 (West), ordered Celsius to cease and desist from: (1) offering for sale any security, including any Earn Rewards product, to or from New Jersey without first registering the security with the Bureau or qualifying for an exemption; (2) accepting any additional assets into an existing Earn Rewards account; and (3) violating any other provision of the Securities Law and any rules promulgated thereunder for the sale of any security in New Jersey.[6]  The Bureau also denied that Celsius qualified for any exemptions to the New Jersey registration requirements for securities.

41.     Around the same time the Texas Bureau of Securities issued a similar cease and desist notice of hearing against Celsius.[7]  As discussed further below, several other state regulatory agencies also issued orders seeking to stop Celsius from conducting its unlawful business.

**B.      The Celsius Financial Products**

42.     The Executive Defendants promoted, sold, and solicited the sale of a suite of Financial Products to Plaintiffs and Class members, including the Earn Rewards Accounts, CEL Tokens, and Celsius Loans.

**1.      Earn Rewards Accounts**

43.     Celsius, operating under the control of the Executive Defendants, sold what it called Earn Rewards Accounts, which were, in truth, unregistered securities in the form of individual and

---

[5]      *See* fn.2, *supra*.

[6]      *Id.*

[7]      Texas State Securities Board, *Notice of Hearing (SOAH Docket No. 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)*, https://ssb.texas.gov/sites/default/files/2021-09/20210917_FINAL_Celsius_NOH_js_ signed.pdf (last visited Jun. 19, 2023).

corporate accounts.  Investors in these accounts ("Earn Rewards Investors") deposited certain popular cryptocurrencies with Celsius to earn high interest rates of "up to 17.78% Annual Percentage Yield ("APY")."  The promoted interest rates advertised by Celsius were well in excess of the rates currently being offered by short-term investment grade fixed income securities or on bank savings accounts.

44.    Celsius, operating under the direction and control of the Executive Defendants, turned around and then deployed customers' deposits and/or collateral (via additional loans, investments or on exchanges) in an attempt to generate the high interest rates that the Executive Defendants promised to investors.

45.    Only certain types of cryptocurrencies were accepted for deposit in the Earn Rewards Accounts.  Although Defendants refers to payments to Earn Rewards Investors as "Rewards," these "Rewards" were just another way to say "interest," which is clear from Celsius' API Partner disclosures from the Celsius Website.  For example, in the "Interest Calculations" section it stated: "This pages describes how interest is calculated and disbursed.  Celsius pays interest on the value of each asset in a user's wallet.  Interest is paid using the same asst(s) that is held in the user's wallet.  Obtain current interest rates for each token using the SDK getinterestRates0 method or Get Interest Rates API operation."[8]

46.    Executive Defendants claimed that Earn Rewards Investors earned a variable interest rate on their investment and could withdraw their digital assets at any time, subject to a maximum three-day processing time specified by Celsius.

47.    The variable interest rates for the Earn Rewards Investors were posted on the Celsius Website.  Celsius' interest rates for deposits of certain cryptocurrencies in its Earn Rewards

---

[8]    *See* fn.2, *supra*.

accounts were "tiered" depending upon the nature and amount of the cryptocurrency invested, as was explained on the Celsius Website.  As of the initial filing of this Action, Earn Rewards Investors were purportedly entitled to 6.2% on their first Bitcoin deposited and 3.51% on additional deposits of Bitcoin.  Rates on other cryptocurrencies ranged from 13.99% for the Synthetix Network Token (SNX) to 0.0% for Ripple (XRP).

48.    Celsius also paid interest for deposits of certain Stablecoins in its Earn Rewards accounts, as explained on the Celsius Website.

49.    The manner in which interest was purportedly calculated and credited to Earn Rewards Investors illustrated on the Celsius Website and specified in the Celsius Terms, stated as follows:



Rewards are payable based on a daily periodic rate applicable to the Loaned Digital Assets. The daily periodic rate is calculated by dividing the then-applicable annual reward rate by three hundred sixty-four (364) days; then it is further divided down to the hour, minute, and second of that day. Loaned Digital Assets, including those received as Rewards from previous weeks, will begin gaining Rewards according to the hour, minute, and second on the timestamp verifying the completion of the applicable transaction and shall cease and/or decrease the amount paid as Rewards at the moment when the User has entered an external transmission, withdrawal or transfer of rights (via CelPay) request, or posted any Loaned Digital Assets as collateral for a Fiat Loan. Therefore, any Loaned Digital Asset transferred mid-week will receive Rewards with no distinction, based on the rates calculated for the relative time within the allocation period. [9]

---

[9]    Celsius Network, https://celsius.network/ (last visited July 12, 2022)

50.     The Executive Defendants advertised that interest on the Earn Rewards product was paid to investors in cryptocurrency (or CEL Tokens depending on certain factors) based on the "daily periodic rate," which was "calculated by dividing the then-applicable annual reward rate by 364 days; then it is further divided in the hour, minute, and second of that day" and was credited to the Earn Rewards Investors' accounts weekly on the first business day of the week.

51.     The Executive Defendants described Celsius' business model in a now-deleted blog post as one that returned 80% of its total revenue to Earn Rewards Investors: "The Celsius business model is structured to do the exact opposite of what banks do – by giving 80% of total revenue back to our community each week in the form of earned interest.  We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset-backed loans at an average of 9% interest.  We're taking the exact same 80% profit margin that banks have kept for themselves for centuries and returning it to our community of depositors."[10]

52.     Prior to the issuance of cease-and-desist orders from Texas and New Jersey, the Earn Rewards Accounts were available for purchase by anyone holding idle digital assets.  In the wake of the New Jersey Bureau's findings of fact, however, the Executive Defendants limited the sale of Earn Rewards Accounts in the U.S. to accredited investors.

        **2.      CEL Tokens**

53.     Celsius, operating under the direction and control of the Executive Defendants provided investors that deposit their crypto assets within the Celsius Network with two choices for how they would like to receive their yield: "In-Kind" or "In-CEL."  Celsius paid users who select "In-Kind" in the same asset they deposited and users who choose "In-CEL" in CEL, Celsius' native

---

[10]     *See* Nasdaq, *Voyager Token Is Soaring As Investors Search for Yield in Crypto Space,* (Apr. 13, 2021, 2:04 PM), https://www.nasdaq.com/articles/voyager-token-is-soaring-as-investors-search-for-yield-in-crypto-space-2021-04-13 (quoting Celsius blog post).

token, at a higher APY.  For example, Celsius advertised a 6% APY on Ethereum ("ETH") deposits paid in ETH and 7.87% APY on ETH deposits paid in CEL.  Celsius explained this extra CEL in its whitepaper: CEL Tokens are a "platform utility token" that is rewarded to crypto holders in the Celsius Wallet as interest on their coins.  That interest is generated from fees, in CEL tokens, collected from institutional traders who use the assets pool.  Celsius used the proceeds from the sale of CEL tokens to cover "all costs and membership growth" for the Celsius Earns Rewards Accounts.

54.     These CEL tokens then were distributed back to the users lending their crypto on Celsius' website.  In this model, the borrowers were the ones buying CEL.  Celsius was simply collecting payment in its native token and transferring the proceeds back to its users.

55.     In reality, it appears that, rather than redistributing in-CEL fees from lenders to users, Defendants were causing Celsius to purchase hundreds of millions of dollars of CEL Tokens to meet liabilities to users.

56.     On-chain analysis of Celsius' wallets and their CEL Token transactions show the scale of potential CEL repurchases.  As detailed in the Arkham Report on the Celsius Network (the "Arkham Report") "from July 2019 to March 2021 Suspected Celsius addresses withdrew over 76 million CEL from the exchange Liquid, worth $127 million at the time of withdrawal. Since December 2021, suspected Celsius addresses withdrew around 82 million CEL from FTX – equivalent to 12% of the total CEL supply and worth $226 million at time of withdrawal."[11]  The Arkham Report concluded that because those withdrawals were not "preceded by equivalent CEL

---

[11]     Arkham Intelligence, *Report on Celsius Network*, (Jul. 7, 2022), https://www.arkhamintelligence.com/research/reports/celsius-report.

deposits by Celsius, and because Celsius does not appear to use these exchanges for CEL custody, these withdrawals likely indicate CEL purchases."[12]

57.     By purchasing its customers' in-CEL payments rather than collecting them through fees or distributing from the treasury, the Executive Defendants' profit margins decreased as this added another cost.  Additionally, Celsius was required to expend capital that could otherwise be used to meet withdrawal requests, risking a liquidity crisis like Celsius began experiencing in June 2022 (discussed further below).

58.     Throughout 2021 and 2022, the Individual Defendants were the largest holders of CEL tokens.  In particular, as of July 14, 2021, the Individual Defendants held the following amounts of CEL tokens:

- Mashinsky – 70,056,514;

- Leon – 15,929,760

- Goldstein – 9,595,765;

- K. Mashinsky – 5,292,918;

- Beaudry – 1,052,342; and

- Urata-Thomson – 629,134.

59.     Between September 30, 2021 to June 30, 2022, the Individual Defendants and other Celsius insiders, employees, as well as the Celsius treasury, owned approximately 70% of all CEL Tokens.

### 3.     The Celsius Loans

60.     The Executive Defendants also offered and sold various promissory notes to investors that deposited their digital assets within the Celsius Network (the "Celsius Loans").

---

[12]         *Id.*

61.     In particular, Executive Defendants offered customers a "loan" program, through which users could obtain a loan in fiat currency or stablecoins against their digital assets.  They offered loans in six-month increments, the shortest period being six months and the longest 60 months.  Defendants made these loans on a by-asset basis, meaning that each loan would be secured by one kind of crypto asset.  Digital assets locked as collateral did not earn rewards, and Celsius could deploy those assets in the same manner as any other customer assets in the Earn program.

62.     The Executive Defendants also used the Celsius Loans to incentivize the use of CEL tokens, with customers who used their CEL tokens as collateral for Celsius Loans receiving even lower interest rates than those who provided other digital assets as collateral.

63.     The Celsius Loans were available to eligible investors via the "Borrow" option available on the Celsius mobile app.

64.     Borrowers deposited their digital assets as collateral onto the Celsius mobile app in exchange for fiat or one of several stablecoins like USDC, USDT, and DAI.  Celsius then would collect monthly interest payments on the Celsius Loans.

### C.     The Celsius Financial Products Are Unregistered Securities

#### 1.     Earns Rewards Accounts and Celsius Loans Are Securities Under *Reeves*

65.     As noted by the United States Supreme Court, "Congress' purpose in enacting the securities laws was to regulate ***investments***, in whatever form they are made and by whatever name they are called.  However, notes are used in a variety of settings, not all of which involve investments.  Thus, they are not securities *per se*, but must be defined using the 'family resemblance' test."  *Reves*, 494 U.S. 56, 67.

66.     Pursuant to the family resemblance test, a note is presumed to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument.  *Id.* These factors include: (1) investments in a business enterprise; (2) there was "common trading" of the notes, which offered and sold to a broad segment of the public; (3) the public reasonably perceived from advertisements for the notes that they were investments, and there were no countervailing factors that would have led a reasonable person to question this characterization; and (4) there was no risk-reducing factor that would make the application of the Securities Acts unnecessary, since the notes were uncollateralized and uninsured and would escape federal regulation entirely if the Acts were held not to apply.  *Id.*

67.     Here, the four enumerated factors do not militate in favor of rebutting the presumption that the Earn Rewards Accounts, CEL token and Celsius Loans were securities.  First, Plaintiffs and the Class invested fiat and/or other digital assets and cryptocurrencies in a business enterprise, namely Celsius.  There was common trading of the CEL Token and Earn Rewards Accounts insomuch as the digital assets deposited by investors were regularly offered and sold to both institutional and retail investors.  All of the marketing materials promoted by Defendants led the public to believe that opening up an Earn Rewards Account with Celsius was a "high-yield, low-risk" investment.

### 2.     Earn Rewards Accounts Are Securities Under the *Howey* Test

68.     Numerous federal and state regulators have analyzed whether financial products like the Celsius Earn Rewards Accounts are securities under the so-called *Howey* test articulated by the U.S. Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 294 (1946). For example, the SEC investigated a nearly identical financial product (*i.e.*, a high interest cryptocurrency lending account) offered by BlockFi in 2022.  On February 25, 2022, the SEC announced a

18

settlement with BlockFi for $100 million in penalties for offering unregistered BlockFi interest accounts ("BIAs") that offer high APRs to customers to lend out digital tokens.  Pursuant to that settlement, the BIAs (which are virtually identical in form and substance to the Voyager Earn Accounts) must now be classified and registered as securities under applicable securities laws, as BlockFi was determined not to qualify for an exemption from SEC registration.  BlockFi agreed to cease offering or selling BIAs in the United States until it registers its crypto-lending products.

69.     Shortly thereafter, the New Jersey Bureau of Securities issued a cease-and-desist order, finding that the Celsius Earn Rewards Accounts were securities and that Celsius had offered and sold these unregistered securities in violation of New Jersey law.  Ultimately, at least seven state Attorney Generals (Alabama, Delaware, Kentucky, New Jersey, Texas, and Vermont, and Washington) took specific action finding that Celsius was violating their state laws prohibiting the crypto-asset broker-dealer from selling any more unregistered securities, including issuing "cease and desist" letters to Celsius. Additionally, the California Department of Financial Protection and Innovation issued its own cease and desist order on August 8, 2022, which required Celsius to stop violating California Corporations Code Sections 25110 (sale of unregistered securities) and 25401 (misleading statements) in connection with the promotion and sale of Earn Rewards Accounts.

70.     Likewise, the Vermont Department of Financial Regulation disclosed in a particularly detailed filing in the Celsius bankruptcy that, as of July 2022, "at least 40 state securities regulators were engaged in a multistate investigation arising from, inter alia, concerns about potential unregistered securities activity, mismanagement, securities fraud, and market manipulation by Celsius and its principals."[13] This joinder motion further stated: "Vermont and

---

[13]     Joinder in Motion of U.S. Trustee for Appointment of an Examiner, *In re: Celsius Network, LLC*, 1:22-bk-10964 (Sep. 7, 2022) (ECF No. 730) at *2.

other state regulators are especially concerned about losses suffered by retail investors; for example, middle-class, unaccredited investors who may have invested entire college funds or retirement accounts with Celsius."[14] According to the Vermont's Department of Financial Regulation:

> During the course of the multistate investigation, it has become clear that Celsius, through its CEO Alex Mashinsky and otherwise, made false and misleading claims to investors about, inter alia, the company's financial health and its compliance with securities laws, both of which likely induced retail investors to invest in Celsius or to leave their investments in Celsius despite concerns about the volatility of the cryptocurrency market. These claims included, at a minimum, (A.) Representations as to the company's ability to meet its obligations and to safeguard customer assets, when in fact Celsius lacked sufficient assets to repay its obligations at the time such statements were made. . . . (B.) Statements that Celsius was profitable or financially healthy when Celsius experienced catastrophic losses in 2021 and failed to earn sufficient revenue to support returns to Earn Account investors. . . . (C) Representations as to Celsius' compliance with applicable laws and regulations, when Celsius was actually subject to several pending actions and investigations by regulators for violating securities laws. [15]

71.     This joinder motion also described several admissions made during the "341 meeting" in the Celsius bankruptcy. In particular:

> During the 341 meeting, Celsius admitted, through its CFO Chris Ferraro, that the company's insolvency started with financial losses in 2020 and through 2021, belying the claims in Celsius's "First Day" declarations that the company's insolvency stemmed from the fall of the crypto market during Spring 2022 and the related "run on the bank," and further demonstrating the falsity of Celsius's representations to investors. State and federal securities laws required Celsius to publicly disclose financial statements and a range of material information about its financial condition, business, and risk factors. Instead, Celsius and its management kept its massive losses, asset deficit, and deteriorating financial condition secret from investors.
>
> Celsius also admitted at the 341 meeting that the company had never earned enough revenue to support the yields being paid to investors. This shows a high level of financial mismanagement and also suggests that at least at some points in time,

---

[14]     *Id*.

[15]     *Id*. at *2-*4.

yields to existing investors were probably being paid with the assets of new investors.

Credible claims have been asserted publicly, through letters to this Court and otherwise, that Celsius and its management engaged in the improper manipulation of the price of the CEL token, including by using the proceeds of investor deposits to acquire CEL tokens and increase its Net Position in CEL how Defendants conduct misled investors, stating that "By increasing its Net Position in CEL by hundreds of millions of dollars, Celsius increased and propped up the market price of CEL, thereby artificially inflating the company's CEL holdings on its balance sheet and financial statements. Excluding the Company's Net Position in CEL, liabilities would have exceeded its assets since at least February 28, 2019.[16]

72.     Vermont's joinder motion also described how Defendants' conduct misled investors. Specifically, it stated that by increasing its Net Position in CEL by hundreds of millions of dollars, Defendants "increased and propped up the market price of CEL, thereby artificially inflating the company's CEL holdings on its balance sheet and financial statements. Excluding the Company's Net Position in CEL, the Company would have been insolvent since at least February 28, 2019."[17] According to Vermont, these misleading practices "may have also enriched Celsius insiders, at the expense of retail investors." Further, "[b]y increasing its Net Position in CEL, Celsius invested depositor assets in a long position in CEL that was inconsistent with its purported "market neutral" investment strategy." In sum, the joinder motion submitted that an Examiner should investigate whether Celsius assets were deployed to manipulate the market price of CEL, thereby artificially inflating the value of CEL tokens.[18]

---

[16]     *Id*. at *4-*5.

[17]     *Id*. at *6.

[18]     Ultimately, as discussed in greater detail below, the Examiner appointed by the bankruptcy court did find that improper manipulation of the market price of CEL had occurred.

73.     Despite being on clear notice that their Celsius Earn Rewards Accounts constituted unregistered securities, Defendants continued to offer these unregistered securities to retail investors across the United States.

### 3.     CEL Tokens Are Securities Under *Howey*

74.     The SEC Framework provides guidance for analyzing whether a digital asset has the characteristics of one particular type of security – an "investment contract."

As explained in the SEC Framework:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.[19]

75.     The SEC Framework makes clear that "[w]hether a particular digital asset at the time of its offer or sale satisfies the *Howey* test depends on the specific facts and circumstances."[20] The specific facts and circumstances relating to CEL support the conclusion that CEL is a security under the *Howey* test.

---

[19]     SEC, *Framework "Investment Contract" Analysis of Digital Assets,* (Mar. 8, 2023), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets, at §I (footnotes omitted).

[20]     *Id.*, §II.

i.       **Celsius Investors Invested Money**

76.     The SEC Framework states that: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."[21]

77.     Plaintiffs and the Class invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase CEL Tokens.  As explained in the SEC Framework, investment of both fiat and digital currency meets the first prong of *Howey*.

78.     The CEL tokens were available on the Company's website and mobile app, which allowed retail investors to purchase CEL tokens or Earn Rewards accounts with traditional and other digital currencies.

79.     Defendants also sold CEL tokens to retail investors through global, online cryptocurrency exchanges during its on-going, continuous offering.

80.     Every purchase of CEL tokens by a member of the public was an investment contract.

ii.       **CEL Token Investors Were Intertwined in a Common Enterprise with Defendants**

81.     The profits of each investor in CEL tokens are inextricably intertwined with those of all other purchasers because CEL is fungible.

82.     The SEC Framework states that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists."[22]  The SEC Framework also elaborates: "Based on our

---

[21]      *Id.*, §II(A) (footnote omitted).

[22]      *Id.*, §II(B) (footnote omitted).

experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."[23]

83.    CEL is no exception to the SEC Framework's observation regarding the "common enterprise" element of the *Howey* test.  The prospective profits of Plaintiffs and the Class, if any, are intertwined with the fortunes of Celsius, Executive Defendants have conceded that Celsius used the funds from its CEL Tokens to partially fund its operations.

84.    Additionally, investors were passive participants in the Cel Token continuous offering, and the profits of each Plaintiff, and the Class were intertwined with those of Defendants and of other investors.

85.    The Executive Defendants also were responsible for supporting the CEL Tokens, pooled investors' assets, and controlled those assets.

86.    Further, Defendants held a significant stake in the CEL Tokens, and thus shared in the profits and risk of the project.

87.    The weekly interest rate (paid in CEL tokens or in-kind assets) provided to Earn Rewards account holders were dependent on Celsius' revenue generation, regardless of whether those "rewards" were based on any predetermined rate. After all, Celsius could only afford to pay those weekly interest rates so long as the Company continued to generate revenue from its lending and trading activities (which, in turn, were dependent upon a steady influx of new investor deposits in Earn Rewards Accounts and additional CEL token purchases).

---

[23]    *Id.* at n.11 (citing *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1307 (D.C. Cir. 1992)).

> iii.     **Investors Purchased the Celsius Financial Products with a Reasonable Expectation of Profit from Owning Them**

88.     With respect to the element of "reasonable expectation of profits," the SEC Framework states that "[a] purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."[24]

89.     Investors in the CEL tokens, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits.  The primary purpose for purchasing CEL tokens was to make a profit or accumulate interest.

90.     Defendants themselves have recognized that CEL investors have a reasonable expectation of profit, and publicly touted CEL's price performance on numerous occasions.

91.     The SEC Framework lays out a number of characteristics informative of whether the "reasonable expectation of profits" element is met.  The SEC Framework states that "[t]he more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit . . . ."[25]  Based on the facts above, each and every characteristic identified by the SEC Framework is present in the case of CEL:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

- The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

*     *     *

---

[24]     *Id.*, §II(C).

[25]     *Id.*, §II(C)(2).

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that [the Defendants'] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

- The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The [Defendants have] raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The [Defendants are] able to benefit from [their] efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The [Defendants] continue[] to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

    o   The expertise of [Defendants] or [their] ability to build or grow the value of the network or digital asset.

    o   The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

    o   The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

o     The future (and not present) functionality of the network or digital asset, and the prospect that [the Defendants] will deliver that functionality.

o     The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

o     The ready transferability of the digital asset is a key selling feature.

o     The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

o     The availability of a market for the trading of the digital asset, particularly where the [Defendants] implicitly or explicitly promise[] to create or otherwise support a trading market for the digital asset.[26]

### iv.     Investors Expected Profits from the CEL Tokens to Be Derived from the Managerial Efforts of the Executive Defendants

92.     The SEC Framework explains:

When a promoter, sponsor, or other third party (or affiliated group of third parties) (each, an "Active Participant" or "AP") provides essential managerial efforts that affect the success of the enterprise, and investors reasonably expect to derive profit from those efforts, then this prong of the test is met. Relevant to this inquiry is the "economic reality" of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." The inquiry, therefore, is an objective one, focused on the transaction itself and the manner in which the digital asset is offered and sold.[27]

93.     Specifically, with respect to the element of "[r]eliance on the [e]fforts of [o]thers,"

the SEC Framework states:

The inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:

---

[26]     *Id*.

[27]     *Id.*, §II(C) (footnotes omitted).

> ▪ Does the purchaser reasonably expect to rely on the efforts of a[] [promoter]?
>
> ▪ Are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," as opposed to efforts that are more ministerial in nature?[28]

94. Plaintiffs and the Class have entirely passive roles vis-à-vis the success of CEL. Rather, as Executive Defendants' own marketing makes clear, the success of CEL, and the profits the Class reasonably expected to derive from investing in CEL (and the related Earn Rewards Accounts), are dependent on the essential technical, entrepreneurial, and managerial efforts of Defendants, Celsius, and its agents (like Wintermute) and employees.

95. Plaintiffs and the Class reasonably expected Executive Defendants to provide significant managerial efforts, to develop and improve the Celsius platform and the Earn Rewards Program, and to provide and/or secure exchanges through which CEL can be traded or liquidated. Defendants repeatedly represented that they would provide significant managerial efforts to achieve these objectives and make CEL a profitable investment by:

a. Developing and attracting users to the Celsius platform;

b. Developing the Earn Rewards program to provide financial incentivizes and benefits to CEL holders, and in particular to CEL holders that were also investors in Celsius Earn Rewards Account securities; and

c. Burning CEL Tokens to reduce the circulating supply and thereby increase the value of CEL Tokens.

96. CEL therefore derives its value entirely from the usefulness and popularity of the Celsius platform and the Earn Rewards program, which is in turn highly, if not entirely, dependent

---

[28]   *Id.*, §II(C)(1) (footnotes omitted).

on the significant technical, entrepreneurial, and managerial efforts of Celsius and Executive Defendants. The purchase of CEL is thus an investment in a common enterprise, with an expectation of profits, based upon the efforts of its promoter, the Defendants.

97. The SEC Framework lays out a number of characteristics informative of whether the "[r]eliance on the [e]fforts of [o]thers" element is met. The SEC Framework notes that "[a]lthough no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others . . . .'"[29] Based on the facts above, each and every characteristic identified by the SEC Framework is present in the case of CEL:

- [Defendants are] responsible for the development, improvement (or enhancement), operation, or promotion of the network [and] purchasers of the digital asset expect [Defendants] to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

- Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale [both true of VGX and the Voyager Loyalty Program] purchasers would reasonably expect [Defendants] to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by [Defendants], rather than an unaffiliated, dispersed community of network users (commonly known as "decentralized" network).

- [Defendants] create[] or support[] a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

---

[29] *Id.*, §II(C)(1).

- [Defendants] ha[ve] a lead or central role in the direction of the ongoing development of the network or the digital asset.  In particular, [Defendants] play[] a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- [Defendants] ha[ve] a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade.  For example, purchasers may reasonably rely on [Defendants] for liquidity, such as where the [Defendants have] arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  o Determining who will receive additional digital assets and under what conditions.

  o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

  o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

  o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect [Defendants] to undertake efforts to promote [their] own interests and enhance the value of the network or digital asset, such as where:

  o [Defendants] ha[ve] the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the [Defendants] retain[] a stake or interest in the digital asset.  In these instances, purchasers would reasonably expect [Defendants] to undertake efforts to promote [their] own interests and enhance the value of the network or digital asset.

  o [Defendants] distribute[] the digital asset as compensation to management or [Defendants'] compensation is tied to the price of the digital asset in the secondary market.  To the extent these facts

are present, the compensated individuals can be expected to take
steps to build the value of the digital asset.

o    [Defendants] own[] or control[] ownership of intellectual property
rights of the network or digital asset, directly or indirectly.

o    [Defendants] monetize[] the value of the digital asset, especially
where the digital asset has limited functionality.

98.    Here, the CEL Token and the Earn Reward Accounts program with which it is
intertwined exhibit all of these characteristics.

### 4.    Investors Would Not Reasonably Have Understood that the Financial Products Sold by Celsius Were Securities

99.    In connection with the launch of the Celsius Financial Products, Defendants made
statements that reasonably led Plaintiffs and Class members to conclude that the Celsius Financial
Products were not securities.

100.    As a threshold matter, the Defendants refused to register any of the Celsius
Financial Products with the SEC, which indicated to investors that these were not securities.  In
fact, the Executive Defendants touted their application for an exemption from registrations as if it
is an actual exemption, which it was not.  No such valid exemption from registration requirements
existed for any of the Celsius Financial Products.

101.    At the time of the launch of the Celsius Financial Products, Defendants took
advantage of the market's lack of understanding and awareness concerning how cryptocurrency
projects work.  Considering the new technology at issue and the Company's other statements,
many investors were understandably unaware that Celsius Financial Products had fundamentally
different features than other bitcoin, which the SEC has determined is not a security.

102.    In addition to claiming Celsius' technical superiority over other cryptocurrencies,
the Company also indicated that it would benefit financially and use the funds raised through the

sale of the Celsius Financial Products to continue to fund the Celsius-related products and support the growth of the project.

103.    At the time the Celsius Financial Products were publicly released, Defendants took advantage of the market's lack of understanding and awareness concerning how this investment contract worked.  With promises that Celsius would outperform other cryptocurrencies, many individuals were unaware that the Celsius Financial Products had fundamentally different features than other cryptocurrencies, including being more centralized than Bitcoin or Ethereum.  One of these primary differences is that all CEL Tokens were issued by Mashinsky and the Company at creation at very little economic cost – and enormous potential upside – to them.

104.    The creation of the Celsius Financial Products occurred through a centralized process, in contrast to Bitcoin and Ethereum.  This, however, would not have been apparent at issuance to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent and process of management that a reasonable purchaser could have known that he or she had acquired a security.

105.    Purchasers were thereby misled into believing that the Celsius Financial Products were something other than securities, when they were securities.

106.    Accordingly, it was not apparent to a reasonable investor, at issuance, that the Celsius Financial Products were securities under the law, and a reasonable investor would not have believed they were securities.

### 5.    Guidance from the SEC

#### i.    The SEC's 2019 Framework

107.    On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") in which it provided "a framework for analyzing

whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."[30]

108.    The Framework described how to analyze the various facts in making the determination of whether a given digital asset is a security.

109.    In particular, the Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"[31]

110.    The Framework further notes that the "stronger the[ ] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"[32]

111.    The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

112.    Defendants actively marketed the Celsius Financial Products, thereby necessitating the continued managerial efforts of the Executive Defendants.  Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).

---

[30]    *See* fn.19, *supra*

[31]    *Id*.

[32]    *Id*.

113.    Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset.  This includes, *inter alia*, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, 'burning,' or other activities."[33]

114.    As noted above, all of the CEL Tokens in circulation were created at the direction of Mashinsky.

115.    The framework further states that "An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents[.]"[34]

116.    Here, the Executive Defendants discussed the long-term prospects on years-long time frames, encouraging Plaintiffs and Class members to "hold" and treat he Celsius Financial Products as long-term savings accounts.

117.    The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework.  For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform."[35]

118.    Here, the Defendants were the liquidity providers for the CEL Tokens that were traded publicly.

---

[33]    *Id.*

[34]    *Id.*

[35]    *Id.*

119.    Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."[36]

120.    Here, the Executive Defendants, were the arbiters over the use of the cryptocurrency deposited on Earn Rewards investors.

121.    The Celsius Terms, implemented by the Executive Defendants, provided that an Earn Rewards investor relinquished control over the deposited cryptocurrency to Celsius and that Celsius was free to use those assets as it sees fit, including commingling the Earn Rewards investor's cryptocurrency with those of other Earn Rewards investors, investing those pooled assets in the market, and lending them to institutional and corporate borrowers.  Having relinquished control over the deposited cryptocurrency in their Earn Rewards accounts, the Earn Rewards Investors were passive investors.

122.    Specifically, Paragraph 4.D. "Earn Rewards" of the amended Celsius Terms provide:

> Our Earn Rewards service allows you to earn a financing fee from Celsius, referred to as "Rewards," in the form of Digital Assets (either in-kind, i.e. in the same Digital Asset you transfer, or in CEL Tokens, where permitted) in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof.  If our Earn Service is available to you, upon your election, you will lend your Eligible Digital Assets to Celsius you grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service.[37]

---

[36]    *Id*.

[37]    Celsius Network, *Terms of Use,* (Sep. 29, 2022)*,* https://celsius.network/terms-of-use

123.     Paragraph 13 of Celsius' amended Terms, "Consent To Celsius' Use of Digital Assets," also described the status of cryptocurrency deposited with Celsius by Earn Rewards Investors:

> In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.  You acknowledge that with respect to the Digital Assets used by Celsius pursuant to this paragraph:
>
> (i)     You will not be able to exercise rights of ownership;
>
> (ii)    Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and
>
> (iii)   In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws.[38]

124.     Celsius, operating under the direction and control of the Executive Defendants, then pooled the deposited cryptocurrencies together with Celsius' other assets, to, among other income-generating activities, collateralize Celsius' borrowings, purchase securities and digital assets for Celsius' own account, make loans to institutional and corporate borrowers, and mine for cryptocurrency.

---

[38]     *Id.*

125.    The Executive Defendants did not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom Celsius has lent material amounts of cryptocurrency; (c) the terms and duration of the loans; (d) the types of securities and digital assets it trades; or (e) the profits or losses derived from these activities.

126.    As Celsius' founder, Defendant Mashinsky, stated in an article he authored on March 7, 2021, for the DataDrivenInvestor's website, reposted in the "Media" tab on the Celsius Website, "[u]sers transfer assets with Celsius, Celsius lends funds to institutions and returns up to 80% of earnings to users."[39]

127.    In sum, the Executive Defendants made managerial judgements and/or decisions that directly or indirectly impacted the success of the Celsius network or the value of Celsius Financial Products generally.

128.    The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset."[40]  According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."[41]

---

[39]    Alex Mashinsky, *How Celsius creates prosperity for retail and institutional investors alike,* DataDrivenInvestor (Mar. 7, 2021), https://medium.datadriveninvestor.com/how-celsius-creates-prosperity-for-retail-and-institutional-investors-alike-cc086084c6bd.

[40]    *See* fn.19, *supra*.

[41]    *Id.*

129.     Here, Individual Defendants retained a significant interest in the Celsius project, including the CEL Token, even after selling off many CEL Tokens throughout the Relevant Period.

### ii.        SEC's Previous Statements and Findings

130.     On May 7, 2021, on CNBC's "Squawk Box" television program, chairman of the SEC Gary Gensler stated that "a lot of crypto tokens – I won't call them cryptocurrencies for this moment – *are indeed securities*[.]"[42]  (Emphasis added.)

131.     In a June 14, 2018 speech entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)" that is available on the SEC's website, the following observations were made on "when a digital transaction may no longer represent a security offering":[43]

> If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

> "And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise.  The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception."[44]

---

[42]     Jesse Point, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com /2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

[43]     William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets Summit: Crypto*, SEC (Speech) (Jun. 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

[44]     *Id.*

132.    A key factor in determining whether a digital asset is a security or not is whether the there is a centralized entity behind the digital asset.[45]   As discussed above, the circumstances surrounding the creation of the Celsius Token demonstrate that an exceedingly small number of centralized insiders (*i.e*., the Individual Defendants) maintained control and/or ownership over the Celsius project.

133.    It is worth noting that Mashinsky told the Examiner during his interview that he tried to drum up more so-called "use cases" for CEL to, in turn, increase its value.  In fact, according to the Examiner's Report, Mashinsky was "very jealous of Binance and others that created a whole ecosystem around their tokens."[46]   Those same tokens that Mashinsky tried to emulate with CEL have been deemed securities by the SEC (*e.g*., Binance's native BNB token, Voyager's native VGX token).

134.    Indeed, the SEC and other state regulators have, directly and indirectly, found that native tokens similar to the CEL tokens are securities that require registration prior to being sold to investors.  Most notably, the New York Attorney General has brought a parallel civil action against Mashinsky for the sale of unregistered securities.  *The People of the State of New York v. Mashinsky*, Case No. 450040/2023 (N.Y. Sup. Ct.) (Dkt. No. 1) (alleging that CEL tokens are securities).  The SEC has also found that rival crypto lending business Voyager's VGX token (similarly in all but name to the CEL token) bears the hallmarks of a security requiring registration

---

[45]    *Id*. (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

[46]    Final Report of Shoba Pillay, Examiner, *In re Celsius Networks, Ltd*., Case No. 22-10964-mg (January 31, 2023) (Dkt No. 1956) (the "Examiner's Report"), at *90 n.212.

before being sold to investors.[47]   Finally, the object of Mashinsky's adoration, Binance's BNB token, has also been deemed by the SEC as an investment contract (*i.e.*, a security) under the *Howey* test.   *See SEC v. Binance Holdings Limited*, 1:23-cv-01599 (S.D.N.Y.) (ECF No. 1) (alleging that BNB tokens were unregistered securities sold in violation of federal securities laws, notwithstanding any supposed "use cases").

135.     While certain of Celsius' loan products appear to be licensed under various state licensing requirements for money services businesses or money transmitters, the Celsius Earn Rewards and CEL Token products are not currently registered with any federal or state securities regulator, nor is it exempt from registration – as required by law, even though those financial products are a "security" and subject to such requirements.

### D.     Executive Defendants Misleadingly Promoted The Celsius Financial Products

136.     In addition to violating federal and state securities laws by failing to register the Celsius Financial Products before publicly offering them for sale to Plaintiffs and the members of the Class, the Executive Defendants, led by Mashinsky, engaged in a scheme to defraud investors by making a series of misleading and false statements in connection with the subsequent promotion and sale of the Celsius Financial Products.

137.     Defendants repeatedly promoted its Earn Rewards Accounts as "high-yield" and "low-risk" investments for investors.   They also claimed the stability of the interest paid was primarily due to all of the institutional payments Celsius received from its Celsius Loan products.

---

[47]     *See* Objection of the SEC to Final Approval of the Adequacy of the Debtor's Disclosure Statement and Confirmation of the Chapter 11 Plan, *In re: Voyager Digital Holdings, Inc.*, 1:22-bk-10943 (S.D.N.Y. Bkr.) (ECF No. 1047) at *3 (noting that the sale of VGX tokens should not be permitted to be sold as part of the Voyager bankruptcy because such activity "may constitute the unregistered offer or sale of securities under federal law").

Mashinsky personally told investors that Celsius would generate sustainably high returns by making low-risk collateralized loans to first-tier institutions and cryptocurrency exchanges as well as overcollateralized loans to retail borrowers. Concurrently, the Defendants also repeatedly touted the growth prospects for the Company and the CEL Token. These misrepresentations painted a rosy picture for Celsius' future and lured unsuspecting investors into purchasing the Celsius Financial Products at inflated rates.

138. At the outset, the Arkham Report describes the nature of Defendants' misrepresentations:

> Celsius Network positions itself as a wallet that enables users to "Earn" on the assets they "deposit." The "deposit" could be described as an unsecured loan from the user to the organization, and "Earn," or accrual of value to the user over time, could be described as synthetic liability accrual, meaning it is not on-chain.

> Celsius attracted users by offering exceptionally high yields on deposits, such as 5% APY for Bitcoin and up to 10% for USD-pegged stablecoins – 100x the average conventional savings account interest rate of 0.1%. For Celsius to make good on its high yield promised to investors it needed it outperform those high returns through its lending and investing to make money and remain solvent. This is impracticable through conventional lending in traditional finance, where interest rates aren't high enough. ***Through Celsius' public materials, they claim such high yields are sustainable by the nature of the cryptocurrency market***.

> On the "Why Trust Celsius" section of the website, Celsius directs users to its whitepaper from 2018***. This whitepaper explains that "members will be able to easily earn interest on their crypto assets the same way they earn on the savings in the bank – but with much better rates."*** When describing where this yield comes from, the whitepaper states, "Hedge funds, family offices and crypto funds still want to play in the world of cryptocurrency. Fortunately for us, they are willing to pay high fees to do so."

> In a video on the official Celsius Network YouTube channel titled "How Celsius earns yield," ***CEO Alex Mashinsky explains that Celsius earns its yield through institutional lending***. According to Mashinsky, when an institution needs fast access to crypto assets for arbitrage, market making, or shorting, they borrow those assets from Celsius at a high interest rate for a short period of time. Mashinsky claims that "the key is to get a high yield at a low risk."

> Building a banking business on the model of high yield at low risk can be compared to building a business on the model of buying dollars for 50 cents. It's a perfect

model, except it requires finding someone who will take the other side of the trade. If other lenders agreed that a loan was low risk then it wouldn't be high yield, so you have to rely on systematically beating the market. This is hard to do with billions of dollars of capital at rates many times those of conventional low-risk loans, which recently have been at zero or even negative interest. In reality, ***despite their public emphasis on institutional lending, Celsius was chasing yield in other places that many would not characterize as low-risk***.[48] (Emphasis added.)

139.    The Celsius Website (the contents of which were controlled and/or approved by the Defendants) touted the increased return on investment that investors could expect from buying and holding CEL Tokens. For example, according to the promotion on the "CEL Token Explained" page on the Celsius Website, "More CEL. More rewards. It's not rocket science." Defendants also provided the following chart to investors, which outlined the high yield rates that CEL Token investors would receive. Notably, the yields would take the form of "Bonus Rewards" (*i.e.*, extra interest) or a "Loan Interest Discount" (*i.e.*, a credit towards a Celsius Loan product):

| Reward Status | CEL Ratio | or CEL Balance | Bonus Rewards | Loan Interest Discount |
|---|---|---|---|---|
| NONE | 0%–5% | 0 CEL | 0% | 5% |
| BRONZE | 5%–10% | 1 CEL | 10% | 5% |
| SILVER | 10%–15% | 1,000 CEL | 15% | 10% |
| GOLD | 15%–25% | 10,000 CEL | 20% | 15% |
| PLATINUM | 25%–100% | 25,000 CEL | 30% | 25% |

140.    The Executive Defendants promoted the CEL Token as both an investment product that essentially paid dividends and a credit that could be used in the purchase of a Celsius Loan product.

---

[48]       *Id.*

141.    The whitepaper further promoted what it calls the "Tokenized Flywheel," which purports to show how the Celsius Financial Products interacted with each other to create a perpetual wealth creation system.  The following diagram illustrates this notion:



142.    A similar version of the Tokenize Flywheel was also posted on the Celsius Website:



143.    On March 7, 2019, Mashinsky was interviewed at the NASDAQ MarketSite near Times Square in New York.  During that interview Mashinsky claimed that funds deposited on the Celsius platform were "as safe as it is with the bank" and assured investors that the executives at Celsius were "always acting in your best interest."   Similarly, in a March 12, 2019 blog post Mashinsky misleadingly stated to investors: "The more people that deposit, the more profits there are to distribute to the community, and THAT is a sustainable and scalable promise."  Mashinsky further told investors that Celsius's team is "hard at work acting in [investors'] best interest" and that Celsius's business model was "straightforward and transparent."

144.    Mashinsky, accompanied by the other Executive Defendants and Celsius employees, also held weekly podcasts on YouTube throughout the Relevant Period, using the "Ask Me Anything" ("AMA") format, whereby investors could ask questions directly to Mashinsky, the Executive Defendants, and other Celsius representatives.  During these podcasts, Mashinsky and Executive Defendants repeatedly made false and misleading statements regarding Celsius' operations and financial stability.

145.    For example, during the May 19, 2020 AMA, Mashinsky falsely stated that "we are only doing asset-backed lending. . . .  We only lend against collateral . . . without exception. . . . We have over one hundred percent collateral."

146.    Likewise, on July 17, 2020, Mashinsky made the following misleading statement during the weekly AMA podcast: "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf."

147.    During the November 6, 2020, AMA Mashinsky falsely reiterated that "We do not do . . . unsecured lending" and falsely claimed that Celsius "only lend[s] to the first-tier institutions, first tier exchanges. . . ."

148.    On the December 3, 2020 AMA, Mashinsky misleadingly stated that Celsius generated revenue by lending assets in a way "similar to what banks do."

149.    On February 5, 2021, during his weekly AMA session on YouTube,[49] Mashinsky made several statements promoting the Celsius Loans to investors.  In particular, in response to a question about whether Celsius would allow borrows to use multiple sources of collateral for their Celsius Loans, Mashinsky proclaimed that crypto investors that held CEL Tokens or other cryptocurrencies should "borrow against it" because "it helps you earn [and] defer your taxes. That's what the rich guys do.  That's how they stay rich and famous."[50]

150.    Later during that AMA, an investor asked about the circumstances under which Celsius will liquidate a borrower's collateral.  Tal Bentov, the VP Lending (Retail) at Celsius, replied:

> First of all, we hate the word 'liquidations.'  We really want to avoid it at all costs. If you get a margin call and you don't know how to answer . . . You have different coins, you need some more time . . . You need to contact us and let us know that. We have a big enough team that we can handle all of this . . . *We liquidate only when someone is not answering our margin calls and he/she keeps being in default. We give a lot of time. A lot more than others.  Trust me.  Sometimes weeks to answer our margin calls!*[51]  (Emphasis added.)

151.    Near the end of the February 5th AMA, Mashinsky promoted the Earn Rewards Accounts' ability to "earn" investors various cryptocurrencies "for free."

152.    On February 12, 2021, Mashinsky participated in the weekly Celsius AMA, discussing, among other things, the various future prospects for the Company.  Notably, Mashinsky agreed that the purchase of CEL Tokens was "an investment in Celsius' future," and

---

[49]    Celsius Network, *Money For Your Honey, Loans Q&A – Celsius AMA,* YouTube (Feb. 5, 2021), https://www.youtube.com/watch?v=2wqD78AnFaw.

[50]    *Id.*

[51]    *Id.*

went on to stated that "Celsius has 2 components.  Celsius has the CEL Token and also the equity. When you buy the CEL Token, you're basically voting 'yes' or 'no.'  You're voting with the community on your need, or you're wanting to earn more interest.  You're going to get that 25% bonus, or that 25% premium."[52]

153.    On February 26, 2021, Mashinsky again participated in the weekly Celsius AMA on YouTube,[53] discussing, among other things, how Celsius would deal with "handling flash crashes."  Mashinsky stated:

> We don't provide high LTV's. . . .  Celsius doesn't make money by liquidating you. We don't charge any fees.  We don't try to give you these gimmicks and special rates . . . Our goal, our mission is to make sure that we have you as a customer for life.  What are the chances that you're going to stick with us if we liquidated you? Most of our loans are 25% or 33% LTV loans.  We discourage you from taking 50% LTV loans because that is much higher risk.  ***So Celsius did not have any liquidations, because we give you plenty of time***.  ***We give you advanced notice most of the time, then we tell you you can put more collateral or return some of the dollars or assets back.***  We have almost 0 liquidations.  That's not our business. It's the opposite of our business.[54]  (Emphasis added.)

154.    The Executive Defendants, through their control over Celsius' various social media accounts, also marketed these particular Celsius Financial Products with the hashtag slogan "#UnbankYourself."  For example, on March 22, 2021, the Celsius Twitter account posted the following message to investors: "We know time is money, so we've made it easier to have both by offering loans with interest rates as low as 1%, ZERO origination fees, and same day approval. Get cash in hand today without giving up on your investment."[55]

---

[52]    *Id.*

[53]    Celsius Network, *Interview with Nicholas Merten of DataDash – Celsius AMA,* YOUTUBE (Feb. 26, 2021), https://www.youtube.com/watch?v=cZPy7Pu6vxg&t=3s.

[54]    *Id.*

[55]    @CelsiusNetwork, TWITTER (Mar. 22, 2021, 7:48 AM) https://twitter.com/CelsiusNetwork/status/1374010096145952769?s=20&t=sQgj5 D1x21gHwOFPs4eLHg.

155.    On April 23, 2021, Mashinsky returned to making statements regarding Celsius' borrower-friendly stance on liquidations during his weekly AMA on YouTube.[56]  In particular, Mashinsky stated a "margin call doesn't mean we sold your assets or stole your coins.  That's what the other guys do.  *We always give you ample time* to post more collateral, return some of the assets, or instruct us to sell your coins."[57]  (Emphasis added.)

156.    On the May 14, 2021 AMA, Mashinsky made several misleading statements regarding the collateralization of loans at Celsius, telling investors that: "When you transfer your assets to your Celsius wallet you've instantly start[ed] generating rewards that are paid out every Monday.  These rewards compound causing your returns to stack and snowball over time.  Celsius is able to achieve this by lending out the community's assets to vetted financial institutions.  These loans are collateralized.  This means the institutions give Celsius assets or dollars to hold onto before we give out the digital assets.  This protects the community and keeps them whole."

157.    The aforementioned statements about Celsius' loan collateralization were false and/or misleading, given that many of Celsius' institutional loans were uncollateralized. Moreover, the statements concerning liquidations were false and misleading as a significant number of liquidations occurred without warning in the lead up to users being locked out of their accounts.

158.    On May 28, 2021, Mashinsky promoted the stability and wherewithal of the CEL Token: "Looking at coins, the CEL token was one of the most stable out there.  It did better than Bitcoin or Ethereum.  It did not drawdown as much.  Obviously Celsians who held CEL did very

---

[56]     Celsius Network, *Future Coin Listings & Features – Celsius AMA,* YouTube (Apr. 23, 2021), https://www.youtube.com/watch?v=bzEyHLgBY7Y&t=350s.

[57]     *Id.*

well as well."[58]   Mashinsky congratulated the investors that held onto their CEL Tokens during the brief market downturn and bragged that there were "only 20 liquidations" from the 10,000 margin calls that occurred during that time period because Celsius "does a better job than most. Accommodating, providing enough warning, giving you enough time for doing what's right.  We don't make any money from liquidating you."[59]   Mashinsky falsely proclaimed that "during these drawdowns is when Celsius shines, both from the fact that it does not crash [CEL].  I think NEXO token was down about 75% from top to bottom just last week.  So those are examples of just a different community.  A HODL community versus a speculative community.  Same thing with Binance and other platforms.  Obviously, we only care about doing what's in the best interests of the HODLer."[60]

159.   On July 16, 2021, Mashinsky participated in the Celsius AMA on YouTube and asked investors "So, when are you building us a rocket?  We're going to the moon!  Everyone wants to know when CEL Token is going to the moon [Mashinsky pounds on the desk]! . . . I have to beat these billionaires!  I want to be in outer space . . . ."[61]   The phrase "going to the moon" in the crypto trading context refers to a drastic increase in the price of digital asset in question.  Here, Mashinsky was signaling to investors that the price of the CEL Token was going to increase exponentially in the future.

160.   In early August 2021, Mashinsky continued to misleadingly tout the relative safety of Celsius and its high yield rates compared to depositing funds with traditional banks.  For

---

[58]   Celsius Network, *Bitcoin Miami and Upcoming Mega Deals – Celsius AMA May 28th 2021*, YOUTUBE (May 28, 2021), https://www.youtube.com/watch?v=C7d7rZUEfGo.

[59]   *Id.*

[60]   *Id.*

[61]   Celsius Network, *Celsius AMA July 16th 2021,* YOUTUBE (Jul. 16, 2021), https://www.youtube.com/watch?v=B9eNsTnpAxk.

example, on August 2, 2021, Mashinsky represented that Celsius was safer than a bank, insisting that "we have less risk, we have much less risk" than banks.  Then on August 5, 2021, Mashinsky participated in an interview titled "How Crypto Yields Work" and made additional misleading statements concerning the staggering return on investments that investors could receive from Celsius without risk.  In particular, Mashinsky stated that Celsius offered to pay investors "almost 100 times more than your bank pays you . . . and we do that without taking any risk . . . or taking minimal risk."

161.    Similarly, Mashinsky stated during a September 10, 2021 AMA on YouTube that "We are shooting to the moon.  We might get there before Elon Musk.  Because our numbers are just getting better and better."[62]  Again, these promotions were meant to mislead investors into purchasing CEL Tokens on the prospect that the CEL Tokens' value would increase.

162.    On December 1, 2021, Celsius held an AMA session on YouTube where investors could ask questions of Celsius representatives.  One investor expressed concern about a "CEL token liquidation cascade" and asked whether Celsius was "worried at all," to which Celsius content manager Zachary Wildes replied "I'm personally not . . . I do think we need to bring a lot more time and attention and focus to CEL token and its utilities.  I'm not concerned about a cascading liquidation event where everyone gets destroyed."[63]  Wildes continued that "We're at a low-point for CEL sentiment and the future of the token" and asked Mashinsky if there was "any level of reassurance we can give . . . to the community to show our commitment to CEL token?"[64]

---

[62]      Celsius Network, *Celsius AMA September 10th 2021*, YOUTUBE (Sep. 10, 2021), https://www.youtube.com/watch?v=lc8crMFnRgY.

[63]      Ozi_Crypto, *Celsius Network Twitter Spaces AMA 1-12-2021*, YOUTUBE (Nov. 30, 2021), https://www.youtube.com/watch?v=1v9zDkWbZJc&list=PL91_dMxDmGklKG DKCX_YFDLeRk0ag2Koj&index=28.

[64]      *Id.*

Mashinsky responded that "Earning in CEL allows you to earn twice as many CEL right now with the price lower.  If you believe in the viability of the company, then you would know you're getting a 50% discount.  If you don't believe in it, then you probably don't want these CELs anyway.  If you're not sure about it, how about some of the worlds best investors coughing up 750$ Million?  They bought into half of all the CEL tokens out there.  Our Treasury, which is mostly CEL token.  They're part owners of that . . . ."[65]  Mashinsky's statements falsely suggested to investors that the Company's successes would lead to a 50% increase in the CEL Token price in the future and that Celsius had the support of well-capitalized backers who would be able to continue to shore up Celsius' finances.

163.    On December 3, 2021, Mashinsky published an Ask Me Anything interview wherein he makes several misleading statements about the safety and stability of investing in the various Celsius Financial Products.  In particular, Mashinsky falsely stated that "Celsius . . . helps people navigate in a safe way into [the DeFi] environment . . . because Celsius already did the homework and figured out what's safe."  Mashinsky further told investors that because "not all yield is created equal," Celsius only used "safe protocols," was "very skeptical," and "careful and [worked] with very few companies."  Mashinsky even cautioned investors against using other crypto platforms that offered similar yield bearing investments: "if somebody's offering you [a yield] of 20%, I would be very careful digging into why and how they're paying it."  To underscore the safety of Celsius compared to other high-yield bearing accounts, Mashinsky blatantly misrepresented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything. . . ."

---

[65]     *Id.*

164.    Similarly, during the following week's Ask Me Anything interview on December 10, 2021, AMA, Mashinsky declared that "Celsius takes full responsibility if anything goes bad" and claimed that if "something bad happens with the Celsius deployment . . . Celsius [is] standing behind it." Mashinsky frightened investors into staying with Celsius by stating that competitors' platforms could not be relied upon "when they . . . blow up . . . or when they don't perform or they don't deliver. . . ." December 10, 2021, AMA, Mashinsky yet again assured investors that Celsius "[doesn't] do it by taking risk. . . ."

165.    On January 12, 2022, Mashinsky participated in the weekly Celsius YouTube AMA podcast, misleadingly promoting the "huge demand for CEL Token" that the Company was creating.[66] "We still have new users signing on every day and none of that changes. But this is all new demand that never existed before."[67] Mashinsky further stated that "We believe that the token has not shown its full potential yet. A lot of it is on us. Again, we were not focused on the token performance and all that in 2021. As you can see, we're launching big things this year. And obviously, these things are gonna have major major impact on the price of CEL."[68]

166.    Later during the AMA, Mashinsky was confronted by a popular commentator in the crypto sector, Dirty Bubble, who asked if Mashinsky or other Celsius insiders were selling their CEL Tokens. Mashinsky became defensive, vaguely acknowledging that he and his wife "did a bunch of transfers. We did sell some tokens. It's not like we didn't sell any. My wife hasn't sold anything."[69] But then Mashinsky went on to challenge anyone listening "to go and

---

[66]    Ozi_Crypto, *Celsius Network Twitter Spaces AMA 12-1-2022*, YOUTUBE (Jan. 12, 2022), https://www.youtube.com/watch?v=bPk7rKAXMvU&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=22.

[67]    *Id.*

[68]    *Id.*

[69]    *Id.*

find one project, just one, where the founders hold more tokens in their project than Celsius.  Just find one!"[70]  Mashinsky tried to excuse his selling activities saying "you know, there is no rules in this business.  It's not like somebody has to hold the tokens . . . I wouldn't measure what me or Nuke or Krissy or Daniel do as having anything to do with what the company does.  You guys should just watch if the company is working for you.  Does the company deliver things that are in your best interests?"[71]

167.    Dirty Bubble replied that "Celsius is going off of reputation" and asked about whether Celsius would be making the same kind of disclosures of CEL Token sales by Celsius executives as would be required if Celsius was a public company.[72]  Mashinsky bluntly replied "We're not a public company!  So what the fuck are you talking about!?"[73]

168.    On January 19, 2022, Mashinsky participated in the weekly Celsius "Ask Me Anything" session on YouTube and made a series of false and misleading statements regarding the CEL Token and how it was poised for future growth in use and, more importantly, price.[74]  For example, during this AMA, Mashinsky went on a rant about how everyone at Celsius did not "have to worry about humility" because they instead had "conviction."[75]  In a seemingly unintentional moment of honesty, Mashinsky essentially admitted that Celsius relied on con-man style tactics to instill confidence in a target: "Everybody from Celsius on this call has the same conviction.  They

---

[70]    *Id.*

[71]    *Id.*

[72]    *Id.*

[73]    *Id.*

[74]    Ozi_Crypto, *Celsius Network Twitter Spaces AMA 19-1-2022*, YOUTUBE (Jan. 18, 2022), https://www.youtube.com/watch?v=EE4k_WLqldc&list=PL91_dMxDmGklKGDKCX_ YFDLeRk0ag2Koj&index=21.

[75]    *Id.*

wouldn't be a part of CEL Team 6 if they didn't have that full conviction.  100%.  And they don't need humility.  They just need to share with you the conviction and CONVINCE you that it's the right thing."[76]    Mashinsky then quickly returned to promoting the CEL Token's future, acknowledging that the Company "took our hand off the wheel" with the CEL Token, but that they had a plan and a "super team" to "get the car back on the road."[77]

169.    For example, when asked about how Celsius generates revenue, Mashinsky falsely responded that "*We always make all of our money from institutions* . . . .  We don't charge fees, spreads, all of that stuff."[78]  (Emphasis added.)

170.    Celsius' whitepaper also promoted the CEL Token as a necessity for the Company's future growth: "Our lending and borrowing model requires a blockchain and an open ledger technology, it also requires consensus and a global footprint of coin holder in order to really gain traction and complete our mission.  Any loan we issue may be collected from thousands of individual coin holders which may be switched at any time.  Only a smart contract capable of tracking and paying in micropayments can handle such complexity."[79]  In truth, Celsius does not operate a blockchain of its own and the CEL Token is a simply a standard ERC-20 token built on the Ethereum blockchain.  Moreover, Celsius' suggestion that managing a loan ownership profile requires a blockchain is not true.

171.    As noted in a blog post on January 18, 2022, entitled *Celsius Network: Financials proved it was a Ponzi scam* the "real purpose of this token was to create an Initial Coin Offering

---

[76]    *Id.*

[77]    *Id.*

[78]    *Id.*

[79]    Celsius   Network,   *Borrow   Cash.   Earn   Interest,*   ("Celsius   Whitepaper")*,* https://celsius.network/static/celsius-whitepaper.pdf.

("ICO") that netted them $50 million without strings to start financing their operations.  But there is one other valuable feature: they can pay investors with this token they minted out of thin air because non-US investors have the option to receive their returns in the CEL token for an extra 2% yield and it costs Celsius effectively nothing."[80]

172.    As such, the CEL token has no utility and serves no real purpose for investors.

173.    The Executive Defendants led consumers to think that most of the yield Celsius offered its users came from institutional securities lending.  The Celsius Network website had, multiple explanations of how the return comes from lending assets to institutions on a short-term basis.  The Celsius YouTube channel also had videos of the CEO of Celsius, Defendant Mashinsky, praising the Company's institutional lending strategies and even berating the risk of competing DeFi yield strategies.

174.    On April 13, 2022, in an interview with CNBC International, Mashinsky was asked to respond to a report that Celsius was offering uncollateralized loans that "could be incredibly risky."  Mashinsky falsely denied the report, stating unambiguously that "we don't offer any non-collateralized loans."   During that same interview, Mashinsky also falsely and misleadingly claimed that Celsius dealt only with "very credible" institutional counterparties.

175.    On May 13, 2022, Mashinsky held another Ask Me Anything interview on YouTube and made fraudulent statements about the stability of Celsius in the wake of the Terra collapse: "Celsius is stronger than ever, we have billions of dollars in liquidity . . . and we continue to do what Celsius does best – serve the community, protect the community, make sure your assets are there when you need them."

---

[80]     Want Financial Independence, *Celsius Network Scam: A Technical Ponzi Scheme* (Jan. 18, 2022), https://wantfi.com/celsius-network-review.html (last visited July 12, 2022).

176.    On May 16, 2022, Mashinsky falsely reaffirmed the stability of Celsius in a YouTube interview titled Luna/UST Aftermath on Crypto Markets & Stablecoins, claiming that "companies like Celsius . . . are standing strong," and that they were "ready at all times . . . with the liquidity."  In truth, Celsius was already insolvent at the time this statement was made.

177.    In a Celsius network video published on May 24th, 2022,[81] Mashinsky offered his thoughts on the aftermath of the Luna-Terra collapse.  Mashinsky provided the following advice regarding crypto yield-bearing products: "if you do not understand where the yield comes from, then you should not be in the project.  If you cannot prove how the yield is earned, do not invest in the project."[82]  Notably, Mashinsky failed to disclose all of the sources of customer money's yield, and the significant risks associated with those sources.  Instead, what investors were told was that depositing crypto in Celsius was akin to depositing money in a savings account, and the profit came from established institutional lending.  But as noted, the Executive Defendants purposefully refused to provide investors with all of the wallet addresses owned/controlled by Company insiders (including Individual Defendants' wallet addresses).  Without sophisticated wallet labeling to determine which anonymous addresses belonged to Celsius Network, and on-chain analysis of the movement and usage of these funds, it was extremely difficult for investors to know Celsius was hunting yield with corporate funds via leveraged positions in DeFi protocols with liquidation risk.

178.    On May 27, 2022, Mashinsky published another "Ask Me Anything" interview on YouTube, which played a pre-recorded solicitation video that offered new investors a bonus for

---

[81]    Crypto News, *Alex Mashinsky Gives BitcoinPrice Outlook, Talks Terra Collapse,* (Jun. 1, 2022),  https://cryptonews.com/videos/bitcoin-has-never-done-this-before-alex-mashinsky-gives-price-outlook-talks-terra-collapse.htm.

[82]    *Id.*

joining Celsius: "Did you know you can earn crypto by referring a friend?  You'll get $50 in crypto

for each completed referral.  Your friend will get a $50 referral reward too."

179.    In late May 2022, Mashinsky was still actively recruiting new investors, urging

them to disregard all criticism of Celsius from "naysayers and haters," to "ignore the FUD" (a

popular crypto acronym that stands for fear, uncertainty, and doubt), and continued to encourage

existing investors to HODL (*i.e.* "hold on for dear life").  For example, on May 29, 2022,

Mashinsky sent the following message to new investors on Twitter: "These are hard times for

many. . . .  I will personally give one of the new @CelsiusNetwork users $1000 this week if you

show you opened an account and started #HODLing to build your #FinancialFreedom."

180.    During a June 1, 2022, "Ask Me Anything" interview published on YouTube,

Mashinsky stated: "Celsius continues to do what it did for the last five years.  Again, most of our

business, I would say 90% of our business, has nothing to do with DeFi."  Mashinsky further

falsely minimized Celsius's exposure to the collapse of Terraform Labs' UST and LUNA tokens:

"I know people are concerned about the whole market and they were specifically concerned with

the Terra/Luna situation and we've publicly stated many times that we didn't lend to them, we

didn't buy Luna or UST, we were not like many others who invested in the project, we didn't have

any exposure to that, we have very small losses when we withdrew from the Anchor Protocol but

these were in a single millions [sic]. . . ."  Mashinsky also misleadingly downplayed concerns that

Celsius "must have had huge damage from Luna," saying "No, we didn't have any, actually. . . .

You should be worried about other people."  When questioned whether Celsius had any other

exposure to the Terra-related after effects, Mashinsky misleadingly reassured that Celsius had

"[n]o other exposure that I know of. . . .   There are other market participants who had big

investments in Luna and UST, and so we basically either reduced or eliminated any exposure to those parties."

181.    During that same AMA interview on June 1, 2022, Mashinsky was asked about "the elephant in the room"; namely that, "after everything that's happened recently, the number one question from people is 'are our funds safe at Celsius?'" Mashinsky declared: "yes, so not just that they're safe . . . we provided [the opportunity for] anyone who wanted to withdraw partially or fully, there were no problems."  Mashinsky then confirmed that the Executive Defendants had the "framework and structure" to "let the community know immediately if there is a problem" involving "any type of insolvency issues."

182.    On June 4, 2022, Mashinsky posted a message on his official Twitter account, admitting to using risky decentralized finance investments after users accused his company of misleading customers on the source of yield and use of funds: "Celsius lends on DeFi when yields are high and borrows on DeFi when rates are low like now.  @CelsiusNetwork is earning income from these activities."[83]  Mashinsky then dismissed the criticism of the way Celsius promoted the source of yield and use of funds, calling them "baseless allegations" to make investors doubt the validity of the well-founded criticisms.

183.    June 10, 2022, AMA – only two days before Celsius froze withdrawals from its platform – Mashinsky continued to promote Celsius to investors: "Celsius has billions in liquidity. . . .  [W]e provide the immediate access to everybody, anyone who needs access to it, to the liquidity."  In the same AMA, Mashinsky stated "when you went through several bear markets,

---

[83]     @Mashinsky, Twitter (Jun. 4, 2021) https://twitter.com/Mashinsky/status/1533261237202599938?s=20&t=nHwUESvAsmWNp8dmmyy-dA.

you know what to do . . . you need to have liquidity, which we have . . . that's why anyone who wants to withdraw has no problem. . . ."

184.   June 11, 2022, one Twitter user speculated about Celsius's ability to fulfill withdrawal requests: "I hope retail [investors] can get out.  I've been hearing about accounts locked."  Mashinsky immediately rejected the premise that Celsius investors were in any danger, replying on Twitter: "[D]o you know even one person who has a problem withdrawing from Celsius?  Why spread FUD and misinformation."

185.   As disclosed in the Examiner's Report, Celsius managers recognized that many of the statements that Mashinsky made during AMAs and in his tweets, particularly about how Celsius was deploying customer assets, were not true. As early as May 2021, Celsius's Chief Risk Officer, Rodney Sunada-Wong, raised the prospect of editing the April 20, 2021 AMA (and others) after the fact and before posting them to YouTube to eliminate any misleading statements.[84]  Mr. Sunada-Wong suggested that future AMAs could be taped rather than proceeding live so that false or misleading statements made by Mashinsky or the Executive Defendants could be removed before the AMA was broadcast to the public "[t]o protect Celsius." Mashinsky resisted that suggestion, claiming that any delay in the AMA's release would create "FUD" with investors. According to the Examiner's Report, all throughout 2021 and up until July 2022, Celsius executives (including those in the Company's risk, regulatory, compliance and legal departments, which were overseen by the Executive Defendants) continued to identify incorrect statements that Mashinsky and the Executive Defendants made during the weekly AMAs. Indeed, Mashinsky, Goldstein, Leon, and Beaudry were copied the internal emails and communications discussing the

---

[84]      *See* fn.46, *supra* at *21.

false and misleading statements made in the AMAs and were aware of (and approved) the efforts

to edit the videos of the AMAs to remove certain false and misleading statements contained within.

186.    The statements by Mashinsky and other Executive Defendants that were edited out

of the AMAs included material misstatements about Celsius' balance sheet and the risk undertaken

by the Company.  For example, Mr. Sunada-Wong called it "crucial" to delete a statement from

the May 14, 2021 AMA that said "When you transfer your assets to your Celsius wallet you've

instantly start[ed] generating rewards that are paid out every Monday.  These rewards compound

causing your returns to stack and snowball over time.  Celsius is able to achieve this by lending

out the community's assets to vetted financial institutions.  These loans are collateralized.  This

means the institutions give Celsius assets or dollars to hold onto before we give out the digital

assets.  This protects the community and keeps them whole."  This misleading statement (many of

Celsius's institutional loans were uncollateralized) was deleted and no longer appears on the

version of the May 14, 2021 AMA posted on YouTube.  The YouTube editing process occurred

every week from May 2021 until around June 12, 2022 when the Company froze all customer

withdrawals.

187.    These AMAs were broadcast live to thousands of investors.  As the Examiner's

Report goes on to state: "Lists containing these misstatements were circulated internally.  In some

instances, Celsius was able to edit the AMAs after posting; in other instances, it was not.  But what

Defendants, including Mr. Mashinsky never did was correct the record after the fact for the

thousands of live audience members who heard these misstatements or for those who watched the

recorded videos on YouTube before they were edited.  Instead, in some instances, internal

documents suggest that Celsius employees "hoped viewers would not notice the discrepancies that

had been edited from the videos."[85]  In truth, even though Leon, Urata-Thompson, Goldstein, and Beaurdy each knew that the false and misleading statements in the AMAs continued to be regularly disseminated to Plaintiffs and the Class, none of them did anything more than try to hide the evidence of the fraud after the fact.

188.    Executive Defendants also misled investors about the future growth potential for the Earn Rewards Accounts, encouraged Earn Rewards Investors to treat their Earn Rewards Accounts as long-term investments as evidenced by the statement on Celsius' homepage: "Start earning top rates on any amount of crypto and get paid every Monday to keep HODLing."  According to Celsius, "HODL started as a typo and has become a crypto rallying cry.  A misspelling of the word 'hold,' HODLers believe in the future of digital currencies and know it would be a mistake to sell at this early stage."[86]

189.    Executive Defendants also touted the ability of Earn Rewards Investors to manage their Earn Rewards accounts as long-term investments using the "HODL Mode" feature of their Celsius account.  Celsius describes HODL Mode on its Website as an account security feature "that gives [account holders] the ability to temporarily disable outgoing transactions from [their] Celsius account.  [Account holders] control when HODL Mode is activated and it is an ideal feature for those that do not plan on withdrawing or transferring funds from their account for an extended period of time."[87]

---

[85]      *Id.*

[86]      Celsius  Network,  https://support.celsius.network/hc/en-us/articles/360001716538-What-s-HODL-Mode (last visited Jun. 19, 2023).

[87]      Celsius  Network,  https://support.celsius.network/hc/en-us/articles/360007608077-What-is-the-HODL-Mode- (last visited Jun. 19, 2023).

190.     Defendants' instilled a corporate culture to promoting "HODLing," including its description of Celsius as a "HODLing platform," the premium interest rates Celsius pays on its Earn Rewards accounts, the weekly compounding of interest payments, and the availability of HODL Mode makes the Celsius Earn Rewards account an attractive long-term investment to Celsius Earn Rewards Investors.

191.     In a July 14, 2022, sworn declaration filed in the Celsius's bankruptcy proceeding, Mashinsky admitted that Celsius made "poor asset deployment decisions." In fact, at the same time the Executive Defendants and Mashinsky were promoting the Earn Rewards Accounts and the CEL Tokens on social media as "safe" and the Company as a good steward of customer's deposits, Mashinsky was secretly selling millions of dollars' worth of CEL Tokens.

192.     According to the Arkham Report, several Ethereum addresses have been identified as likely belonging to Mashinsky (the "Mashinsky Wallets").[88]  The Mashinsky Wallets regularly sold large amounts of CEL Tokens on decentralized exchanges, totaling $44 million.  At the same time that he was promoting CEL Tokens to users and denying that he was selling the token, Mashinsky appears to have been quietly selling millions of dollars of CEL Tokens.

193.     The following is a list of the specific addresses comprising the Mashinsky Wallets, which are owned/controlled by Mashinsky and/or his wife Krissy Mashinsky, and were used to sell the CEL Tokens that Mashinsky had set aside for himself at the time of minting:

- 0xf716F34cb7FabfaA930169eC66278f525b6a1597 ($21M in sales);

- 0x34F30e5473fE5D2dcD9A930275Be30ACC1EEF12b ($100k in sales);

- 0x11729acCDA2dA02B453cB4AEA4EFCDeDc0E56bD9 ($1M in sales);

- 0xc33192B79AD149b05169516A8aF2adc6e1E08EF6 ($12M in sales);

---

[88]     *See* fn.11, *supra.*

- 0x6D27BA372b148A190F0806899e53a6D4009cf5af ($8M in sales);

- 0x23cE2180754AF6207Ee13e745BC903795661e7C9 ($300k in sales);

- 0xd50061dDC6E813F56dF865D450B3cC61973E881A ($2M in sales); and

- 0x2a020312Dd646D81acBC81015Df532eAFC2D5257 ($530k in sales)

194.    Most of the CEL sales from the Mashinsky Wallets took place on the decentralized exchanges Uniswap and Airswap.  Typically, Mashinsky swapped CEL Tokens for the stablecoin USDC.  In other instances, Mashinsky opted to take ETH or wBTC.  Notably, one of the Mashinsky Wallets also deposited CEL Tokens to the centralized exchange Liquid at the same time that Celsius was purchasing large amounts of CEL Tokens on that same exchange.  As discussed in the Arkham Report, one particular Mashinsky Wallet address deposited over 9.1 million CEL Tokens to Liquid from June 2019 to July 2020.[89]  During the same time, Celsius appears to have purchased over 29 million CEL from Liquid, creating a situation where Celsius was using corporate funds on the same orderbook the CEO used to exit his CEL Token position.

195.    As all of this activity was occurring within the Mashinsky Wallets, Mashinsky publicly promoted CEL and denied that he or other Executive Defendants were selling.  Mashinsky also gave the impression that he was increasing his CEL holdings by publicizing CEL purchases.

196.    For example, on October 9, 2021, Mashinsky tweeted, "Lots to CELebrate here in #London busy week with a lot of large deals and events.  It pays to #HODL."[90]  Nine hours later, on the very same day, one of the Mashinsky Wallets sold 12K CEL on Airswap for $69k in USDC.  Similarly, on December 9, 2021, Mashinsky posted a message on his Twitter account, promoting

---

[89]     *Id.*

[90]     @Mashinsky, TWITTER (Oct. 9, 2021)
https://twitter.com/Mashinsky/status/1446846073713184772.

CEL Tokens as a long-term investment for Company insiders and stating: "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token."[91]  But only five days earlier, on December 4, 2021, one of the Mashinsky Wallets was selling over 11,000 CEL Tokens for about $43,000 worth of WBTC.  Since June 9, 2021, the Mashinsky Wallets sold approximately 2.8 million CEL Tokens valued at over $16 million at the time.

197.    As the Examiner's Report concludes:

> In every key respect – from how Celsius described its contract with its customers to the risks it took with their crypto assets – how Celsius ran it business differed significantly from what Celsius told its customers.  The Examiner interviewed and communicated with a number of Celsius's customers, many of whom stated that Celsius's misstatements about how it would handle their crypto assets led them to invest significant crypto assets with Celsius that they would not have invested if they had understood the level of risk Celsius was taking or that many of the things Celsius presented in its AMAs, tweets, and other marketing materials were not true.[92]

### E.    The Fall of Celsius

198.    On-chain analysis of Celsius owned/controlled wallets indicates that Celsius, operating under the control and direction of the Executive Defendants, had billions of dollars in leveraged positions on decentralized finance (DeFi) protocols that were threatened with liquidation when the broader crypto market was in decline.  In order to avoid liquidation, the Executive Defendants were forced to deploy $750 million of liquid assets that could no longer be used to meet withdrawal obligations.

199.    Celsius' Chief Compliance Officer and General Counsel, Defendant Beaudry, left Celsius shortly thereafter in September 2021.  Between December 2021 and May 2022, Beaudry withdrew coins with a market value of $2,143,502 (after accounting for several deposits during

---

[91]    @Mashinsky,         TWITTER         (Dec.         9,         2021) https://twitter.com/Mashinsky/status/1468995783982825480 (last visited July 12, 2022).

[92]    *See* fn.46, *supra* at *22.

that period).  According to the CEL tokens transactions on the public Ethereum blockchain records, Beaudry made three large withdrawals of CEL tokens in January 2021 and immediately swapped the CEL tokens for ETH and stablecoins.

200.    In the run-up to the June 12, 2022 pause on customer withdrawals and Celsius's July 12, 2022 bankruptcy filing, Celsius's problems came to a head. During a bull market, in 2021, Celsius still recorded a pre-tax loss of $811 million.  As the markets began to fall in 2022, Celsius continued to lose money, reporting a first quarter loss of $165 million.  The bear market also made it more difficult to close the gap between Celsius's reward rates and the yield it could earn on its customers' assets and fill the hole in its balance sheet as a result of its CEL buybacks and other losses.  In January 2022, for example, nearly every opportunity Celsius had to deploy its BTC was below its cost of funding, contributing to an overall continuing firmwide negative NIM.

201.    As a result, Celsius's Treasury department urged Mashinsky to change the way the Company set its reward rates so that those rates did not exceed Celsius's yield.  Mashinsky resisted because of his belief that "all of our customers will leave us" if rates were cut, and he refused to reduce the reward rates for CEL or to suspend the ability of customers to collateralize their loans with CEL.  When Celsius's new Chief Financial Officer confronted Mashinsky with these issues, Defendant Mashinsky told him to "tell your team to stay in their lane" and that he did not need help with marketing, as Mashinsky would "bring in a few billion just like I brought in the first 20B."

202.    Instead of lowering the reward rate for CEL, Mashinsky did the opposite, establishing a shortsighted policy that allowed any user that held 1 CEL to earn a 10% bonus on their in-CEL earnings.  Savvy Celsius customers quickly took advantage of this new offer.

Because Celsius did not charge for swaps, customers began to arbitrage, taking their higher CEL rewards and then swapping that CEL for other coins.

203. While Celsius struggled with its reward rates, the Company also began experiencing a severe and rapid reduction in its liquidity (contrary to statements that Celsius did not have liquidity issues). By early May 2022, Celsius's capital was "near zero." And Celsius's employees were openly speculating about the Company's continued existence. Between May 7, 2022 and May 9, 2022, as the price of the Terra stablecoin (UST) dropped, Celsius scrambled to reduce its exposure, escaping with a $30 million loss. By May 11, 2022, Celsius had failed its own Modeled Liquidity Outflow (or "MLO") test. Celsius developed the MLO test to determine how much of each type of coin it would need to hold to meet anticipated withdrawals if prices dropped significantly over one day or over one week. When the tests began to fail, however, the Executive Defendants relaxed the test instead of prohibiting further deployments as its Liquidity Risk Policy required.

204. In the wake of the Terra/Luna crash, from May 9, 2022 to May 24, 2022, Celsius experienced significant customer withdrawals – a net loss of over $1.4 billion in assets. On May 12, 2022, the price of CEL had fallen to $0.57. The Executive Defendants and Defendant Wintermute both propped up the CEL market that day, leading to a temporary increase in the token's price to $0.90. Later, on the same day, Mashinsky directed the purchase of $5 million of CEL, but Celsius only had $1.6 million of stablecoin and could not make the purchase, marking the end of Celsius's individual efforts to support CEL's price.

205. By May 27, 2022, Celsius only had sufficient liquidity to meet 30% of its BTC obligations and 21% of its ETH obligations to customers. Celsius also had triggered the modified stress test introduced only three weeks earlier. The percentage of Celsius's assets that constituted

"Deployable Liquidity" (*i.e.*, assets Celsius could access within seven days) went from approximately 49% in February to under 33% by the end of May and under 24% by the Pause.  In other words, a substantial majority of Celsius's assets were essentially unavailable to meet withdrawal requests.

206.    Throughout May 2022, the Executive Defendants sought to assure Plaintiffs and Class members that Celsius' business and operations were in order.  For example, on May 11, 2022, both the Executive Defendants via the Celsius account and Mr. Mashinsky personally posted on Twitter that "All user funds are safe."  That same day, Mashinsky represented to investors that "Celsius has not experienced any significant losses and all funds are safe."  At the beginning of the May 13, 2022 AMA, he falsely stated "Celsius is stronger than ever."

207.    The Executive Defendants also attempted to attract additional deposits by offering promo codes and reassurances about its liquidity.  In a May 27, 2022 AMA, Celsius offered rewards for referring friends to Celsius.  On May 29, 2022, Mashinsky offered to pay $1,000 to one new Celsius customer that week.

208.    In early June 2022, Mr. Mashinsky continued to publicly represent that customers' crypto assets were safe at Celsius.  He pushed promo and referral codes to attract new customers. But on June 5, 2022, a report appeared that a risky defi protocol named Stakehound, a risky DeFi lending protocol, had lost the keys to 35,000 of Celsius's ETH one year earlier in May 2021 – a loss that Celsius had not previously made public.  In response to those reports, between June 7, 2022 and June 10, 2022, Celsius published a series of blog posts and continued to livestream AMAs in which it repeatedly emphasized Celsius' so-called core themes of transparency and liquidity.  Mashinsky falsely told a June 10 AMA audience that Celsius had "billions" in liquidity.

Behind the scenes, on June 9, 2022, the Risk Committee reported that any additional withdrawals would materially deplete Celsius's liquidity.

209.     By June 12, 2022, the house of cards fell down.  Executive Defendants were forced to pause all customer withdrawals.  One month later, on July 12, 2022, Celsius filed its chapter 11 petition.  Celsius's former Vice President of Treasury summed up Celsius's problems as follows: "Pay unsustainable yields so you can grow AUM [assets under management], forcing you to take on more risk, experience losses bc of those risks + bad controls / judgment and you are where you are."

210.     After the news of Celsius freezing withdrawals broke on June 12, the price of CEL fell to $0.28.

211.     On July 8, 2022, a research company, Arkham published the Arkham Report on Celsius Network, detailing the business practices of the Executive Defendants.  According to the Arkham report, "Celsius was one of the biggest players in DeFi, accounting for a huge portion of the funds deployed to the three largest DeFi protocols, Compound, Aave, and Maker."[93]

212.     The Arkham Report also provided the following breakdown of Celsius' DeFi positions as of June 21st, 2022, eight days after freezing user accounts:

---

[93]     *See* fn.11, *supra*.



- ➔ **On AAVE** – 32% of stETH supplied; 17% of WBTC supplied; 6% of ETH supplied; 35% of LINK supplied; 78% of SNX supplied; 70% of xSUSHI supplied; 37% of USDC borrowed; 30% of DAI borrowed; 12% of REN borrowed.
  - ◆ Celsius' cumulative positions account for 12% of the total supply and 17% of the total amount borrowed in US dollar value on AAVE.
- ➔ **On Compound** – 43% of WBTC supplied; 13% of ETH supplied; 57% of DAI borrowed.
  - ◆ Celsius' cumulative positions account for 11% of the total supply and 20% of the total amount borrowed in US dollar value on Compound.
- ➔ **On Maker** – 38% of WBTC-A supply; 59% of DAI borrowed from WBTC-A pool.
  - ◆ Celsius' cumulative positions account for 6% of the total supply and 3% of the total amount borrowed in US dollar value on Maker.
- ➔ **ETH2 staking** – 2.5% of all ETH staked.
- ➔ **stETH** – 10% of stETH in circulation.

$671M Supplied    $492M Supplied    $396M Supplied

$273M Borrowed    $210M Borrowed    $178M Borrowed

Aave    Maker    Compound

*Celsius DeFi Positions on 21 June 2022* [94]

213.    In early June 2022, the broader digital asset and cryptocurrency market saw a steep decline in price, which precipitated Celsius Network's crisis.  On June 10th, 2022, Bitcoin began the day trading at around $30,000.  Over the following eight days, Bitcoin's price fell over 40% to below $18,000.  Other crypto assets saw an even more dramatic crash during this time.

214.    The crypto market downturn forced Celsius to deploy significant capital to protect the Company's highly leveraged DeFi positions from liquidation.  Maker allows users to borrow DAI (Maker's native stablecoin pegged to one US dollar), against various collateral options.  Each loan has a maximum collateral-to-debt ratio that triggers a liquidation of the posted collateral when crossed.  On June 10, 2022, Celsius had 17.8k WBTC of collateral in Maker and $280 million in DAI borrowed against it.  The loan had a minimum collateralization ratio of 145%, meaning the position is liquidated when the collateral posted is worth less than 145% of the debt.  At the time,

---

[94]    *Id.*

this WBTC was worth $530 million for a 190% collateralization ratio, seemingly a comfortable cushion.  But the combination of liability-asset denomination mismatch and volatility caused the strength of the position to deteriorate rapidly.

215.    In three days, the price of Bitcoin fell below Celsius' original liquidation price of $22.8k.  The fragility of the Executive Defendants' leveraged positions forced the company to use liquidity to pay down DeFi debt instead of honoring customer withdrawals.  Between June 11, 2022 and June 16, 2022, Celsius, operating under the direction of the Executive Defendants, added 6.2k WBTC as collateral and paid back 53.8 million of its DAI debt, reducing its liquidation price to $13.6k per BTC.  After July 1, 2022, the Executive Defendants paid back another $220 million in DAI to close out the position.  AAVE rates every position on its platform with a health factor based on various risk parameters and liquidates any position with a health factor below 1.0.  At the start of the market downturn, around June 10, 2022, Celsius appears to have had $604 million of collateral against $303 million in debt on AAVE with a health factor of 1.6.  On Compound, Celsius appears to have had $421 million of collateral against a $218 million debt.  During the market crash, Celsius again gathered liquid capital to shore up these liabilities, adding tens of millions of dollars' worth of BTC, ETH, LINK, SNX, and BAT as collateral on AAVE and paying $30 million toward their debt.  On Compound, they paid $40 million towards their debt and added over $1 million UNI as collateral.  Since June 10, 2022, Celsius has deployed $546 million in stablecoins, 7.2k BTC, 16.3k ETH, and tens of millions of dollars of other tokens to its leveraged DeFi positions.  These deployments were worth roughly $750 million at the time of transactions.

216.    On June 13, 2022, Celsius froze all accounts.   According to their official announcement, this was done "due to extreme market conditions in order to stabilize liquidity and operations while we take steps to preserve and protect assets."[95]

**F.    Executive Defendants and Wintermute Engaged in Improper Market Making**

217.    As part of its investigation into the conduct leading up to Celsius' filing for bankruptcy protections, the Celsius Examiner issued her Final Report on January 30, 2023, which contained numerous factual allegations that were gleaned from internal documents from Celsius and the Executive Defendants and interviews with current and former Celsius employees (including, but not limited to, the Executive Defendants).   This information, along with other publicly-available internal conversations among the Executive Defendants, confirmed the scheme by Executive Defendants and Defendant Wintermute to wash trade CEL tokens to influence the price and/or trading activity of CEL tokens.

218.    Wintermute acts as a purported "market maker" in the crypto industry.   The term "market making" however, is abused in the crypto industry with the phrase used very generally to describe all manners of complicated trading activities, including wash trading, that work to harm investors.

219.    Wash trading is a classic form of market manipulation that creates the illusion that a particular asset is trading far more often than it actually is.   The following excerpt explains wash trading in the context of cryptocurrency:

> For example, large investors within a crypto project, XYZ, might buy some more XYZ crypto from that project using multiple addresses.   Once they've acquired additional XYZ, then they would transfer the same amount of XYZ to the exchanges. At that point, they would convert XYZ to Ether and use that Ether to buy more XYZ.

---

[95]    Celsius Network, *A Memo to the Celsius Community,* (Jun. 12, 2022) https://blog.celsius.network/a-memo-to-the-celsius-community-59532a06ecc6.

This behavior would continue for some time, using multiple addresses in an attempt to disguise their intent.

Outside investors would see the increased interest and volume in XYZ, then decide to buy into the project long-term. This additional interest from outside holders with long-term intent increases the price of XYZ. Then, the insider would sell some of their XYZ crypto at a profit. In essence, the large investors of XYZ use wash trading to mislead others about the speculative interest in the project – so they can eventually dump their holding at a profit.[96]

220.    In a wash trading scheme, a trader buys and sells the same asset between or among his or her own accounts in transactions lacking true economic purpose. Wash trading is not an arm's length market activity and is not the result of market forces of supply and demand. Wash trading gives the artificial appearance of, among other things, increased trading volume, liquidity, and trading interest for the asset at issue. It may also artificially inflate the aggregate trading volume of the platform upon which the asset is being traded.

221.    This is precisely what occurred with the washing trading engaged in by the Executive Defendants and Defendant Wintermute. Rather than implementing rules and controls to prevent fraudulent and manipulative acts, Defendants actively carried out these various frauds. The supposed controls were virtually non-existent, and those that did exist did not monitor for or protect against "wash trading" or self-dealing, which was implemented by the Executive Defendants and Wintermute in order to manipulate prices of the CEL Tokens. Most notably, from at least March 2021 up until Celsius froze withdrawals on June 12, 2022, the Executive Defendants actively engaged Defendant Wintermute to engage in improper market making via the use of wash trading.

---

[96]    Bybit, *Wash Trading: What It Is & Why It's Important,* (Feb. 20, 2022) https://learn.bybit.com/trading/what-is-wash-trading/.

222.   Defendant Wintermute and the Executive Defendants engaged in a wash trading scheme that artificially inflated the trading volume of the CEL Tokens sold and marketed by Celsius.

223.   By the time Mashinsky and Leon created the Celsius Platform, they understood the importance to investors that platforms' monitor for and preventing manipulative trading (including wash trading), especially given the largely regulatory non-compliant nature of crypto asset trading platforms, the risks of manipulative conduct on such platforms, and the perceived importance of presenting accurate information to the public.

224.   But Executive Defendants purposefully failed to implement controls to prevent manipulative trading on the Celsius Platform that they falsely claimed to investors to have implemented, resulting in fake volumes and liquidity that induced investors to deposit more digital assets on the Celsius platform and to purchase more CEL tokens as part of the Celsius Flywheel.

225.   Executive Defendant's statements about Celsius' trading activity, internal controls and compliance, and soundness of its business practices described herein were false and misleading, as these Executive Defendants actively engaged in such acts, practices, and courses of business that operated as a fraud and deceit upon the purchasers of the Celsius Financial Products. During the Class period, Defendants – contrary to their public statements – failed to implement controls to monitor for and prevent manipulative trading.  Moreover, whenever Mashinsky reported trading volume without disclosing the extensive nature of the wash trading that Defendants knew existed on the Celsius Platform – as described below – they deceived investors into thinking that the trading volumes on the platform were robust, real, and reliable.

226.   Any time the Executive Defendants provided CEL Token price information or trading volume numbers to the investing public without qualification and without warning

investors about the potential for manipulative trading given the lack of surveillance and monitoring over the platform's trading, it was false and misleading.

227.    Defendants' statements about compliance and trading volumes were material to investors trading in the CEL Tokens and on the Celsius platform.  When deciding whether to trade in CEL Tokens, a reasonable investor would consider it important to know that the Executive Defendants and Wintermute were engaging in manipulative trading with respect to the CEL Tokens, and ensuring that the reported trading volumes reflected real market demand based on arm's length transactions operating under legitimate market principles.

228.    Volume is important for investors in evaluating prices (including anticipated price movement), market activity (including demand and available liquidity), and market efficiency. Defendants' scheme depended heavily on Class members believing that the CEL Token prices, trading, and reported liquidity were not tainted by fraud.

229.    This information was also material to Plaintiffs and other investors because Celsius's trading volume and profitability served as an important metric for the yield that the company would purportedly pay on the Earn Accounts.  Investors like Plaintiffs use market share to assess Defendants' profitability and market share, and as an indication that customers were actually engaged with the platform.  And given the active regulatory scrutiny of businesses involving crypto assets in the United States, investors would and did consider it important to know that they were investing with a compliant platform to reduce the regulatory risk to the business and its profitability.

230.    Much of this wash trading occurred through Defendant Wintermute, an entity engaged at Mashinsky's insistence to act as the market maker on the Celsius Platform.  Wintermute conducted wash trading that fraudulently manipulated trading volumes on the Celsius platform.

231.     The wash trading scheme was occurring contemporaneously with Plaintiffs' purchases.  This wash trading activity corrupted the CEL Token prices, as well as the reported trading volume, all in a strategic pattern to deceive investors.  Investors certainly would have wanted to know that the platform's principal and main figurehead – Defendant Mashinsky – was engaging Wintermute to effectuate a wash trading scheme that would manipulate the prices of the CEL Token.

232.     The specifics of the wash trading scheme are as follows: The exponential increase in CEL's price coincided with an inflationary market and Celsius's own substantial actions to increase the price.  Celsius employees on Celsius's CEL trading desk attributed the increase in CEL price to Celsius's actions in the market.[97]  As noted above and as early as 2018, Celsius had purchased from the market, and publicly disclosed its purchase of, some CEL needed to satisfy customer rewards.[98]  In 2018 and 2019, Celsius calculated on a weekly basis the quantity of CEL it needed to pay customers for the week and then typically purchased half of the required amount from the market while obtaining the other half from Celsius's general deployment wallets.[99]  As a result, in 2018 and 2019, Celsius transferred at least 140 million CEL, valued at over $11 million, into its wallets from the secondary market.[100]

233.     According to internal communications disclosed as part of the Celsius bankruptcy proceedings, the Celsius executives referred to buybacks from May to August 2018 as "an effort

---

[97]     *See* fn.46, *supra* at *96 n.231 (citing to a January 12, 2023 interview with Connor Nolan (Head of Coin Deployment and Institutional Lending at Celsius)).

[98]     Celsius, AMA June 14, 2018, YOUTUBE (June 14, 2018), https://www.youtube.com/watch?v=P89WfneySwE ("We've . . . already started earning interest and started buying some CEL token in the open market . . . .").

[99]     *See* fn.46, *supra* at *96 n.233.

[100]     *See id*., *96 n.234 (noting that "The Examiner's blockchain analysis confirmed at that least 32.5 million of these CEL purchases (worth $2.3 million) were buybacks of CEL).

to help stabilize the price," during which time Celsius repurchased three million CEL from the market.[101]   Eventually, the Executive Defendants sought out various so-called crypto "market makers," which purport to provide liquidity for assets traded in a secondary market.  Initially, in June 2019, Celsius hired Algoz "to perform Market Making on CEL and help us with buybacks that reflect the interest paid."  But in March 2020, the Executive Defendants brought in Wintermute to considerably ramp up the market making for CEL tokens.[102]

234.    The Examiner's Report provided specific details demonstrating the improper market making of the CEL token.[103]  To begin, CEL's price was only $0.05 by the end of October 2019[104] – well below its initial ICO price. Internal Celsius communications from November 2019, however, show that Celsius was committed to changing how the market viewed CEL with the goal of having the price of CEL "track the activity on our network," which Mashinsky believed "ha[d] not happened since we launched Celsius."[105]   In response, Johannes Treutler, Head of Trading Desk, stated that to "fix the correlation of CEL and Celsius . . . growth" would require "changing the style we buy back CEL," and he proposed a system by which Celsius would be much more active in the CEL market.[106]  These internal discussions manifested themselves fully the following year and fundamentally changed the way Celsius interacted with its own token.

235.    Beginning in 2020, when Defendant Wintermute took over the primary market making duties for Celsius and the CEL tokens, the Executive Defendants began to make public

---

[101]    *Id*., *96 n.235.

[102]    *Id*., *96 n.236.

[103]    *See generally id.*, **96-114.

[104]    Celsius, CoinMarketCap, https://coinmarketcap.com/currencies/celsius/ (last visited Jun. 19, 2023).

[105]    *See* fn.46, *supra* at *96 n.238.

[106]    *Id*., *96 n.239.

statements related to Celsius's CEL buyback program and how the program helped increase CEL's price.  For example, Celsius's then-Vice President of Finance and Operations stated in an AMA, "we work with a lot of different coins that enable us to generate enough revenue to put that back into the market for CEL.  Because we have to go out to the market to buy CEL every week to pay it, we're using the revenues we're making from these loans to be able to convert that into CEL that we pay back to the community."[107]

236.     The market making strategy devised and employed by the Executive Defendants and Defendant Wintermute was simply to "protect" the price of CEL since, as Mashinsky admitted in a May 16, 2020 email, Celsius would "rise and fall with CEL."[108]  The specific details of this strategy to improperly manipulate the price and trading activity of CEL tokens via massive amounts of wash trading had three primary parts: (1) buybacks; (2) resting orders; and (3) over-the-counter ("OTC") sales.

237.     First, Celsius and Wintermute consistently bought back more than 50% (and usually 100%) of the weekly CEL rewards from the market.[109]  Mashinsky explained: "[W]e do not use [CEL already held by Celsius] for the weekly buys, so the weekly buys are a 100% done from the market.  So when we tell you we've bought the million or a little bit more of CEL, you

---

[107]   Celsius, *AMA July 2, 2020*, YOUTUBE (Jul. 2, 2020), https://www.youtube.com/watch?v=Ym1EjbThjVk.

[108]    *See* fn.46, *supra* at *98 n.241 & 242.

[109]    *Id.*, *98 n.243 (noting that, in late May 2020, Celsius bought 100% CEL rewards while reporting that it had bought 80% CEL rewards); Treutler, Johannes, Slack (August 5, 2020); *see also id.* (Treutler confirming on September 22, 2020 that 100% of CEL buyback should be from the market and not to use CEL in Treasury).

know for sure that it came from us actually going into the different markets and grabbing CEL spot price."[110]

238.    Based on the setting of reward rates, Mashinsky and the Executive Defendants would calculate how much CEL was needed to pay customers' rewards each week.  Executive Defendants and Wintermute would then time their purchases/sales of the needed CEL throughout the week to either raise the price of CEL or avoid a price drop.  This deceitful strategy was wildly successful at first.

239.    For example, on May 29, 2020, in internal communications between Defendant Urata-Thompson, then-Chief Financial Officer and Chief Investment Officer and Celsius' Head of Institutional Lending Connor Nolan, Urata-Thompson praised Nolan's execution of the market manipulation strategy, stating: "[G]reat jobs with CELs. I was told during the AMA that it hit 20 cents."[111]  Mr. Nolan responded, "Yeah that was mainly us haha we did this week['s] buy- which was the plan of course."[112]  Similarly, two weeks later, on July 14, 2020, Urata-Thompson instructed Mr. Nolan that "if the CEL market dips, let's go in with all we got for this week and buy it up."[113]

240.    With respect to "resting orders," the Executive Defendants and Wintermute made resting orders of CEL purchases on exchanges at prices below the then-current market price of CEL, which would automatically trigger if CEL dipped to the specified price.  As was concluded

---

[110]    Celsius, *AMA October 2, 2022*, YOUTUBE (Oct. 2, 2020), https://www.youtube.com/watch?v=HpTDWR7fnas.

[111]    *See* fn.46, *supra* at *99 n.245.

[112]    *Id*., *99 n.246.

[113]    *Id*., *99 n.247.

by the Examiner, "Celsius did this for the express purpose of token price control."[114]  According to a June 5, 2020 internal Slack communication from Treutler: "The current buyback structure is designed to take [large] sellers [of CEL] out of the market if possible.  To prevent others to front run these sell orders and depress the market for weeks."[115]  The Examiner's Report noted that, "[t]o ensure that Celsius stayed ahead of market conditions, Mr. Treutler and Mr. Nolan, and later Dean Tappen (Coin Deployment Specialist) would monitor CEL trading activity seven days a week and readjust the 'resting orders' as needed to protect the price of CEL."[116]

241.     Significantly, as a byproduct of the execution of the resting order component of the manipulative market making scheme, Celsius was often protecting CEL from the price drops that would have been caused by Mashinsky himself selling large amounts of his personal CEL holdings.  Indeed, according to the transactions recorded on the Ethereum blockchain, Mashinsky sold at least 3.6 million CEL in 2019, at least another 11.9 million CEL in 2020, and at least an additional 8.7 million CEL in 2021.[117]  As the Examiner's Report further observed that, on April 5, 2020:

> Mr. Treutler noted that within the previous 24 hours, Mr. Mashinsky had withdrawn 800,000 CEL; 508,000 the week prior; 650,000 two weeks prior; and 900,000 three weeks prior – 'and all the CEL go to a wallet he mostly uses for Liquid' (an exchange platform). Mr. Mashinsky continued to sell throughout 2020, causing Mr. Treutler to comment in October 2020, 'I am still concerned about the CEL Alex is selling every day . . . 120k CEL yesterday . . . 120k CEL the day before . . . Alex is the biggest seller by far and depressing the market . . . 120k CEL = $165K a day.' At those volumes, Mr. Mashinsky constituted 'between 20-25% of the daily trading volume.'[118]

---

[114]     *Id*., *99 n.248.

[115]     *Id*., *100 n.249.

[116]     *Id*., *100 n.250.

[117]     Etherscan,     https://etherscan.io/token/0xaaaebe6fe48e54f431b0c390cfaf0b017d09d42d, (last visited Jun. 19, 2023)

[118]     *See* fn.46, *supra* at *100 n.252 & 253.

242.    Similarly, as the Examiner's Report found in January 2021, one of Mashinsky's other companies began selling off large amounts of CEL to such a degree that the Executive Defendants had to continue increasing the size of their resting orders to purchase the CEL tokens being sold by Mashinsky, and thus protecting CEL's price from, "drop[ping] like a stone."[119]

243.    Finally, Celsius used its over-the-counter (OTC) trading desk to sell CEL in order to manipulate the price of CEL. According to the Examiner's Report, these OTC sales (which were made at market prices), went "hand in hand with the weekly CEL purchases for Interest payments. . . ."[120] This strategy was internally referred to as the "OTC Flywheel" and operated on the theory that: "[t]he more CEL we sell . . . [t]he more CEL we can repurchase . . . [t]he more attractive CEL markets look like . . . [t]he more CEL buy orders we received . . . [t]he more our Treasury is worth."[121]

244.    According to the Examiner's Report, an internal Celsius memo dated April 20, 2020, described in greater detail the OTC Flywheel strategy and explained that CEL repurchases, which it designated as "value based repurchase examples," would be made "on a case to case basis depending on our Cash Needs."[122] The Examiner's Report further described the April 20th memo as providing guidance to Celsius' OTC desk about how to execute these purchases and mandating that "for small CEL sales (*i.e.*, sales up to 250,000 CEL or $25,000 worth), the OTC desk should repurchase 50% within one week of the initial sale," while for so-called "big" sales (*i.e.*, sales of

---

[119]    *See* fn.46, *supra* at *101 n.255 (citing a January 7, 2021 internal Slack communication from Treutler).

[120]    *Id.*, *101 n.256.

[121]    *Id.*, *101 n.257.

[122]    *Id.*, *102 n.259 (noting that Head of Coin Deployment and Institutional Lending, Connor Nolan, confirmed in an interview with the Examiner that the precise approach to CEL buybacks "could vary on [a] week-to-week basis").

up to four million CEL or $400,000 worth), "the OTC desk should repurchase 33% within one week of the initial sale." Finally, for "extreme[ly] big" sales (*i.e.*, sales of 10 million CEL or over $1 million worth), the April 20th memo advised that "the OTC desk should repurchase 25% within one week of the initial sale."[123]

245.    The Examiner found that once the program started, Celsius (at the direction of Executive Defendants) often would purchase CEL in amounts significantly greater than needed to meet reward obligations. The Examiner's Report provided the following examples of this: (1) on November 10, 2020, Mr. Treutler proposed and directed the purchase of 100,000 CEL per day for that week, even though Celsius only needed 65,000 CEL per day to satisfy its reward obligations; and (2) around December 28, 2020, Celsius' trading desk purchased $3.8 million in CEL despite needing only $1.5 million to cover its reward obligations.[124]

246.    According to internal Slack communications cited to in the Examiner's Report, the Celsius Head of Trading admitted that "the amount of CEL purchased and the price involved were secondary concerns. The primary goal was to 'always . . . buy at le[ast] as much to keep the OTC flywheel alive and to rescue CEL from large sellers if needed.'"[125] In 2020, Celsius transferred at least 106.9 million CEL into its wallets from the secondary market.[126] Of this amount, Celsius bought back at least 53.6 million of these CEL tokens at a cost of at least $58.1 million.[127] According to the Examiner's Report, "On at least one occasion Mr. Nolan questioned whether

---

[123]    *Id.*, *102 n.260.

[124]    *Id.*, *102 n.261 & 262.

[125]    *Id.*, *102 n.263 (citing to a November 30, 2020 Slack communication from Johannes Treutler).

[126]    *See*   https://etherscan.io/token/0xaaaebe6fe48e54f431b0c390cfaf0b017d09d42d,   (Last visited Jul. 19, 2023).

[127]    *Id.*

Celsius should continue with certain buybacks given the cost involved and how high the price of CEL had risen in response to Celsius's efforts.  Mr. Treutler responded, 'I don't think we pushed too far.  Honestly there is no too far.'"[128]

247.    As the price of crypto assets were experiencing a decline in early September 2020, the manipulative market making strategy devised by Executive Defendants and Wintermute succeeded.[129]  As noted in the Examiner's Report, on September 6, 2020 Treutler instructed Nolan to continue to buy CEL to "push the overall price" with the goal of setting a "new [higher] normal" price of CEL in relation to BTC.[130]  Similarly, the Examiner's Report described an exchange between Treutler and Nolan on September 19, 2020, wherein they discussed a strategy for buying additional CEL to "keep pushing" CEL prices higher.[131]  According to the Examiner's Report, after Treutler solicited Nolan's views, Nolan said that it would depend on "how aggro we want to be," to which Treutler countered: "Enough Aggro to fuel the next wave of FOMO [Fear of Missing Out] . . . Prices drive prices."[132]  The Examiner's Report also described the results of this conversation, as follows:

> The next day, Mr. Treutler noted "CEL . . . did pretty well.  We bought between 0.000057-0.000064 [BTC] and price does live now between 0.000062-0.000073."  Mr. Treutler and Mr. Nolan then discussed and agreed "to keep supporting the rise" in CEL and to purchase any "sell walls as they appear" to guard against a price drop.[133]

---

[128]    *See* fn.46, *supra* at *103 n.266 (citing to an August 12, 2020 Slack communication from Johannes Treutler).

[129]    *Id.*, *103 n.268 (citing to a September 6, 2020 Slack communication from Johannes Treutler).

[130]    *Id.*, *104 n.268 & 270 (citing to a November 6, 2020 Slack communication from Connor Nolan and noting that both Nolan and Treutler credited these efforts with staving off a significant price drop to "save [the] day").

[131]    *Id.*, *104 n.271.

[132]    *Id.*, *104 n.271 & 276.

[133]    *Id.*, *104 n.274 & 275.

248.    The Examiner further reported that, at times, the market making activities by the Executive Defendants and Wintermute was causing Celsius to purchase "100% of markets" for CEL.[134]  The Examiner's Report went on: "On occasion, Celsius also bought CEL to improve its position in business deals.  In one case, Mr. Treutler noted that '[w]e bought a lot [of CEL] . . . to support price for this deal' and that the purchases resulted in Celsius securing a better deal in the transaction than it otherwise would have secured."[135]

249.    According to an internal Slack communication from Treutler cited to in the Examiner's Report, the purpose of the Executive Defendants' three-prong strategy was induce investors "to keep the FOMO flywheel spinning" with continual CEL Token purchases.[136]  Further, the Examiner's Report found that, within Celsius, "there was a shared view that 'if people want to know if Celsius is doing well they look at CEL and not at anything else.'"[137]  Ultimately, as confirmed by the Examiner during an interview with Celsius' Chief Revenue Officer and Head of Strategy, Roni Cohen-Pavon, "the bottom line was that Celsius 'create[d] the market for CEL' through its flywheel model of going to market to buy more."[138]

250.    The Examiner's Report found that internal communications from September 2020 support this conclusion.[139]  The Examiner's Report further noted statements from Treutler that "the higher $CEL -> the more people understand Celsius is a legit company and will get customers .

---

[134]    *Id.*, *104 n.276.

[135]    *Id.*, *105 n.277.

[136]    *Id.*, *105 n.278.

[137]    *Id.*, *105 n.279.

[138]    *Id.*, *105 n.281 (citing to a November 15, 2022 interview with Roni Cohen-Pavon).

[139]    *See id.*, *105 n.282.

. .".[140]  Mr. Nolan, according to the Examiner's Report, agreed and called the increasing price of

CEL "our great marketing tool."[141]

251.    In a video posted to the Celsius YouTube channel on April 14, 2020, Mashinsky

promoted CEL as being integral to the Flywheel and to the value of Celsius itself:

> the value of CEL is connected to the total economic activity on Celsius . . . . More
> deposits allows us to do more loans, more loans generates more income and more
> income means more income that Celsius generates from these coins that people
> gave us translates into us having to buy more Bitcoin, Ethereum, CEL token . . . .
> If we have more users, more loans, more earnings, we have to buy more CEL token.
> That impacts the price of the CEL . . . all the utilities that allow people to earn more
> using the CEL token also translate to more demand.[142]

252.    This promotion is repeated by Mashinsky during an Ask Me Anything interview on

July 17, 2020: "More users, more deposits, means more loans, more loans means more interest for

Celsius, more interest means more CEL token, you know what happens when you have to go to

market to buy more CEL token, prices go up.  That's the flywheel and we do it better than anyone

else."[143]

253.    The Examiner's Report states that Mashinsky reiterated this flywheel concept

during his interview with the Examiner.  For example, "Mr. Mashinsky also told the Examiner that

the value of CEL was not tied to the value of Celsius as a company but rather to "more users, more

assets, more yield, more people earning in CEL."[144]

---

[140]    *Id.*, *105 n.283.

[141]    *Id.*, *105 n.284.

[142]    Celsius, *CEL token Flywheel and utility*, YOUTUBE (Apr. 14, 2020),
https://www.youtube.com/watch?v=3w1Yal8AerQ.

[143]    Celsius, *Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon*,
YOUTUBE (Jul. 17, 2020), https://www.youtube.com/watch?v=csFrn4XtwL0.

[144]    *See* fn.46, *supra* at *105 n.288 (citing to a January 5, 2023 interview of Alex Mashinsky).

254.    Of course, in reality the Executive Defendants nevertheless proceeded to promote the price of CEL tokens as a proxy for Celsius's financial health.  For example, during an October 5, 2020 video posted to the Celsius YouTube channel, Mashinsky discussed the "over 2,000 percent increase in the last year" in the price of CEL and stated that "seeing the volume increased tenfold is basically a great validation of the utility of the token as well as the flywheel running on its own instead of us having to crank it up once in a while."[145]

255.    In addition, the Executive Defendants and Wintermute would sync some of their larger purchases of CEL tokens to coincide with Celsius' weekly AMAs in order to use the combination of their manipulative price support for CEL and the Executive Defendants' misleading marketing to increase customer demand for, and the price of, CEL tokens.  As described in the Examiner's Report, on May 29, 2020, "after apparently observing an increase in CEL's price the week before, Ms. Urata-Thompson directed the trading desk to 'schedule the purchase [of CEL] around the AMA today to have a strong effect similar to last week.'"[146]  The Examiner's Report also found that Urata-Thompson had also directed the implementation of another tactic to support CEL's price: new standing orders to protect against any drop in price.[147]  Within a week of its implementation, it was reported to Celsius's Executive Committee that this strategy had caused the price of CEL to go dramatically – "+55% within 12 hours" on the day of the AMA – and that the "[t]actical CEL purchase enable[d] the rise & AMA caused it."[148]

---

[145]    Celsius, *Celsius Fly-wheel and incoming Inflection point*, YOUTUBE (Oct. 5, 2020), https://www.youtube.com/watch?v=Eu2PvnuJEZ0.

[146]    *See* fn.46, *supra* at *Id*., *108 n.291.

[147]    *Id*.

[148]    *Id*., *108 n.293.

256.    On January 3, 2021, Mashinsky sent a direct message to Johannes Treutler that candidly discussed the Executive Defendants' market manipulation strategy and stressed that Wintermute needed to "continue doing their job" as part of the scheme.  In particular, Mashinsky stated: "We will be paying all CEL from treasury until further notice.  Please stop buying any CEL for the weekly interest unless it drops 30% or moves from the $6.7 levels.  CEL going up too fast is not good for us.  Wintermute should continue doing their job.  Did we talk to them about adding FTX and increasing CEL liquidity they have?"

257.    Celsius did not inform its customers about the herculean efforts that were undertaken by Executive Defendants and Wintermute,  in order to artificially support the price of CEL.  According to the Examiner's Report, in a particularly frank Slack communication on March 21, 2021, Treutler acknowledged to Urata-Thompson and Nolan: "Just to clarify between us three: The last 3-4 months we bought always more CEL than what we pay as interest per week but we did not buy it for the interest payments, that was just what we told the community."[149]

258.    The price of CEL peaked between late April and early June 2021 with CEL hitting its record high of $8.02 on June 4, 2021.[150]  The dramatic increase in CEL price was a double-edged sword for the Executive Defendants and Wintermute.  While the increase price of CEL would serve to attract new investors into purchasing more CEL tokens, as CEL became more valuable the cost to the Executive Defendants and Wintermute of supporting the CEL price would correspondingly become greater and eventually unsustainable.[151]  According to the Examiner's

---

[149]     *Id.*, *108 n.294.

[150]     Celsius,  CoinMarketCap,  https://coinmarketcap.com/currencies/celsius/  historical-data/ (last visited Jan. 29, 2023).

[151]     *See* fn.46, *supra* at *Id.*, *110 n.303 (citing a June 18, 2020 email thread between the Celsius Investment Committee).

Report, "Ms. Harrell saw this issue coming, asking on June 18, 2020, "when will we start reducing interest rates on CEL?  Eventually this needs to taper off.  We can't afford to keep paying the same % of CEL with the value of the token increasing, and the interest compounding."[152]

259.    On the same day that Mashinsky was insisting that Wintermute "continue to do their job" of manipulating the price of CEL via the three-pronged strategy described above, Mashinsky sought to end Celsius's practice of buying CEL from the market to pay weekly rewards. According to the Examiner's Report, on January 3, 2021, Mashinsky told Treutler that, with CEL trading around $6.50, "[w]e cannot support these price levels . . . ."[153]  Mashinsky directed Mr. Treutler to "stop buying any CEL for the weekly interest" and to stop buybacks generally until the price of CEL dropped by at least 30%.[154]  Treutler agreed to no further buybacks, but persuaded Mashinsky to keep open Celsius' resting orders (those orders designed to protect against a sudden and significant drop in CEL price).[155]  Within one week of Mashinsky's "stop buying CEL" directive, CEL dropped by 16% to $5.45.  By January 15, 2021, CEL had fallen by 26% to $4.75.[156]

260.    In the months leading up to Mashinsky's January 2021 directive, the Examiner's Report identifies several internal discussions about the fact that Celsius's prior purchases of CEL were designed to help the insiders (like the Executive Defendants) who owned, and were selling, large amounts of CEL.  The Examiner's Report provided the following summary given by Defendant Urata-Thompson during her interview with the Examiner: "I think they [the founders

---

[152]    *Id.*

[153]    *Id.*, *111 n.306.

[154]    *Id.*, *111 n.308.

[155]    *Id.*

[156]    Celsius,  CoinMarketCap,  https://coinmarketcap.com/currencies/celsius/-historical-data/ (last visited Jun. 19, 2023).

of Celsius] always will have it on the back of their head what is best for their CELs, not best for the company and that to me is [a] conflict of interest."[157]   Similarly, the Examiner's Report included an August 5, 2020 internal Slack communication from Urata-Thompson wherein she stated that, while using customer funds to purchase CEL made her "nervous," the idea of using investor funds to purchase CEL made her "queasy" since a "large chunk of it [is] going into our wallet as founders earnings."[158]   According to the Examiner, Urata-Thompson remarked that at that time (August 2020), "Alex [Mashinsky] is earning $28k a week" in CEL rewards" and "[f]or a company that could lose, at this pace, 6 million before the end of year, I can't possibly justify this."[159]   The Examiner's Report also reported that, when asked in an interview with the Examiner why CEL was purchased back from the market rather than using Treasury funds, Jason Perman, former Vice President of Treasury at Celsius responded that, "the answer lies in who holds the most CEL."[160]

261.   At the same time as the early January 2021 Slack channel communication in which Mashinsky discussed the high cost of CEL buybacks and complained that Wintermute needed to "continue to do their job" to implement the manipulative market making scheme, Mashinsky also spoke about the need take it upon himself to personally take action concerning the price of CEL. According to the Examiner's Report, four days after that Slack communication (*i.e.*, January 7, 2021), "Mashinsky sold approximately $440,000 worth of his own CEL, all of which Celsius purchased pursuant to resting orders in place to guard against sudden, significant CEL price

---

[157]     *See* fn.46, *supra* at *111 n.311.

[158]     *Id.*, *112 n.312.

[159]     *Id.*

[160]     *See id.*, *112 n.314.

drops."[161]   As the Examiner reported, these trades caused Urata-Thompson to comment, "we are talking about becoming a regulated entity and we are doing something possibly illegal and definitely not compliant."   In another communication on December 30, 2020, Ms. Harumi-Thompson wrote that Mr. Mashinsky's claims that he was disposing of large amounts of his CEL "to control the market" were "exactly what I was afraid of."[162]

262.    In June 2021, the Executive Defendants and Wintermute began winding down their fraudulent market making activities, and by July 2021, CEL began to consistently decline in price.[163]   As the following Celsius-created chart from the Examiner's Report shows, there is a strong correlation between the aforementioned market making activities and the price of CEL:



263.    As a result of these manipulative market making activities, transactions, practices, and course of business that operated as a fraud or deceit upon purchasers of the Celsius Financial

---

[161]      *Id.*, *112 n.315.

[162]      *Id.*, *112 n.316.

[163]      Celsius,   CoinMarketCap,   https://coinmarketcap.com/currencies/celsius/historical-data/ (last visited Jun. 19, 2023).

Products, and of their numerous material misstatements and omissions, Executive Defendants and Wintermute obtained substantial digital assets and other monies that Class members paid for trading on the Celsius platform.

## ADDITIONAL SCIENTER ALLEGATIONS

264. The CEL token transactions by Mashinsky evidence an actual intent to defraud Plaintiffs and the Class members. Between 2019 and 2022, Mashinsky sold more than $51.4 million worth of CEL tokens. Additionally, in eight transactions taking place over the course of two days – May 15, 2022 and May 16, 2022 – Mashinsky sold/transferred $2,881,391 worth of other digital assets off of the Celsius platform.

265. Mashinsky's actual intent to defraud Plaintiffs and the Class is further established by, among other things, the following badges of fraud: (1) the general timeline of Mashinsky's sales and transfers; (2) Mashinsky's retention of possession, benefit, or use of the digital assets he sold and/or withdrew; (3) Mashinsky's specific knowledge of Celsius' dire financial condition; (4) Mashinsky withdrew the majority of his CEL tokens, all of his BTC, all of his ETH, and substantially all of his stablecoins, on deposit with Celsius; (5) Mashinsky's sales and transfers were not in the usual course of business; (6) the secrecy, haste, or unusualness of the Mashinsky's CEL token transactions; and (7) Celsius was insolvent or became insolvent shortly after Mashinsky's transactions were completed.

266. The CEL token transactions by Leon evidence an actual intent to defraud Plaintiffs and the Class members. Between July 15, 2021 and May 31, 2022, Leon sold/transferred $9,574,999 worth of digital assets (including $3,123,131 in CEL tokens) off of the Celsius platform.

267.    Leon's actual intent to defraud Plaintiffs and the Class is further established by, among other things, the following badges of fraud: (1) the general timeline of Leon's sales and transfers; (2) Leon's retention of possession, benefit, or use of the digital assets he sold and/or withdrew; (3) Leon's sales/transfers occurred on or about the time that significant regulatory action was taken against Celsius that had a material negative effect on its business.   As the Chief Operations Officer, Leon was uniquely positioned to know that those regulatory actions would have a materially negative effect on Celsius' ability to continue to operate as a going concern; (4) Leon withdrew the majority of his CEL tokens, all of his BTC, all of his ETH, and substantially all of his stablecoins, on deposit with Celsius; (5) Leon's sales and transfers were not in the usual course of business; (6) the secrecy, haste, or unusualness of the Leon's CEL token transactions; and (7) Celsius was insolvent or became insolvent shortly after Leon's transactions were completed.

268.    The CEL token transactions by Goldstein evidence an actual intent to defraud Plaintiffs and the Class members.   Between August 12, 2021 and May 11, 2022, Goldstein sold/transferred $2,392,957 worth of digital assets (including $196,270 in CEL tokens) off of the Celsius platform.

269.    Goldstein's actual intent to defraud Plaintiffs and the Class is further established by, among other things, the following badges of fraud: (1) the general timeline of Goldstein's sales and transfers; (2) Goldstein's retention of possession, benefit, or use of the digital assets he sold and/or withdrew; (3) Goldstein's knowledge of Celsius' financial distress as Celsius' CTO; (4) Goldstein's sales and transfers were not in the usual course of business; and (5) the secrecy, haste, or unusualness of the Goldstein's CEL token transactions.

270.    The CEL token transactions by Beaudry evidence an actual intent to defraud Plaintiffs and the Class members.   Between April 6, 2022 and March 5, 2022, Beaudry sold/transferred $8,381,541 worth of digital assets (including $4,014,146 in CEL tokens) off of the Celsius platform.

271.    Beaudry's actual intent to defraud Plaintiffs and the Class is further established by, among other things, the following badges of fraud: (1) the general timeline of Beaudry's sales and transfers; (2) Beaudry's retention of possession, benefit, or use of the digital assets he sold and/or withdrew; (3) Beaudry's sales/transfers occurred on or about the time that significant regulatory action was taken against Celsius that had a material negative effect on its business.  As the Chief Compliance Officer, Beaudry was uniquely positioned to know that those regulatory actions would have a materially negative effect on Celsius' ability to continue to operate as a going concern; (4) Beaudry withdrew the majority of his CEL tokens, all of his BTC, all of his ETH, and substantially all of his stablecoins, on deposit with Celsius; (5) Beaudry's sales and transfers were not in the usual course of business; and (6) the secrecy, haste, or unusualness of the Beaudry's CEL token transactions.

272.    The CEL token transactions by Urata-Thompson evidence an actual intent to defraud Plaintiffs and the Class members.  Between September 6, 2022 and June 12, 2022, Urata-Thompson sold/transferred $1,480,306 worth of CEL tokens.

273.    Urata-Thompson's actual intent to defraud Plaintiffs and the Class is further established by, among other things, the following badges of fraud: (1) the general timeline of Urata-Thompson's sales and transfers; (2) Urata-Thompson's retention of possession, benefit, or use of the digital assets she sold and/or withdrew; (3) Urata-Thompson's knowledge of Celsius' financial distress as Celsius' CFO and CIO; (4) Urata-Thompson's sales and transfers were not in

the usual course of business; and (5) the secrecy, haste, or unusualness of Urata-Thompson's transactions.

274.    The CEL token transactions by K. Mashinsky evidence an actual intent to defraud Plaintiffs and the Class members.  Between April 6, 2022 and May 31, 2022, K. Mashinsky sold/transferred $4,973,695 worth of CEL tokens.

275.    K. Mashinsky's actual intent to defraud Plaintiffs and the Class is further established by, among other things, the following badges of fraud: (1) her close and intimate relationship with the primary wrongdoer, Celsius director and former CEO Alex Mashinsky (2) the general timeline of K. Mashinsky's sales and transfers, especially those transactions made shortly before customer accounts were frozen; (3) K. Mashinsky's retention of possession, benefit, or use of the digital assets she sold and/or withdrew; (4) K. Mashinsky's knowledge of Celsius' precarious financial condition as well her spouse's knowledge that Celsius was insolvent; (5) K. Mashinsky's sales and transfers were not in the usual course of business and K. Mashinsky had not previously made such a large withdrawal of her CEL tokens; and (6) the secrecy, haste, or unusualness of K. Mashinsky's transactions.

276.    The CEL token transactions by Defendant AMV evidence an actual intent to defraud Plaintiffs and the Class members.  Between July 28, 2021 and October 7, 2021, AMV sold/transferred $12,184,032 worth of CEL tokens.

277.    AMV's actual intent to defraud Plaintiffs and the Class is further established by, among other things, the following badges of fraud: (1) Defendant Mashinsky's complete ownership and control over AMV; (2) the general timeline of AMV's sales and transfers; (3) AMV's retention of possession, benefit, or use of the digital assets it sold and/or withdrew; (4) Mashinsky's knowledge of Celsius' financial distress as Celsius' CEO; (5) AMV's sales and

transfers were not in the usual course of business; and (6) the sequence of events that show, after each of AMV's large withdrawals of CEL Tokens, Mashinsky sold CEL tokens in small consistent tranches after the withdrawals.  These sales suggest a coordination on the part of Mashinsky so as to avoid scrutiny or impact on the price of CEL.

278.    The CEL token transactions by Defendant Koala1 evidence an actual intent to defraud Plaintiffs and the Class members.  In seven transactions all occurring on May 27, 2022, Koala1 sold/transferred $5,120,316 worth of digital assets off of the Celsius platform.

279.    Koala1's actual intent to defraud Plaintiffs and the Class is further established by, among other things, the following badges of fraud: (1) Defendant Mashinsky's complete ownership and control over Koala1; (2) the general timeline of Koala1's sales and transfers; (3) Koala1's retention of possession, benefit, or use of the digital assets it sold and/or withdrew; (4) Mashinsky's knowledge of Celsius' financial distress as Celsius' CEO; (5) Koala1's sales and transfers were not in the usual course of business; and (6) the secrecy, haste, or unusualness of Koala1's transactions.

## CLASS ALLEGATIONS

280.    Plaintiffs bring this Action, individually, and on behalf of a nationwide class and California state subclass, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

Nationwide Class (limited to Counts 1-8 and 13-15)

> All persons who, during the Class Period, purchased Celsius Financial Products and were subsequently damaged thereby.

California Subclass (limited to Counts 9-13)

> All persons who, during the Class Period, purchased Celsius Financial Products in California and were subsequently damaged thereby.

281.    The Class Period for Counts 1 and 9 (the federal and state unregistered securities claims) is defined as the period between January 1, 2020 and the date of this filing.

282.    The Class Period for Counts 2 and 10 (the federal and state manipulation claims) is defined as the period between March 20, 2020 and the date of this filing.

283.    The Class Period for all other Counts (*i.e.* Counts 3-8 and 11-15) is defined as the period between February 9, 2018 and the date of this filing.[164]

284.    Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers, and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

285.    **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identity of individual members of the Class is currently unknown, such information being in the sole possession of Defendants and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class consists of at least thousands of people.  The number of Class members can be determined based on Celsius' and other third party's records.

286.    **Commonality**: Common questions of law and fact exist as to all members of the Class.  These questions predominate over questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

a.    whether the Celsius Financial Products are securities under the Securities Act of 1933;

---

[164]    Plaintiffs reserve the right to expand or amend any of the aforementioned the Class Periods based on discovery produced in this matter.

b.   whether the sale of Celsius Financial Products violates the registration of the Securities Act of 1933;

c.   whether Defendants improperly and misleadingly marketed Celsius Financial Products in violation of the Securities Exchange Act of 1934;

d.   whether Executive Defendants and Wintermute improperly manipulated the price of CEL tokens in violation of the Securities Exchange Act of 1934;

e.   whether Defendants' conduct violates the state consumer protection statutes asserted herein;

f.   whether Individual Defendants conspired to artificially inflate the price of the Celsius Financial Products and then sell their Celsius Financial Products to unsuspecting investors;

g.   whether Defendants have been unjustly and wrongfully enriched as a result of their conduct;

h.   whether the proceeds that Defendants obtained as a result of the sale of Celsius Financial Products, rightfully belongs to Plaintiffs and Class members;

i.   whether Defendants should be required to return money they received as a result of the sale of Celsius Financial Products to Plaintiffs and Class members;

j.   whether Individual Defendants breached the implied covenant of good faith and fair dealing; and

k.   whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

287.   **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members.   Plaintiffs' and Class members' claims all arise out of Defendant's uniform

misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of Celsius Financial Products.

288. **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

289. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by the Company's conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

290. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Unregistered Offering and Sale of Securities in
### Violation of Sections 5 and 12(a)(1) of the Securities Act of 1933
### (Against the Executive Defendants)

291.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-124, and 269-279, and further allege as follows:

292.    The Class Period for this Count is defined as the period between January 23, 2020, and the date this Action was first brought.

293.    Executive Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interest commerce for the purpose of sale or for delivery after sale.

294.    Celsius Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

295.    Plaintiffs and members of the Class purchased Celsius Financial Product securities.

296.    No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.   No exemption to the registration requirement applies.

297.    SEC Rule 159A provides that, for purposes of Section 12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller.  17 C.F.R. §230.159A(a).  The Securities Act in turn defines "issuer" to include every person who issues or proposes to issue any security.  15 U.S.C. §77b(a)(4).  Executive Defendants are issuers of Celsius Financial Products.

298.    The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to

plaintiff and did so for financial gain.  *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21, 647 (1988); *accord, e.g.*, *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).  That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner.  *Pinter*, 486 U.S. at 647; *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).  Celsius and the Defendants are all statutory sellers.

299.     By reason of the foregoing, Executive Defendants violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

300.     As a direct and proximate result of Executive Defendants' unregistered sale of securities, Plaintiffs and the Class have suffered damages in connection with their Celsius Financial Product purchases.

## SECOND CAUSE OF ACTION

### Violation of Sections 10b of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder
### (Fraudulent Statement Liability)
### (Against Defendant Mashinsky)

301.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-55, 125-206, and 253-279, and further allege as follows:

302.     The Class Period for this Count is defined as the period between February 9, 2018 and the date this Action was first brought.

303.     Plaintiffs bring this claim for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

304.     The Celsius Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

305.     Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Id.*

306.     Defendant Mashinsky (with the aid of the other Defendants) carried out a plan, scheme, and course of conduct that he intended to and did deceive the retail investors – Plaintiffs and the other Class members – who acquired Celsius Financial Products pursuant to the continuous offering and thereby caused them to purchase Celsius Financial Products at artificially inflated prices.

307.     In connection with the continuous offering of Celsius Financial Products, Defendant Mashinsky disseminated, approved, and/or endorsed the false statements described herein, which Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

308.     Defendant Mashinsky employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high market prices for Celsius Financial Products, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

309.    As the Commissioner of California's Department of Financial Protection and Innovation found in the Desist and Refrain Order that it issued on August 8, 2022, the misleading statements and omissions alleged herein violated Section 25401 (similar to 10b-5). In particular, the Desist and Refrain Order stated:

> In offering the Earn Rewards accounts to California residents, touting the accounts as "safe," and advertising on its website "24/7 access" and "[i]t's your crypto, after all," Celsius failed to fully disclose material aspects of its business and Earn Rewards including, but not limited to:
>
> a.  the types of trading and investment activities that Celsius engages in,
>
> b.  the identities and creditworthiness of those who borrow digital assets,
>
> c.  the amount of digital assets used in each income-generating activity,
>
> d.  the risk that third-party custody services might lose access to digital assets,
>
> e.  the risk that lenders to which Celsius sent digital asset collateral would be unable to return Celsius' collateral in a timely manner,
>
> f.  the risk that in the event of a sudden request for withdrawals that Celsius' own attempts to unwind illiquid positions may prevent it from having adequate assets to meet customer withdrawal demands, and
>
> g.  Celsius financial statements or other information reflecting its financial state.
>
> Celsius also represented that it provides 80 percent of its revenue to its customers yet Earn Rewards Investors are only entitled to interest at rates set by Celsius.
>
> Further, in offering Earn Rewards, CEO Alexander Mashinsky failed to disclose material aspects of Celsius' business, and made materially misleading statements, or omitted to state material facts necessary to make statements made, in the light of the circumstances under which the statements were made, not misleading. Mashinsky represented on numerous occasions that even in a worst-case scenario, Earn Rewards Investors would be able to timely withdraw their investments and would not suffer losses on their investments, and continued to make representations that it was safe to deposit assets with Celsius even in the days leading up to the company's decision on June 12, 2022, to suspend customer withdrawals.

310.    Similarly, the Commissioner also found that it is "false, misleading, or deceptive… to advertise that borrowers are merely putting up "collateral" to secure their loans when in fact

borrowers have their collateral subject to unknown investment risks that could potentially be lost in the event Celsius became insolvent."[165]

**Misrepresentations and Omissions**

311.   Defendants' untrue statements and omissions of material facts in connection with the sale of Celsius Financial Products include, but are not limited to the following examples:

> a.  On February 5, 2021, Mashinsky made several statements promoting the Celsius Loans to investors.  In particular, when an investor asked about the circumstances under which Celsius will liquidate a borrower's collateral, Tal Bentov, the VP Lending (Retail) at Celsius, replied: "We liquidate only when someone is not answering our margin calls and he/she keeps being in default.  We give a lot of time.  A lot more than others.  Trust me.  Sometimes weeks to answer our margin calls!"[166]  Near the end of the February 5th AMA, Mashinsky promoted the Earn Rewards Accounts' ability to "earn" investors various cryptocurrencies "for free."[167]  In order to make those statements not misleading, Defendants were obligated to disclose that (1) borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice, and (2) that the yield rate offered by Celsius was not "free"

---

[165]    California Department of Financial Protection and Innovation, *Accusation and Statement in Support of Order to Suspend CFL Business Operations* (Aug. 19, 2022), https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/08/Admin.-Action-Celsius-Lending-LLC-Accusation.pdf

[166]    *See* fn.2, *supra*.

[167]    *Id.*

but rather was provided off of highly risky, yet undisclosed, investments by Celsius.

b.   On February 26, 2021, Mashinsky participated in the weekly Celsius AMA on YouTube, discussing, among other things, how Celsius would deal with "handling flash crashes."  Mashinsky stated:

> We don't provide high LTV's. . . .  Celsius doesn't make money by liquidating you.  We don't charge any fees.  We don't try to give you these gimmicks and special rates… Our goal, our mission is to make sure that we have you as a customer for life.  What are the chances that you're going to stick with us if we liquidated you?  Most of our loans are 25% or 33% LTV loans.  We discourage you from taking 50% LTV loans because that is much higher risk.  ***So Celsius did not have any liquidations, because we give you plenty of time.  We give you advanced notice most of the time, then we tell you you can put more collateral or return some of the dollars or assets back.***  We have almost 0 liquidations.  That's not our business.  It's the opposite of our business.[168]

In order to make those statements not misleading, Defendants were obligated to disclose that borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice.

c.   On April 23, 2021, Mashinsky again made statements regarding Celsius' borrower-friendly stance on liquidations during a Celsius weekly AMA on YouTube.  In particular, Mashinsky stated a "margin call doesn't mean we sold your assets or stole your coins.  That's what the other guys do.  ***We always give you ample time*** to post more collateral, return some of the assets, or instruct us to sell your coins."[169]  (Emphasis added.)  In order to make this statement not misleading, Defendants were obligated to disclose

---

[168]   *See* fn.53, *supra*.

[169]   Celsius Network, *Future Coin Listings & Features – Celsius AMA (April 23rd 2021)*, YOUTUBE (Apr. 23, 2021), https://www.youtube.com/watch?v=bzEyHLgBY7Y&t=350s.

that borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice.

d.  On May 28, 2021, Mashinsky promoted the stability and wherewithal of the CEL Token: "Looking at coins, the CEL token was one of the most stable out there.  It did better than Bitcoin or Ethereum.  It did not drawdown as much.  Obviously Celsians who held CEL did very well as well."[170] Mashinsky congratulated the investors that held onto their CEL Tokens during the brief market downturn and bragged that there were "only 20 liquidations" from the 10,000 margin calls that occurred during that time period because Celsius "does a better job than most.  Accommodating, providing enough warning, giving you enough time for doing what's right. We don't make any money from liquidating you."[171]   Mashinsky proclaimed that "during these drawdowns is when Celsius shines, both from the fact that it does not crash [CEL].  I think NEXO token was down about 75% from top to bottom just last week.  So those are examples of just a different community.  A HODL community versus a speculative community.  Same thing with Binance and other platforms.  Obviously, we only care about doing what's in the best interests of the HODLer."[172]   In order to make those statements not misleading, Defendants were obligated

---

[170]     Celsius Network, *Bitcoin Miami and Upcoming Mega Deals – Celsius AMA May 28th 2021,* YOUTUBE (May 28, 2021), https://www.youtube.com/watch?v=C7d7rZUEfGo (last visited July 12, 2022).

[171]     *Id.*

[172]     *Id.*

to disclose that (1) borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice, and (2) that the CEL Token was far from stable but rather subject to severe volatility because of Company insider selling pressure.

e. On October 9, 2021, Mashinsky stated the following: "Lots to CELebrate here in #London busy week with a lot of large deals and events.  It pays to #HODL."[173]  In order to make those statements not misleading, Defendants were obligated to disclose that, when this statement was made, Mashinsky intended to (and later did) actually sell a portion of his CEL Tokens.

f. On December 1, 2021, Celsius held an AMA session on YouTube where investors could ask questions of Celsius representatives.  One investor expressed concern about a "CEL token liquidation cascade" and asked whether Celsius was "worried at all," to which Celsius content manager Zachary Wildes replied "I'm personally not . . . I do think we need to bring a lot more time and attentIon and focus to CEL token and its utilities.  I'm not concerned about a cascading liquidation event where everyone gets destroyed."[174]  Wildes continued that "We're at a low-point for CEL sentiment and the future of the token" and asked Mashinsky if there was "any level of reassurance we can give . . . to the community to show our commitment to CEL token?"[175]  Mashinsky responded that "Earning in

---

[173]     *See* fn.90, *supra.*

[174]     *See* fn.63, *supra.*

[175]     *Id.*

CEL allows you to earn twice as many CEL right now with the price lower. If you believe in the viability of the company, then you would know you're getting a 50% discount.  If you don't believe in it, then you probably don't want these CELs anyway.  If you're not sure about it, how about some of the worlds best investors coughing up 750$ Million?  They bought into half of all the CEL tokens out there.  Our Treasury, which is mostly CEL token.  They're part owners of that . . . ."[176]  In order to make those statements not misleading, Defendants were obligated to disclose that: (1) borrowers did not have flexibility of options when receiving a margin call, but rather faced immediate liquidation without proper notice; (2) that there was a significant risk that a CEL Token liquidation cascade not only could happen, but was likely to happen in the near future; (3) that the Company's successes would not automatically lead to a 50% increase in the CEL Token price in the future; and (4) that Celsius did not, in fact, have the support of well-capitalized backers or the ability to maintain the Company's operations in the event of a price collapse.

g.  On December 9, 2021, Mashinsky posted a message on his Twitter account, promoting CEL Tokens as a long-term investment for Company insiders and stating: "All @CelsiusNetwork founders have made purchases of #CEL and are not sellers of the token."[177]  In order to make those statements not misleading, Defendants were obligated to disclose that only

---

[176]  *Id.*

[177]  *See* fn.90, *supra*.

five days earlier Mashinsky sold over 11,000 CEL Tokens for about $43,000 worth of WBTC.

h. On January 19, 2022, Mashinsky made a series of statements regarding the CEL Token and how it was poised for future growth in use and, more importantly, price. For example, when asked about how Celsius generates revenue, Mashinsky responded that "***We always make all of our money from institutions*** . . . We don't charge fees, spreads, all of that stuff."[178] In order to make that statement not misleading, Defendants were obligated to disclose that depositing digital assets into Earn Rewards Accounts was not akin to depositing money into a savings account and that the profit comes from the Company searching of yield with corporate funds via leveraged positions in DeFi protocols with severe liquidation risk.

**Materiality**

312.    The forgoing misrepresentations and omissions were each material. These representations related to critical issues concerning the security of Celsius Financial Product holders' investments.

313.    These misrepresentations and omissions related to, among other things: (i) the extent to which the Defendants and other insiders were restricted from selling substantial amounts of Celsius Financial Products on crypto-asset exchanges; (ii) the extent to which Defendants and its insiders intended to sell their Celsius Financial Product holdings over that same period; and (iii) the extent to which Defendants and its insiders did in fact sell substantial amounts of their

---

[178]    *See* fn.74, *supra.*

Celsius Financial Products crypto-asset exchanges over that same period while simultaneously promoting the same securities as long-term investments.  If a reasonable investor knew that the Company and the Executive Defendants were engaging in highly speculative investments in a volatile crypto market to earn the yield necessary to make good on its promises to investors, then that investor would reasonably expect the price of Celsius Financial Products to be substantially lower, given that the investment would be much riskier.

314.    Accordingly, there is a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

**Scienter**

315.    Defendant Mashinsky acted with scienter in engaging in the forgoing misconduct, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to him.

316.    Defendants knew before the 2018  launch that any applicable vesting periods would not preclude the Executive Defendants or their friends and family dumping massive quantities of Celsius Financial Products on the market, and Mashinsky intended to transfer millions of the newly issued Celsius Financial Products to project insiders (in particular the Individual Defendants and the Mashinsky-owned/controlled entities AMV and Koala1), and that he, along with those insiders, intended to dump tens of millions of these tokens on crypto-asset exchanges, such that Celsius and its insiders intended to profit massively from the offering, while outside investors would be precluded from doing so.

317.     Indeed, Defendant Mashinsky necessarily knew what restrictions were imposed on his own CEL Tokens, as well as the tokens that he issued and allocated to current and former team members, and to outside investors.  Individual Defendants all knew that they, along with current and former team members, held a significant amount of the total CEL Token supply in circulation, and that if that portion of the Float were sold, the price of the CEL Tokens would plummet and likely cause the collapse of the other Celsius Financial Products.  It was thus highly unreasonable for Defendant Mashinsky to misleading conceal information relating to selling restrictions imposed on them and their insiders' tokens.

318.     Defendant Mashinsky's failure to disclose such information, coupled with his incessant promotion of the Celsius Financial Products as being "low risk," demonstrates that the Mashinsky intended that he and the other Individual Defendants (along with his companies AMV and Koala1) would sell substantial amounts of CEL Tokens at significant profits at a price that was artificially inflated on and during the weeks and months that followed the CEL Token launch.

319.     Defendant Mashinsky had the motive not to disclose these facts because such disclosure would have been self-defeating.  Hhe controlled a significant proportion of Celsius Financial Products, and such a disclosure would decrease the value of those assets.  In other words, Mashinsky had an incentive to ensure that the price of Celsius Financial Products remained inflated.

320.     Defendant Mashinsky executed on that plan, too, by (along with current and former team members) selling billions of Celsius Financial Products on the market during that period.

321.     Mashinsky also knew that he had sold Celsius Financial Products on the market on and in the months that followed the Company's launch during continuous offering.  Hhe likewise knows that the other Individual Defendants (and former team members and family) sold Celsius

Financial Products. Indeed, in addition to Mashinsky's admission of selling some of his CEL Token holdings, he also knows which CEL Tokens were allocated to team members and can therefore track the transaction history of that CEL Token on the blockchain.

**Reliance, Economic Loss, and Loss Causation**

322.    As a result of the publication and dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of the Celsius Financial Products upon issuance on February 9, 2018, and for a period of time, thereafter, were artificially inflated.

323.    In ignorance of the fact that the price of Celsius Financial Products was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Defendant Mashinsky made and approved, or upon the integrity of the market in which the Celsius Financial Products were sold, or on the absence of material adverse information that Mashinsky knew or recklessly should have known of but failed to disclose in public statements, Plaintiffs and the other Class members acquired Celsius Financial Products at artificially high prices and were damaged thereby.

324.    As a direct and proximate result of Mashinsky's wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with the respective purchases of Celsius Financial Products and are entitled to an award compensating them for such damages.

325.    Indeed, the price of CEL Tokens dropped significantly as Executive Defendants disclosed, and the market discovered the truth concerning the Company's true financial condition and its prospects for the future.  For example, the price of CEL Tokens went from a high of $7.73 on June 3, 2021, to a low of $0.28 just over a year later on June 12, 2022, in the wake of the June Crisis and Celsius freezing its investors accounts.

326.     In addition, as a direct and proximate result of Defendant Mashinsky's wrongful conduct, Celsius has generated and retained ill-gotten gains in connection with the launch of Celsius Financial Products, such that Plaintiffs and the other Class members are entitled to the disgorgement of Celsius' ill-gotten gains acquired from such misconduct.

327.     As a direct and proximate result of the false and misleading statements and omissions made by Mashinsky to investors in order to solicit the sale of unregistered securities, Plaintiffs and the Class have suffered damages in connection with their Celsius Financial Product purchases.

## THIRD CAUSE OF ACTION

**Violation of Sections 10b of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder**
**(Scheme Liability)**
**(Against all Defendants)**

328.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-279, and further allege as follows:

329.     The Class Period for this Count is defined as the period between June 1, 2019, through the date of the initiation of this Action.

330.     Plaintiffs bring this claim for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. §240.10b-5(a) and (c).

331.     For this cause of action, the Executive Defendants and Wintermute are collectively referred to as the "Scheme Liability Defendants."

332.     The Celsius Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

333.     Subsections (a) and (c) of Rule 10b-5 allow a allow a suit against defendants who, with scienter, "employ any device, scheme, or artifice to defraud," or "engage in any act, practice,

or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5.

334.     "Unlike a claim under subsection (b) of Rule 10b-5, a claim of liability for violations of subsections (a) and (c) does not require an allegation that the defendant made a false or misleading statement; rather, liability is premised on a course of deceptive or manipulative conduct."  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152-53 (1972) (observing that "the second subparagraph of [Rule 10b-5] specifies the making of an untrue statement of a material fact and the omission to state a material fact, [but] [t]he first and third subparagraphs are not so restricted"); *In re DVI, Inc. Sec. Litig*., 639 F.3d 623, 643 (3d Cir. 2011) ("We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements.").  Thus, to state a claim to state claim under subsections (a) and (c) of Rule 10-b5, Plaintiffs must allege that Defendants committed a deceptive or manipulative act, in addition to the other standard elements of a Section 10(b) violation: scienter; connection with the purchase or sale of securities; reliance; economic loss; and loss causation.  *See SEC v. Lucent Techs., Inc*., 610 F. Supp. 2d 342, 350 (D.N.J. 2009).

335.     As with claims under subsection (b) of Rule 10b-5, claims under subsections (a) and (c) are subject to the PSLRA, and, thus, a "strong inference" of scienter must be pled "with particularity."  15 U.S.C. §78u-4(b)(2)(A).  To meet this standard, Plaintiffs must set forth "what manipulative [or deceptive] acts were performed, which defendants performed them, when the manipulative [or deceptive] acts were performed and what effect the scheme had on the securities at issue."  *In re Royal Dutch/Shell Transport Sec. Litig*., 2006 WL 2355402, at *7 (D.N.J. Aug. 14, 2006).

336.    The Scheme Liability Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period, did manipulate the price and trading activity of CEL Token securities to the detriment of the investing public, including Plaintiffs and other Class members, in connection with the purchase and/or sale of CEL Tokens.

337.    Wintermute and each of the Executive Defendants conspired and employed devices, schemes, and artifices and engaged in acts, practices, and a course of business as alleged herein to unlawfully manipulate and profit from the illegal wash trading of unregistered CEL Tokens.

338.    The Scheme Liability Defendants' actions alleged herein constitute manipulative acts.  Through massive amounts of wash trading and other fraudulent market making conduct, the Scheme Liability Defendants falsely increased both the price of the CEL Token and appearance of market activity.  These manipulative acts were intended to and did deceive the retail investors – Plaintiffs and the other Class members – who acquired Celsius Financial Products during the Class Period and thereby caused them to purchase Celsius Financial Products at artificially inflated prices.  Thus, Plaintiffs and other Class members suffered losses as a result of the Scheme Liability Defendants' wash trading which manipulated the CEL Token marketplace.

339.    Plaintiffs and other members of the Class were damaged by relying on an assumption of an honest and fair market, free of manipulation, when buying and selling CEL Tokens in the marketplace.

340.    Scheme Liability Defendants acted with scienter in connection with the manipulative acts alleged herein in that they acted knowingly and/or recklessly when they

artificially inflated the size of the options open interest pool and thereby interfered with the market for options.

341.    As a direct and proximate result of the Scheme Liability Defendants' wrongful conduct, Plaintiffs and other members of the Class were damaged as a result of their purchase or sale of CEL Tokens.

342.    By virtue of the foregoing, the Scheme Liability Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder.

## FOURTH CAUSE OF ACTION

### Violation of Sections 20(a) of the Securities Exchange Act of 1934
### (Against the Executive Defendants)

343.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-279, and further allege as follows:

344.    The Class Period for this Count is defined as the period between February 9, 2018 and the date of the initiation of this Action.

345.    This Count is asserted against the Executive Defendants (collectively, the "Control Person Defendants") under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a).

346.    The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Exchange Act.  The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful scheme to artificially increase the interest in and price of the Celsius Financial Products, particularly the CEL Token.

347.    The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Celsius, through ownership of voting securities, by contract, subscription agreement, or otherwise.

348.    Mashinsky, Leon, Urata-Thompson, Goldstein, and Beaudry were all directors and officers of various Celsius entities from 2018 through its declaration of bankruptcy.  While not explicitly named as directors, Goldstein, Urata-Thompson, and Beaudry nevertheless were responsible for making high-level decisions for the Company that would normally be carried out by directors.  Thus, the Control Person Defendants also have the power to direct or cause the direction of the management and policies of Celsius.

349.    The Control Person Defendants, separately or together, have sufficient influence to have caused the Company to engage in the fraudulent conduct described above.

350.    The Control Person Defendants, separately or together, jointly participated in the Company's fraudulent conduct described above.

351.    By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## FIFTH CAUSE OF ACTION

### Violation of Sections 20A of the Securities Exchange Act of 1934
### (Against All Defendants)

352.    Plaintiff, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-279, and further allege as follows:

353.    The Class Period for this Count is defined as the period between February 9, 2018 and the date of the initiation of this Action.

354.     Plaintiffs bring this claim under Section 20A of the Securities Exchange Act of 1934, 15 U.S.C. §78t-1, against Defendants on behalf of Class members who transacted in CEL Tokens contemporaneously with Defendants' transactions in Celsius Financial Products.

355.     Since 2018, the Celsius Entities and Defendant Mashinsky (collectively referred to in this cause of action as the "Section 20A Defendants") have been in possession of material, non-public information about Celsius and its insiders, as set forth above with respect to the Section 20A Defendants' violation of Section 10(b) and Rule 10b-5, while the Section 20A Defendants have been transacting in CEL Tokens.   Section 20A Defendants have thus engaged in insider trading through which they have received at least millions of dollars in profits.

356.     The material, non-public information about Celsius and its insiders that the Section 20A Defendants have failed to disclose, during some or all of the time in which they have been transacting in CEL Tokens since 2018, includes the details of any applicable vesting schedules for Celsius and Celsius insiders; that Defendant Mashinsky was not subject to any vesting schedule; that any applicable vesting periods would allow the Section 20A Defendants to transfer tens of millions of the newly issued CEL Tokens to crypto-asset exchanges; that the Section 20A Defendants intended to deposit tens of millions of these tokens on crypto-asset exchanges; that the Section 20A Defendants intended to profit massively from the offering; that the Section 20A Defendants reserved the right to liquidate their tokens far more than necessary to pay expenses; and that the Section 20A Defendants dumped massive amounts of CEL tokens on the market beginning on 2018.

## SIXTH CAUSE OF ACTION

**Violation of Sections 15 of the Securities Act of 1933**
**(Against All the Executive Defendants)**

357.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-279, and further allege as follows:

358.    The Class Period for this Count is defined as the period between February 9, 2018 and the date of the initiation of this Action.

359.    This Count is asserted against the Executive Defendants (collectively referred to in this cause of action as the "Control Person Defendants") under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o.

360.    The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act of 1933. The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of Celsius Financial Products securities as described herein.

361.    The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Celsius, through ownership of voting securities, by contract, subscription agreement, or otherwise.

362.    The Control Person Defendants also have the power to direct or cause the direction of the management and policies of the Company.

363.    The Control Person Defendants, separately or together, have sufficient influence to have caused Celsius Financial Products and/or the Company to submit a registration statement.

364. The Control Person Defendants, separately or together, jointly participated in Celsius' failure to register Celsius Financial Products.

365. By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment/Restitution
### (New Jersey Common Law, in the Alternative)
### (Against All Defendants)

366. Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-279, and further allege as follows:

367. The Class Period for this Count is defined as the period between February 9, 2018 and the date of the initiation of this Action.

368. Plaintiffs and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the Celsius Financial Products, which allowed them to sell their CEL Tokens to Plaintiffs and Class members at inappropriately and artificially inflated prices.

369. Defendants received a financial benefit from the sale of their Celsius Financial Products at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belong to Plaintiffs and members of the Class.

370. Plaintiffs have no other adequate remedy at law for the wrongdoing alleged to have been committed by Defendants.

371. Plaintiffs seek disgorgement of Defendant's ill-gotten gains and/or restitution in the form of the monetary value of the difference between the purchase price of the Celsius Financial Products and the price those Celsius Financial Products sold for.

## **EIGHTH CAUSE OF ACTION**

**Declaratory Judgment**
**(Declaratory Judgment Act, N. J. S. A. 2A:16-51 *et seq.*)**
**(Against the Executive Defendants)**

372.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-279, and further allege as follows:

373.    This Count is asserted against the Executive Defendants under Section 2A:16-59 of the New Jersey Revised Statutes.

374.    The Declaratory Judgments Act, N.J. Stat. Ann. §2A:16-51 *et seq.* (West), authorizes courts to declare rights, status, and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

375.    Plaintiffs and the members of the Class have an obvious and significant interest in this lawsuit.

376.    Upon information and belief, each Class member who purchased a Celsius Loan product in exchange for a promissory note received a loan agreement that contained misrepresentations and/or omissions of material fact that were made negligently or with the intent to deceive investors about the risks underlying the Celsius Loans.

377.    Plaintiffs and Class members justifiably relied on the representations by the Celsius entities that the Celsius Loans were a "low risk" way to "earn" interest and that, in the event of a margin call, borrowers would have ample time and opportunity to address the underlying issue.

378.    If the true facts had been known, Plaintiffs and the Class would not have purchased a Celsius Loan from the Company and/or would have not purchased the Celsius Loan under the same terms.

379.    There is, thus, a justiciable controversy over the legality and enforceability of the Celsius Loan products offering.

380.    Plaintiffs seek an order from the Court declaring that all current and/or open Celsius Loans are (a) unauthorized; (b) wrongfully and fraudulently entered into; and as a result (c) void and unenforceable.

## NINTH CAUSE OF ACTION

**Violation of California
Corporations Code Sections 25110 and 25503
(Qualification Sections)
(Against Executive Defendants)**

381.    Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-124 and 269-279, and further allege as follows:

382.    The Class Period for this Count is defined as the period between January 23, 2020 and the date of this filing.

383.    Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendants.

384.    Each of the Celsius Earn Rewards Account, the CEL Tokens, and the Celsius Loans (the "Celsius Financial Products") are securities within the meaning of the California Corporations Code.

385.    The Celsius Financial Products were and are required to be registered with the Commissioner of Corporations under California law.

386.    Section 25110 (similar to a Section 12(a)(1) claim under the federal securities law) makes it illegal, in connection with the purchase or sale of any security, for any person, directly or indirectly, to offer or sell a security in California "unless such security or transaction is exempted or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part." Further, the offer or sale of such a security "in a manner that varies or differs from, exceeds the scope of, or fails to conform with either a material term or material condition of qualification of the offering. . . shall be an unqualified offer or sale."

387.    Section 25503 establishes a private remedy for damages under Section 25110 of the California Corporations Code. In particular, violators of Section 25110 "shall be liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned." In the event that the plaintiff no longer owns the security, damages "shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff."

388.    Conversely, Section 25503 provides that, if the consideration given for the security is not capable of being returned then damages shall be equal to the value of that consideration plus interest at the legal rate from the date of purchase, provided the security is tendered, plus reasonable attorney's fees; and if the plaintiff no longer owns the security, damages in that case shall be equal to the difference between (a) the value of the consideration given for the security plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees; and (b) the

value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff.

389.     Under Section 25503, "[a]ny person on whose behalf an offering is made and any underwriter of the offering, whether on a best efforts or a firm commitment basis, shall be jointly and severally liable under this section."

390.     As the Commissioner of California's Department of Financial Protection and Innovation found in the Desist and Refrain Order that it issued on August 8, 2022, the "Earn Rewards Accounts are securities in the form of investment contracts subject to qualification" under Cal. Corp. Code, §25000 et seq. "These securities are being offered or sold in this state in issuer transactions. The Department has not issued a permit or other form of qualification authorizing any person to offer or sell these securities in this state. The offer or sale of these securities to the general public on or before April 14, 2022, was not excepted or exempted from qualification."

391.     The Celsius Financial Products have not been registered with the Commissioner, are not exempt from registration, and are not federally covered.  No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

392.     Executive Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, sold and/or offered to sell securities.

393.     Plaintiffs purchased Celsius Financial Products securities from Executive Defendants.

394.     By reason of the foregoing, each of the Defendants have violated Sections 25110 and 25503 of the California Corporations Code.

## TENTH CAUSE OF ACTION

**Violation of California**
**Corporations Code Sections 25400 and 25500**
**(Manipulation Sections)**
**(Against the Executive Defendants and Wintermute)**

395.     Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-124 and 269-279, and further allege as follows:

396.     The Class Period for this Count is defined as the period between March 1, 2020 and the date of this filing.

397.     Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against the Executive Defendants.

398.     Section 25400 makes it illegal, in connection with the purchase or sale of any security, for any person in California, directly or indirectly, "[f]or the purpose of creating a false or misleading appearance of active trading in any security or a false or misleading appearance with respect to the market for any security, (1) to effect any transaction in a security which involves no change in the beneficial ownership thereof, or (2) to enter an order or orders for the purchase of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (3) to enter an order or orders for the sale of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time and at substantially the same price, for the purchase of any such security, has been or will be entered by or for the same or different parties. Cal. Corp. Code § 25400(a). It is similarly unlawful to effect, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others. *Id.* at § 25400(b).

399.    Common examples of such manipulation are wash sales and matched orders. A wash sale is a fictitious sale where there is no change in beneficial ownership and thus no true economic consequence. A matched order occurs when orders are entered simultaneously to buy and sell the same security. Other illegal manipulative practices include, but are not limited to: transferring record ownership of securities in order to hide the true identity of the beneficial owner, which is known as "parking"; and executing a planned series of securities purchases that is specifically designed to artificially restrict the supply and thereby raise prices;

400.    Manipulation can take many forms, but often has a number of common characteristics: (i) restriction of the "float" or floating supply of the securities in the public market; (ii) price leadership by the manipulator; (iii) dominating and controlling the market for the security; and (iv) a collapse of the market for the security after the manipulative activity has ceased.

401.    Executive Defendants and Wintermute, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, for the purpose of creating a false or misleading appearance of active trading in CEL tokens, or a false or misleading appearance with respect to the market for the Celsius Financial Products: (a) have engaged in wash sales of CEL tokens which involved no change in the beneficial ownership thereof; (b) have entered matched orders for the purchase of CEL tokens with the knowledge that the orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such securities, had been or would be entered by or for themselves or different parties; (c) have entered matched orders for the sale of CEL tokens with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of any such securities had been or would be entered by or for themselves or different parties; (d) have engaged in improper parking by transferring

record ownership of CEL tokens in order to hide the true identity of the beneficial owner (i.e. Executive Defendants); and/or € have executed a planned series of securities purchases that was specifically designed to artificially restrict the supply and thereby raise and/or decrease prices of CEL tokens.

402.    Plaintiffs and other members of the California Class were damaged by relying on an assumption of an honest and fair market, free of manipulation, when buying and selling CEL tokens in the marketplace.

403.    Executive Defendants and Wintermute acted with scienter in connection with the manipulative acts alleged herein in that they acted knowingly and/or recklessly when they artificially inflated the size of the options open interest pool and thereby interfered with the market for option

404.    As a direct and proximate result of the wrongful conduct of the Executive Defendants and Wintermute, Plaintiffs and other members of the California Subclass were damaged as a result of their purchase or sale of CEL tokens.

405.    By reason of the foregoing, Executive Defendants and Wintermute have violated, and unless restrained and enjoined will again violate, Cal. Corp. Code, §25000(a)-(b).

406.    By virtue of the conduct alleged herein, the Executive Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the California Subclass for rescission and/or damages suffered.

## ELEVENTH CAUSE OF ACTION

**Violation of Sections 25401 and 25501 of the California Corporations Code**
**(Misrepresentation Sections)**
**(Against Executive Defendants)**

407. Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-124 and 269-279, and further allege as follows:

408. The Class Period for this Count is defined as the period between February 9, 2018 and the date of this filing.

409. Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendants.

410. This Count is asserted against Executive Defendants for violation of Sections 25401 and 25501 of the California Corporations Code.

411. Section 25401 (similar to Rule 10b-5 under the federal securities law) makes it illegal, in connection with the purchase or sale of any security, for any person, directly or indirectly, to offer or sell a security in California "by means of any written or oral communications which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made . . .not misleading." *Id.*

412. Executive Defendants carried out a plan, scheme, and course of conduct that Celsius intended to and did deceive the retail investors – Plaintiffs and the other California Subclass members – who acquired Celsius Financial Products pursuant to the continuous offering and thereby caused them to purchase Celsius Financial Products at artificially inflated prices.

413. In connection with the continuous offering of Celsius Financial Products, Executive Defendants disseminated, approved, and/or endorsed the false statements and omissions described herein, which these Executive Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

414.     Executive Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the California Subclass members that resulted in artificially high market prices for Celsius Financial Products in connection with the continuous offering, in violation of Section 25401 and 25501.

415.     Executive Defendants were, at the time of the wrongs alleged herein, and as set forth herein, "persons" within the meaning of Section 25401 of the California Corporations Code.

416.     Executive Defendants, separately or together, directly or indirectly, caused a false statement or omission to be made in connection with the offers or sales of a security.  These false statements or omissions are specifically set out in paragraphs 137-197, and 311 of this Complaint.

417.     As the Commissioner of California's Department of Financial Protection and Innovation  found in the Desist and Refrain Order that it issued on August 8, 2022, the misleading statements and omissions alleged herein violated Section 25401. In particular, the Desist and Refrain Order stated:

> In offering the Earn Rewards accounts to California residents, touting the accounts as "safe," and advertising on its website "24/7 access" and "[i]t's your crypto, after all," Celsius failed to fully disclose material aspects of its business and Earn Rewards including, but not limited to:
>
> h.   the types of trading and investment activities that Celsius engages in,
>
> i.   the identities and creditworthiness of those who borrow digital assets,
>
> j.   the amount of digital assets used in each income-generating activity,
>
> k.   the risk that third-party custody services might lose access to digital assets,
>
> l.   the risk that lenders to which Celsius sent digital asset collateral would be unable to return Celsius' collateral in a timely manner,

m. the risk that in the event of a sudden request for withdrawals that Celsius' own attempts to unwind illiquid positions may prevent it from having adequate assets to meet customer withdrawal demands, and

n. Celsius financial statements or other information reflecting its financial state.

Celsius also represented that it provides 80 percent of its revenue to its customers yet Earn Rewards Investors are only entitled to interest at rates set by Celsius.

Further, in offering Earn Rewards, CEO Alexander Mashinsky failed to disclose material aspects of Celsius' business, and made materially misleading statements, or omitted to state material facts necessary to make statements made, in the light of the circumstances under which the statements were made, not misleading. Mashinsky represented on numerous occasions that even in a worst-case scenario, Earn Rewards Investors would be able to timely withdraw their investments and would not suffer losses on their investments, and continued to make representations that it was safe to deposit assets with Celsius even in the days leading up to the company's decision on June 12, 2022, to suspend customer withdrawals.

418.    Similarly, the Commissioner also found that it is "false, misleading, or deceptive… to advertise that borrowers are merely putting up "collateral" to secure their loans when in fact borrowers have their collateral subject to unknown investment risks that could potentially be lost in the event Celsius became insolvent."[179]

419.    In ignorance of the fact that the price of Celsius Financial Products was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Executive Defendants made and approved, or upon the integrity of the market in which the Celsius Financial Products were sold, or on the absence of material adverse information that these Executive Defendants knew or recklessly should have known of but failed to disclose in public statements, Plaintiffs and the other California Subclass members acquired Celsius Financial Products at artificially high prices and were damaged thereby.

---

[179]    *See* fn.165, *supra*.

420.     As a direct and proximate result of Executive Defendants' wrongful conduct, Plaintiffs and the other California Subclass members suffered damages in connection with the respective purchases of Celsius Financial Products and are entitled to an award compensating them for such damages.

421.     Indeed, the price of CEL Tokens dropped significantly as Executive Defendants disclosed, and the market discovered the truth concerning the Celsius' true financial condition and its prospects for the future.  For example, the price of CEL Tokens went from a high of $7.73 on June 3, 2021, to a low of $0.28 just over a year later on June 12, 2021, in the wake of the June Crisis and Celsius freezing its investors accounts.

422.     By virtue of the conduct alleged herein, Executive Defendants are liable, jointly or severally, for the wrongful conduct complained of herein and are liable to Plaintiffs and the California SubcClass for rescission and/or damages suffered.

## TWELFTH CAUSE OF ACTION

**Violation of Sections 25402 and 25502 of the California Corporations Code
(Insider Trading Sections)
(Against Individual Defendants, AMV, and Koala1)**

423.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-124 and 269-279, and further allege as follows:

424.     The Class Period for this Count is defined as the period between February 9, 2018 and the date of this filing.

425.     This Count is asserted against Individual Defendants, AMV, and Koala1 (collectively for this claim the "Insider Trading Defendants") for violation of Sections 25402 of the California Corporations Code.

426.    California Corporations Code section 25402 makes it unlawful for an issuer or any person who is an officer, director or controlling person of an issuer "or any other person whose relationship to the issuer gives him access, directly or indirectly, to material information about the issuer not generally available to the public," to purchase or sell any security of the issuer in California at a time when that person knows "material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available," unless that person has reason to believe that the person selling to or buying is also in possession of the information."

427.    Insider Trading Defendants were, at the time of the wrongs alleged herein, and as set forth herein, "persons" within the meaning of Section 25401 of the California Corporations Code.

428.    Insider Trading Defendants separately or collectively had access to material, non-public information. In particular, since March 2020 Insider Trading Defendants knew that Executive Defendants and Wintermute began to engage in improper market making activities that affected the price of CEL tokens. Likewise, according to Celsius' CFO, the Insider Trading Defendants knew that CEO Mashinsky's ponzi-scheme-esq business model was unsustainable since as early as 2020. Finally, Insider Trading Defendants have known since 2020 and throughout 2021 that the Company was insolvent, which was long before the June 2022 freezing of customer accounts and declare Insider Trading Defendants also had access to information evidencing the falsity of Executive Defendants' statements and omissions made in connection with the solicitations and sales of Celsius Financial Products contemporaneously with when those statements and omissions were made.

429.    Individual Defendants, AMV, and Koala1 gained this material, non-public information by virtue of their positions in the Company and/or relationship to Celsius CEO Defendant Mashinsky.

430.    Defendant Mashinsky's non-CEL token sales and/or transfers took place on May 15, 2022 and May 16, 2022, both of which were well after he had access to the material, non-public information discuss herein.

431.    Defendant Leon's twenty-eight (28) CEL and non-CEL token sales and/or transfers all took place between July 15, 2021 and May 31, 2022, all of which are well after he had access to the material, non-public information discuss herein.

432.    Defendant Urata-Thompson's six (6) CEL token sales and/or transfers took place between September 6, 2021 and June 12, 2022, all of which were well after she had access to the material, non-public information discuss herein.

433.    Defendant Goldstein's nine (9) CEL and non-CEL token sales and/or transfers all took place between August 12, 2021 and May 11, 2022, all of which are well after Defendant Beaudry's fifty-eight (58) CEL and non-CEL token sales and/or transfers all took place between July 31, 2021 and March 5, 2022, all of which are well after Insider Trading Defendants had access to the material, non-public information discuss herein had access to the material, non-public information discuss herein.

434.    Defendant Beaudry's fifty-eight (58) CEL and non-CEL token sales and/or transfers all took place between July 31, 2021 and March 5, 2022, all of which are well after he had access to the material, non-public information discuss herein.

435.    Defendant K. Mashinsky's four (4) CEL token sales and/or transfers all took place between April 6, 2022 and May 31, 2022, all of which are well after she had access to the material, non-public information discuss herein.

436.    Defendant AMV's three (3) CEL token sales and/or transfers all took place between July 28, 2021 and October 7, 2021, all of which are well after the company had access to the material, non-public information discuss herein.

437.    Defendant Koala1's seven (7) CEL and non-CEL token sales and/or transfers all took place on May 27, 2021, which was well after the company had access to the material, non-public information discuss herein.

438.    Insider Trading Defendants, directly or indirectly via Defendant Mashinsky, knew that investors like Plaintiffs and members of the California Subclass did not have access to the aforementioned non-public information when selling and/or transferring CEL Tokens and/or other digital assets on the Celsius Platform.

439.    Individual Defendants, AMV, and Koala1 separately or together, were aware that a fact being misrepresented or omitted was material to the buyer's decision to purchase Celsius Financial Products.

440.    Despite knowing that this material non-public information would  affect the market price of CEL tokens, Individual Defendants, AMV, and Koala1separately or together, sold and/or transferred CEL Tokens and/or other digital assets on the Celsius Platform.

## THIRTEENTH CAUSE OF ACTION

**Violation of Sections 25403(b), 25504 and 25504.1 of the California Corporations Code**
**(Secondary Liability Sections)**
**(Against All Defendants Except Mashinsky)**

441.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-124 and 269-279, and further allege as follows:

442.    This Count is asserted against Defendants Leon, Urata-Thompson, Goldstein, Beaudry, K. Mashinsky, AMV, Koala1, and Wintermute (collectively referred to in this count only at the "Secondary Liability Defendants") for violation of Sections 25403, 25504 and 25504.1 of the California Corporations Code.

443.    Secondary Liability Defendants were, at the time of the wrongs alleged herein, and as set forth herein, "persons" within the meaning of Section 25401 of the California Corporations Code.

444.    This Count is asserted against Secondary Liability Defendants because they materially assist, and/or aid and abet (in the violation of Section 25401), or control, induce and/or provide substantial assistance to the Company's and/or Defendant Mashinsky's primary violation of Section 25110 (qualification failure) and/or Section 25401 (manipulation of price),  with intent to deceive or defraud, pursuant to Section 25504.1.

445.    Section 25504 makes the following people liable for Qualification Section (*i.e.* Cal. Corp. Code § 25110 and 25503) violations: "a principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation."

446.    Section 25403(b) makes it unlawful for any person to knowingly provide "substantial assistance" to another person violating Cal. Corp. Code § 25000 et seq.

447.   Section 25504.1 makes anyone who, with "intent to deceive or defraud," "materially assists" the primary perpetrator of a Misrepresentation Section (*i.e.* Cal. Corp. Code § 25401 and 25501) violation.

448.   Secondary Liability Defendants, separately or together, directly or indirectly, provided substantial assistance to the Company and/or Defendant Mashinsky issuing the false statements and omissions made in connection with the offers or sales of an unregistered security alleged herein, thereby aiding and abetting in the Company's violations of federal and state securities laws. Moreover, Secondary Liability Defendants provided material assistance to the Company and/or Defendant Mashinsky with the "intent to deceive or defraud" Plaintiffs and the members of the California Subclass.

449.   Secondary Liability Defendants, separately or together, had knowledge of the falsity or misleading nature of a statement or omission made in connection with the offers or sales of the unregistered Celsius Financial Products.

450.   By virtue of the conduct alleged herein, Secondary Liability Defendants are liable, jointly or severally, for the wrongful conduct of primary violators Celsius and/or Defendant Mashinsky complained of herein, and they are liable to Plaintiffs and the California Subclass for rescission and/or damages suffered.

## FOURTEENTH CAUSE OF ACTION

### Violation of Section 9(a)(1) of the Securities Exchange Act of 1934
### (Against Executive Defendants and Wintermute)

451.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-55, 207-252, and 269-279, and further allege as follows:

452. The Class Period for this Count is defined as the period between March 1, 2020 and the date of this filing.

453. Plaintiffs bring this claim for violations of Section 9(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. §78i(a)(1).

454. The Celsius Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. §77b(a)(1).

455. Section 9(a)(1) makes it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . For the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security, (A) to effect any transaction in such security which involves no change in the beneficial ownership thereof, or (B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties." *Id.*

456. Common examples of manipulation are wash sales and matched orders. A wash sale is a fictitious sale where there is no change in beneficial ownership and thus no true economic consequence. A matched order occurs when orders are entered simultaneously to buy and sell the same security. Other illegal manipulative practices include, but are not limited to: transferring

record ownership of securities in order to hide the true identity of the beneficial owner, which is known as "parking"; and executing a planned series of securities purchases that is specifically designed to artificially restrict the supply and thereby raise prices;

457.    Manipulation can take many forms, but often has a number of common characteristics: (i) restriction of the "float" or floating supply of the securities in the public market; (ii) price leadership by the manipulator; (iii) dominating and controlling the market for the security; and (iv) a collapse of the market for the security after the manipulative activity has ceased.

458.    Executive Defendants and Wintermute, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, for the purpose of creating a false or misleading appearance of active trading in CEL tokens, or a false or misleading appearance with respect to the market for the Celsius Financial Products: (a) have engaged in wash sales of CEL tokens which involved no change in the beneficial ownership thereof; (b) have entered matched orders for the purchase of CEL tokens with the knowledge that the orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such securities, had been or would be entered by or for themselves or different parties; (c) have entered matched orders for the sale of CEL tokens with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of any such securities had been or would be entered by or for themselves or different parties; (d) have engaged in improper parking by transferring record ownership of CEL tokens in order to hide the true identity of the beneficial owner (i.e. Executive Defendants); and/or € have executed a planned series of securities purchases that was specifically designed to artificially restrict the supply and thereby raise and/or decrease prices of CEL tokens.

459.     Plaintiffs and other members of the Class were damaged by relying on an assumption of an honest and fair market, free of manipulation, when buying and selling CEL tokens in the marketplace.

460.     Executive Defendants and Wintermute acted with scienter in connection with the manipulative acts alleged herein in that they acted knowingly and/or recklessly when they artificially inflated the size of the options open interest pool and thereby interfered with the market for option

461.     As a direct and proximate result of the wrongful conduct of the Executive Defendants and Wintermute, Plaintiffs and other members of the Class were damaged as a result of their purchase or sale of CEL tokens.

462.     By reason of the foregoing, Executive Defendants and Wintermute have violated, and unless restrained and enjoined will again violate, Securities Exchange Act of 1934, Section 9(a)(1), 15 U.S.C. § 78i(a)(1).

## FIFTEENTH CAUSE OF ACTION

**Violation of Section 9(a)(2) of the Securities Exchange Act of 1934
(Against Executive Defendants and Wintermute)**

463.     Plaintiffs, on behalf of themselves individually and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-55, 207-252, and 269-279, and further allege as follows:

464.     The Class Period for this Count is defined as the period between March 1, 2020 and the date of this filing.

465.     Plaintiffs bring this claim for violations of Section 9(a)(2) of the Securities Exchange Act of 1934, 15 U.S.C. §78i(a)(2).

466.    The Celsius Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. §77b(a)(1).

467.    Section 9(a)(2) makes it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . To effect, alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others. *Id.*

468.    Common examples of manipulation are wash sales and matched orders. A wash sale is a fictitious sale where there is no change in beneficial ownership and thus no true economic consequence. A matched order occurs when orders are entered simultaneously to buy and sell the same security. Other illegal manipulative practices include, but are not limited to: transferring record ownership of securities in order to hide the true identity of the beneficial owner, which is known as "parking"; and executing a planned series of securities purchases that is specifically designed to artificially restrict the supply and thereby raise prices;

469.    Manipulation can take many forms, but often has a number of common characteristics: (i) restriction of the "float" or floating supply of the securities in the public market; (ii) price leadership by the manipulator; (iii) dominating and controlling the market for the security; and (iv) a collapse of the market for the security after the manipulative activity has ceased.

470.    Executive Defendants and Wintermute, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, for the purpose

of creating a false or misleading appearance of active trading in CEL tokens, or a false or misleading appearance with respect to the market for the Celsius Financial Products: (a) have engaged in wash sales of CEL tokens which involved no change in the beneficial ownership thereof; (b) have entered matched orders for the purchase of CEL tokens with the knowledge that the orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such securities, had been or would be entered by or for themselves or different parties; (c) have entered matched orders for the sale of CEL tokens with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of any such securities had been or would be entered by or for themselves or different parties; (d) have engaged in improper parking by transferring record ownership of CEL tokens in order to hide the true identity of the beneficial owner (i.e. Executive Defendants); and/or (e) have executed a planned series of securities purchases that was specifically designed to artificially restrict the supply and thereby raise and/or decrease prices of CEL tokens.

471.    Plaintiffs and other members of the Class were damaged by relying on an assumption of an honest and fair market, free of manipulation, when buying and selling CEL tokens in the marketplace.

472.    Executive Defendants and Wintermute acted with scienter in connection with the manipulative acts alleged herein in that they acted knowingly and/or recklessly when they artificially inflated the size of the options open interest pool and thereby interfered with the market for options.

473.    As a direct and proximate result of the wrongful conduct of the Executive Defendants and Wintermute, Plaintiffs and other members of the Class were damaged as a result of their purchase or sale of CEL tokens.

474.    By reason of the foregoing, Executive Defendants and Wintermute have violated, and unless restrained and enjoined will again violate, Securities Exchange Act of 1934, Section 9(a)(2), 15 U.S.C. § 78i(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A.  Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.  Appoint Plaintiffs as representatives of the Class and their counsel as Class counsel;

C.  Declare that the Company and Executive Defendants offered and sold unregistered securities in violation of Sections 5, 12(a) of the Securities Exchange Act of 1934, and Section 15 of the Securities Act of 1933;

D.  Declare that Executive Defendants made fraudulent misstatements and omissions with scienter in violation of Section 10b of the Securities Exchange Act of 1934;

E.  Declare that Defendants engaged in a scheme to defraud investors in violation of Section 10b of the Securities Exchange Act of 1934;

F.  Declare that Executive Defendants engaged in a scheme to manipulate the price of securities in violation of Section 9(a) of the Securities Exchange Act of 1934;

G.  Declare that all Celsius Loans currently held by the Company are void and unenforceable, and issue an order directing Celsius to rescind any outstanding Celsius Loans;

H.  Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

I.   Award post-judgment interest on such monetary relief;

J.   Grant appropriate injunctive and/or declaratory relief;

K.  Award reasonable attorneys' fees and costs; and

L.   Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, individually and on behalf of the putative Class, demand a trial by jury on all issues so triable.

DATED:  June 19, 2023                  **RADICE LAW FIRM**

*s/ John Radice*
John Radice (Bar No. 023612004)
475 Wall Street
Princeton, NJ 08540
Telephone: 646-245-8502
Facsimile:  609-385-0745
jradice@radicelawfirm.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Jonathan M. Zimmerman (204322016)
Sean T. Masson (admitted *pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jzimmerman@scott-scott.com
smasson@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (admitted *pro hac vice*)
600 W. Broadway, Suite 3300

San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-236-0508
jjasnoch@scott-scott.com

*Attorneys for Plaintiffs and the Proposed Class*

**TAYLOR-COPELAND LAW**
James Q. Taylor-Copeland (admitted *pro hac vice*)
Max Ambrose (admitted *pro hac vice*)
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-400-4944
Facsimile: 619-566-4341
james@taylorcopelandlaw.com
maxambrose@taylorcopelandlaw.com

*Additional Counsel for Plaintiffs and the Proposed
Class*